UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WHEELY USA, INC.,<br>MAYFAIR-NY LLC, and<br>KENSINGTON-NY LLC,<br><br>     *Plaintiffs*,<br><br>     v.<br><br>THE CITY OF NEW YORK,<br><br>     *Defendant*. | Case No. 1:26-cv-01057<br><br><br>**COMPLAINT FOR<br>DECLARATORY<br><u>AND INJUNCTIVE RELIEF</u>** |

Plaintiffs Wheely USA, Inc., Mayfair-NY LLC, and Kensington-NY LLC ("Wheely" or "Plaintiffs"), by and through their undersigned counsel, bring this Complaint against Defendant the City of New York (the "City" or "Defendant") and allege upon knowledge as to their own acts and upon information and belief as to all other matters as follows:

## **INTRODUCTION**

1. Over the outcry of numerous community groups, drivers, academics, and others, New York City has built an extensive and unlawful surveillance system that threatens the privacy of millions of New Yorkers who use "for hire vehicles" ("FHVs") for travel. Under the City's unprecedented "Location Reporting Rules," codified in Section 59B-19 of the Rules of the City of New York, FHV operators are forced to turn over troves of their sensitive geolocation data to the New York Taxi and Limousine Commission ("TLC") in the form of precise, time-stamped pickup and drop-off locations for *every* trip performed.

2. Through the Location Reporting Rules, the City has amassed an enormous database of passenger and driver information, including the pickup and drop-off locations for nearly three-quarters of a billion trips performed in New York City. Though supposedly "anonymized," the volume of data collected makes it possible to piece together the identities of specific passengers

and track their movements to the places they live, work, socialize, or engage in their personal affairs. Indeed, research studies have found that even limited location data can be used to re-identify 95% of individuals,[1] particularly in conjunction with other publicly available information, with one privacy expert remarking that "D.N.A. . . . is probably the only thing that's harder to anonymize than precise geolocation information."[2]

3.      There is thus significant risk that the data collected from FHV operators under the Location Reporting Rules will be used to de-anonymize New Yorkers and reveal some of the most sensitive, intimate facets of their private lives, such as the doctors they visit, political rallies they attend, and houses of worship where they pray.

4.      Because of the Location Reporting Rules, FHV operators like Wheely are powerless to protect this sensitive information. The Rules require no probable cause, notice, or legal review before the bulk collection of Wheely's data in perpetuity. And there are no real restrictions placed on the use or dissemination of the data, meaning the TLC can—and often does—turn over this sensitive location information to other agencies, law enforcement, or the public pursuant to Freedom of Information Law ("FOIL") requests. Worse still, it is not clear how the TLC stores, retains, or encrypts the data it collects, leaving serious questions regarding the ability of nefarious actors to gain access to the data in order to harass, blackmail, or harm unsuspecting New Yorkers.

5.      These concerns are particularly acute for Wheely, a new entrant in New York City's FHV market. Wheely offers an FHV option for passengers seeking a discreet form of travel.

---

[1]  *See* Larry Hardesty, *How hard is it to 'de-anonymize' cellphone data?*, MIT News (Mar. 27, 2013), https://news.mit.edu/2013/how-hard-it-de-anonymize-cellphone-data.

[2]  Stuart A. Thompson & Charlie Warzel, *Twelve Million Phones, One Dataset*, *Zero Privacy*, N.Y. Times (Dec. 19, 2019), https://www.nytimes.com/interactive/2019/12/19/opinion/location-tracking-cell-phone.html.

Wheely's commitment to passenger privacy includes requiring its drivers to sign NDAs and adhere to advanced privacy standards, and it has previously resisted governmental attempts to infringe on the privacy rights of its customers. Based on Wheely's reputation and business model, Wheely's customers expect that Wheely will safeguard their private and sensitive information. The Location Reporting Rules force Wheely to abandon these principles or face punishment, including repeating fines and possible suspensions.

6.      Wheely brings this action to invalidate the City's overreaching Location Reporting Rules, which should be declared unlawful for the following separate and independent reasons.

7.      *First*, the Location Reporting Rules violate Wheely's rights under the Fourth Amendment to the U.S. Constitution, and Article I, § 12 of the New York State Constitution, because they allow the City to execute a sweeping administrative search of Wheely's property. Wheely has a reasonable expectation of privacy in its records, which contain confidential and highly sensitive time-stamped geolocation data relating to users of Wheely's platform and commercially sensitive information about Wheely's business. The Location Reporting Rules force Wheely to turn over that property to the City (and untold others) on a monthly basis, in perpetuity, and without any warrant, subpoena, probable cause, or opportunity to obtain precompliance review before a neutral decisionmaker. The Rules also are overly broad and devoid of tailoring required in the context of administrative subpoenas.

8.      *Second*, the Location Reporting Rules violate Wheely's rights under the First Amendment of the U.S. Constitution, and Article I, § 8 of the New York State Constitution, because they compel Wheely to speak a particular message to its users. Specifically, Wheely is forced to disseminate a message to its users that they must consent to the disclosure of their sensitive, personal location information to the City. These Rules burden Wheely's protected

3

speech because Wheely would not otherwise choose to persuade or coerce its users to sacrifice their privacy rights. The Location Reporting Rules also violate the First Amendment and Article I, § 8 because, in requiring Wheely to disclose passenger data, the Rules compel Wheely to communicate that data to the City, which Wheely would not otherwise do.

9.    *Finally*, the Location Reporting Rules directly conflict with, and are preempted by, the Stored Communications Act, 18 U.S.C. §§ 2701 *et seq.* (the "SCA"), because they compel Wheely to disclose passenger information to the City without the legal process or consent required by the SCA. The Rules neither contemplate nor provide for any kind of warrant, grand jury request, or administrative subpoena. This leaves only a single potential avenue for compliance with the SCA: user consent. To that end, the Rules attempt to strong-arm FHV operators into doing something the City cannot or will not do itself: negotiate with passengers to obtain their consent to turn over sensitive location information to the City. But the City cannot outsource its responsibilities under the SCA by conscripting private companies, at the threat of fines and sanctions, to obtain user consent in this manner. The Rules thus violate the Supremacy Clause, *see* U.S. Const. art. VI, cl. 2, and are preempted.

10.    The Location Reporting Rules represent a stark example of unjustified governmental overreach—one that fundamentally threatens the privacy and safety of New Yorkers and is untethered to any cognizable governmental interest. They should be invalidated as unlawful.

## **THE PARTIES**

11.    Plaintiff Wheely USA, Inc. is a corporation incorporated in the state of Nevada, and registered in New York. Wheely is a privacy-first ride-hail service and platform that allows users to book trips, either on-demand or in advance. Wheely currently operates in London, Paris,

and Dubai. Wheely USA, Inc.'s wholly owned subsidiaries have recently received licenses from the TLC to operate as "Black Car Bases" in New York City.

12.    Plaintiff Mayfair-NY LLC is a limited liability company incorporated in the state of Nevada, and registered in New York, with a TLC license to operate as a "Black Car Base" in New York City.

13.    Plaintiff Kensington-NY LLC is a limited liability company incorporated in the state of Nevada, and registered in New York, with a TLC license to operate as a "Black Car Base" in New York City.

14.    Defendant the City of New York is a municipal entity created and organized under the laws of the State of New York. The TLC is an administrative agency of the City of New York, created and operating pursuant to Chapter 65 of the New York City Charter. Under Section 396 of the Charter, "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency."

## **JURISDICTION AND VENUE**

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983 because Plaintiffs allege violation of their rights under the Constitution and laws of the United States.

16.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' claims arising under the New York State Constitution because they are so related to the federal claims asserted in this action that they form part of the same case or controversy under Article III of the U.S. Constitution.

17.     The Court may declare the legal rights and obligations of the parties in this action pursuant to 28 U.S.C. § 2201 because the action presents an actual case or controversy within the Court's jurisdiction.

18.     Venue in this District is proper under 28 U.S.C. § 1391 because Defendant is located and resides in this judicial district and in the State of New York, and because a substantial part of the events giving rise to the claims for relief occurred in this District, or in the alternative, because Defendant is subject to personal jurisdiction in this District.

## **FACTUAL ALLEGATIONS**

**A.      The New York City For-Hire Vehicle Industry**

19.     In New York City, there are four classes of "for-hire vehicle" service for passengers seeking to pre-arrange trips: black cars, community cars (aka liveries), luxury limousines, and high-volume for-hire services. The vehicle "base" (i.e., the operator through which FHVs are dispatched) must be licensed with the TLC. 35 R.C.N.Y. § 59B-03.

20.     Black cars are defined, in part, as FHVs "dispatched from a central facility" where "more than ninety percent of the central facility's for-hire business is on a payment basis other than direct cash payment by a passenger." N.Y.C. Admin. Code § 19-502(u).

21.     Taxis are separately defined as motor vehicles "duly licensed as a taxi cab by the commission and permitted to accept hails from passengers in the street." *Id.* § 19-502(k)(l).

22.     Taxis and FHVs are different in many key respects. Taxis, functionally, operate as public utilities—they are required to serve any passenger who hails a ride anywhere within the five boroughs of New York City, at passenger fares that are set in advance by the City and the TLC. They are also subject to strict regulations regarding color, make and model, external markings and decals, and other vehicle attributes. In contrast, FHVs operate in a competitive market in which customers have the opportunity to compare price, driver ratings, vehicle make, and availability

across multiple platforms before booking a ride. FHVs compete only for pre-arranged rides and are not permitted to accept street hails. FHV operators also typically offer safety features that taxis lack, such as real-time trip tracking, driver photo verification, and a rating system that holds drivers accountable.

**B.      Wheely is a For-Hire Vehicle Service with a Focus on Passenger Privacy and Data Security**

23.      Founded in 2010, Wheely is an FHV service that connects users with vehicles driven by highly skilled drivers. Wheely currently operates in London, Paris, and Dubai, and it soon will begin transporting passengers in New York City.

24.      Through its mobile app, Wheely's customers can book a for-hire trip either on-demand or in advance. When booking a trip, customers choose amongst various classes of vehicles for dispatch based on their individual trip needs (sedan or SUV, vehicle size, luggage space in the trunk, etc.). Passengers also have the ability to customize their trip experience—for example, they can set their preferred temperature, music, and door-opening options in the mobile app.

25.      Passenger privacy is the cornerstone of Wheely's service and brand. Wheely's founder has recognized "how sensitive and vulnerable passenger journey data is," and has made addressing the issue a "key differentiator" for the company's success and growth.[3] To that end, all drivers on the Wheely platform attend the Wheely Academy—a three-day accreditation program that focuses on service, safety, etiquette, first aid, privacy, and discretion. During the Wheely Academy, prospective drivers also learn about Wheely's corporate commitment to data security.

26.      Wheely requires drivers to sign NDAs and adhere to advanced privacy standards. This ensures that Wheely users can take private personal and business calls in transit "without

---

[3]   *How Wheely is putting privacy at the heart of its business*, Concentric (Jan. 8, 2021), https://concentricvc.medium.com/how-wheely-is-putting-privacy-at-the-heart-of-its-business-aee586a18ee2.

worrying about what they're saying or who's listening," and that "where they go, and where they live or work remains private."[4]

27.    Wheely believes so deeply in protecting customer privacy that it has fought for those interests, even to its own detriment. In 2020, for example, Wheely was the only ride-hailing service that refused to share passenger trip data with the Moscow Department of Transportation. Wheely argued that Moscow's disclosure law infringed on passengers' privacy because the geolocation data could be used to discern details about individual customers.[5] For taking this stand, Wheely's local subsidiary was suspended and, although it fought the issue in Russian courts, its app was ultimately removed from the local App Store.[6] Wheely still maintains a page on its website debunking the Moscow Department of Transportation's anti-privacy arguments, including the argument that "location data doesn't personally identify anyone and isn't a big deal."[7] As Wheely explains, and as academic studies confirm, location data can be used with other public data to "de-anonymize individuals," allowing regulators and nefarious actors to infer "where you work, where you play, where you practice religion, whose houses you visit frequently, and when you've been to sensitive medical offices."[8]

---

[4]  Wheely, https://wheely.com/en/essentials/the-chauffeurs (last visited Jan. 17, 2026).

[5]  *See* Jonathan Keane, *Wheely Doubles Down In Its Data Skirmish Against Moscow Regulators*, Forbes (Dec. 9, 2020, 3:00 AM), https://www.forbes.com/sites/jonathankeane/2020/12/09/wheely-doubles-down-in-its-data-skirmish-against-moscow-regulators/.

[6]  *See* Jonathan Keane, *Luxury Ride-Hailing Firm Wheely Prepares Its Fight Against Moscow Suspension*, Forbes (Sept. 2, 2020, 3:00 AM), https://www.forbes.com/sites/jonathankeane/2020/09/02/luxury-ride-hailing-firm-wheely-prepares-its-fight-against-moscow-suspension/.

[7]  Press Release, Wheely, Debunking MDOT's anti-privacy argument (Aug. 6, 2020), https://wheely.com/en/newsroom/debunking-mdots-anti-privacy-argument.

[8]  *Id.*

**C.      Passengers Provide Sensitive Personal Information to Wheely**

28.      In using the Wheely platform, passengers input sensitive personal information into Wheely's systems.

29.      To use the Wheely platform, a passenger must first create an account on Wheely's mobile app. A passenger starts by submitting certain identifying information, including their name, phone number, email address, and credit card details.

30.      To book a ride, passengers input their pickup location and optionally desired drop-off spot. The app then shows an estimate of the time for a driver to arrive, total trip length, and cost estimate for the journey. Passengers can also leave a comment for their driver.

31.      Once a passenger's ride is confirmed on the platform and a vehicle has been dispatched, passengers and drivers can use the platform to securely and privately message each other. This is an integral part of Wheely's high-touch and discreet service. For example, if a driver has waited at the pickup location, the driver can message the passenger to ask whether they wish the driver to continue waiting.

32.      By using Wheely's app and service, passengers agree to Wheely's privacy policy.[9] In the privacy policy that will be applicable to users in New York, Wheely explains that it will only process passenger data, including location data, to provide services to a given passenger or to comply with record-retention obligations, as well as for limited ancillary purposes such as fraud prevention, dispute resolution, and safety and security. As for sharing passenger personal data, Wheely affirms that it is "committed to opposing government and third-party requests for rider data to the extent reasonably permitted under applicable laws." And in practice, Wheely will share passenger data only in response to court-issued subpoenas or warrants. Even then, Wheely

---

[9] *Privacy Policy*, Wheely (Mar. 4, 2025), https://wheely.com/en/legal/uk/for-users/privacy.

regularly challenges overly broad requests and regulatory disclosure requirements that infringe on passengers' fundamental rights and freedoms.

33.    As part of its commitment to privacy and data security, Wheely is exploring the use of encryption to store location details securely, ensuring that even Wheely cannot access information not authorized under the privacy policy. However, such encryption cannot be implemented if the Location Reporting Rules remain in place.

## D.    The TLC Enacts and Develops the Location Reporting Rules

34.    Over the past decade, the TLC has enacted an increasingly onerous and intrusive trip reporting regime for FHV base owners over the outcry from community groups, academics, drivers, passengers and others.

### 1.    The TLC Adopts Initial Location Reporting Rules Requiring the Submission of Passenger Pickup Data

35.    In September 2014, the TLC introduced rules requiring all FHV base owners to transmit, among other items, "[t]he date, the time, and the location of the Passenger to be picked up" to the TLC at a "frequency prescribed by the Commission."[10] The proposal marked a notable shift in the FHV regulatory regime. Before its enactment, FHV base owners were required to collect the date, time, and pickup location of passenger rides, but they were not required to collect drop-off location data nor record pickup location data according to any prescribed format. Nor were they required to submit such data to the TLC on a regular basis. Instead, the records were required to be made available for inspection by the TLC upon request.[11]

---

[10] *Notice of Public Hearing and Opportunity to Comment on Proposed Rules*, N.Y.C. Taxi & Limousine Comm'n, at 8 (Nov. 20, 2014), https://www.nyc.gov/assets/tlc/downloads/pdf/fhv_dispatch_rule_final_11_20_14.pdf [hereinafter, the "September 2014 Proposed Rules"].

[11] *See* 35 R.C.N.Y. § 6-08(e) (2010) ("A base owner shall be responsible for ensuring that the following records are kept for all dispatched calls: (1) the date, the time, and location of the passenger to be picked up, the driver's for-hire operator's permit, and the permit number of the for-hire vehicle . . . .").

36.     In justifying its novel proposal, the TLC vaguely cited a purported need to increase "accountability of FHV vehicles and drivers" and to enforce the "important regulatory class distinctions" between FHVs and Taxis. The agency also reasoned that trip data would help "better develop informed policies governing FHV service."[12]

37.     The TLC held a hearing on the proposal on October 16, 2014. At the hearing, a representative from one high-volume FHV expressed concerns that the proposal could "undermin[e] the privacy of drivers, passengers and bases" because it did not "provide for anonymization of the data or explain how trip records will be kept confidential."[13] The representative explained that the TLC's goals could be accomplished through the collection of "a slightly abstracted version of data," such as zip codes, rather than actual street addresses.[14]

38.     These concerns were largely dismissed by the TLC Commissioners present at the hearing. Then-TLC Chair Joshi admitted that the reporting requirements could make the enforcement of driver accountability rules "a lot easier when we have electronic submission," and then-Commissioner Carone professed that the "data is something that we are very, very interested in."[15]

39.     After the hearing, a number of community groups sent a letter to the TLC raising privacy concerns. The letter, signed by American-Arab Anti-Discrimination Committee, Electronic Frontier Foundation, Center for Democracy and Technology, The Constitution Project, Constitutional Alliance, and Defending Dissent Foundation, urged the TLC to reconsider its

---

[12] *Id.* at 4, 5.

[13] Transcript of the New York City Taxi & Limousine Commission at 35:6-7, N.Y.C. Taxi & Limousine Comm'n (Oct. 16, 2014), https://www.nyc.gov/assets/tlc/downloads/pdf/transcript_10_16_14.pdf.

[14] *Id.* at 44:22-23.

[15] *Id.* at 43:11-13, 45:20-22.

proposal due to the "consolidation of vast amounts of information about the private trip records of millions of passengers, with significant implications for their Fourth Amendment rights."[16]

40.    Despite these serious concerns, the TLC adopted the initial trip reporting requirements without alteration and the rules went into effect on December 31, 2014.

41.    With this new regulatory tool in hand, the City began collecting the trip records of millions of FHV passengers, giving it unprecedented insight into the daily lives of New Yorkers. The City boasted that it "ha[d] a better understanding of the movement of millions of passengers a year by our licensed for-hire services, an understanding which is *unmatched by any other jurisdiction*."[17] And, as a sign that additional regulation was forthcoming, the City remarked: "[a]s the record collection process continues, we hope to be able to include data from *more and more* of the for-hire services operating in the city."[18]

### 2.    The TLC Adopts the "Fatigued Driving" Amendments to Require the Submission of Passenger Drop-Off Data

42.    In November 2016, the TLC proposed adding more requirements to the initial Location Reporting Rules—this time, to "support the regulation of fatigued driving and assist TLC with enforcement initiatives in other areas."[19] In addition to mandating that FHV base owners collect and transmit passenger pickup time and location data, the TLC's new proposal required the transmission of passenger *drop-off* time and location data. And to address safety risks of fatigued

---

[16] Letter from American-Arab Anti-Discrimination Comm., Electronic Frontier Found., Cent. for Democracy and Tech., The Const. Project, Const. All., and Defending Dissent Found., to N.Y.C. Taxi & Limousine Comm'n (Nov. 19, 2014), https://media.bizj.us/view/img/4423681/tlcletter.pdf [hereinafter, the "November 2014 Letter"].

[17] Bill de Blasio & Mira Joshi, *2016 TLC Factbook*, N.Y.C. Taxi & Limousine Comm'n, at 2 (Apr. 21, 2016) (emphasis added), https://www.nyctaxinews.com/2016_tlc_factbook.pdf.

[18] *Id.* (emphasis added).

[19] *Notice of Public Hearing and Opportunity to Comment on Proposed Rules*, N.Y.C. Taxi & Limousine Comm'n, at 3 (Nov. 28, 2016), https://www.nyctaxinews.com/sedDriverFatigueRule-PreliminarilyCertifed-11-28-16CLEAN.pdf [hereinafter, the "November 2016 Proposed Rules"].

driving, the TLC proposed implementing a 10-hour daily limit and a 60-hour weekly limit on the number of hours that a FHV driver could spend transporting passengers.

43.     The TLC submitted the following rationale when justifying its proposal to start collecting passenger drop-off time and location data:

> [I]mplementation of the proposed driver fatigue rule is based on calculation of trip times, which will require FHV bases to regularly transmit to TLC drop-off time and location, in addition to the pickup time and location currently required by TLC rule. In addition to requiring FHV bases to report trip times, TLC will also require them to indicate when trips are shared.
>
> . . . .
>
> Drop-off data for FHV trips will also assist TLC in other enforcement actions. For example, it will facilitate investigating passenger complaints or complaints from a pedestrian or other motorist about unsafe driving, including for incidents alleged to have occurred during or between trips, by allowing TLC to determine the location of a vehicle at a particular time.[20]

44.     Community groups again voiced serious concerns, warning that the proposal to include drop-off data would provide the TLC "with a comprehensive view of the movements of individual New Yorkers."[21] In a joint letter to the TLC, these community groups emphasized that "even de-identified data can be 'reverse engineered' to reveal passenger names and trip pickup and drop-off location information" and questioned whether the rules were necessary to meet the TLC's goal of reducing driver fatigue.[22]

45.     At the January 5, 2017, TLC hearing, a number of consumer groups and individuals raised privacy concerns with the proposal, including:

---

[20] *Id.* at 4, 5.

[21] Letter from Cent. for Democracy and Tech., Future of Privacy Forum, Electronic Frontier Found., Tech Freedom, and The Const. Project, to N.Y.C. Taxi & Limousine Comm'n (Dec. 26, 2016), https://fpf.org/wp-content/uploads/2016/12/TLC-Fatigue-Comments-from-FPF-CDT-EFF-Constitution-Project-and-Tech-Freedom.pdf [hereinafter, the "December 2016 Letter"].

[22] *Id.*

- Future of Privacy Forum: "We call on the TLC to . . . tailor the data collection more narrowly to the stated purpose by focusing on trip duration rather than the location of trips[,] . . . collect less precise, more general geographic information[,] . . . [and] enact policies and procedures that detail the privacy and security protections for such sensitive data."[23]

- Tech:NYC: "[W]e support TLC's goals to reduce driver fatigue and its proposal to limit driver hours. But we have significant concerns about the data-sharing component of the proposed rule and we respectfully respect [sic] that the rule be amended to omit any request for location drop-off data . . . ."[24]

- High Volume FHV-affiliated FHV Bases: "[W]hile drop-off time may be needed to calculate trip duration, neither the drop-off location nor whether a trip was shared has any bearing on driver fatigue. In fact, given uncertainty introduced by traffic conditions, road closures and numerous other factors, where a trip ends is a highly unreliable measure of trip duration."[25]

- Other FHV Bases: "[W]e believe a targeted approach to data would be a more effective way to combat driver fatigue. . . . Data requirements carry significant risks concerning personal privacy and industry competitiveness."[26]

- Professor Gautam Hans, then-Clinical Law Fellow at the University of Michigan Law School and now-Clinical Professor of Law at Cornell Law School: "I fundamentally don't think complete anonymization is ever possible."[27]

46.    Despite these expressed concerns, the TLC adopted the "fatigued driving" amendments as proposed and the rules went into effect in March 2017. When commenting on the new requirements, then-TLC Commissioner Marino dismissed passenger privacy concerns,

---

[23] Transcript of the New York City Taxi & Limousine Commission at 66:17-67:2, N.Y.C. Taxi & Limousine Comm'n 66-67 (Jan. 5, 2017), https://www.nyc.gov/assets/tlc/downloads/pdf/transcript_01_05_17.pdf [hereinafter, the "2017 Hearing"].

[24] *Id.* at 77:11-18.

[25] *Id.* at 126:9-17.

[26] *Id.* at 206:8-10, 13-15.

[27] *Id.* at 143:2-3. In an article discussing the proposed rules, Professor Hans explained that "while there may be some connection between fatigued driving and trip duration, the TLC hasn't demonstrated any connection between fatigued driving and its desire to know where all these trips end." Gautham Hans, Opinion, *TLC on the Wrong Trip with Ride Tracking*, N.Y. Daily News (Dec. 29, 2016), https://www.nydailynews.com/2016/12/29/tlc-on-the-wrong-trip-with-ride-tracking/.

opining (without support and contrary to the evidence) that "[t]here's really no threat there regarding people's privacy."[28]

47.    In the TLC's annual report for 2017, the Commission touted the benefits of the new requirements as "reduc[ing] the safety risks of fatigued driving."[29] Specifically, it stated that collecting records indicating "trip *duration* provides a more accurate way to identify drivers at risk of fatigue."[30] However, the TLC offered no explanation as to how collecting records of specific passenger drop-off or pickup *locations* (as opposed to trip durations) would, or even could, further the TLC's stated goal of combating fatigued driving.

### 3.    The TLC Requires Submission of Detailed Passenger Pickup and Drop-Off Location Data

48.    The regulation outlining the Location Reporting Rules for FHV base owners is currently codified in 35 R.C.N.Y. § 59B-19. All FHV bases must transmit the following records to the TLC, on a monthly basis in perpetuity, with respect to all dispatched trips:

   (a)    The date, the time, and the location of the Passenger pickup and drop-off;

   (b)    The Driver's TLC Driver License number;

   (c)    The dispatched Vehicle's License number;

   (d)    The TLC License number of the For-Hire Base that dispatched the Vehicle;

   (e)    The TLC License number of the For-Hire Base affiliated to the dispatched Vehicle;

   (f)    Whether the Passenger is sharing the Vehicle for part or all of the trip with a Passenger from another dispatched call; and

---

[28] David Meyer, *TLC Votes to Require Uber and Lyft to Disclose Trip Data*, StreetsBlog NYC (Feb. 2, 2017, 12:50 PM), https://nyc.streetsblog.org/2017/02/02/tlc-votes-to-require-uber-and-lyft-to-disclose-trip-data.

[29] *2017 Annual Report*, N.Y.C. Taxi & Limousine Comm'n, at 6 (Jan. 17, 2018), https://www.nyc.gov/assets/tlc/downloads/pdf/annual_report_2017.pdf.

[30] *Id.* (emphasis added).

15

(g)    Where applicable, an indication that the trip concluded in a cancellation by the Passenger or Driver.

49.    On April 18, 2017, the TLC published a "Frequently Asked Questions" page on its website about the Location Reporting Rules. In the document, the TLC clarified the type of location data that FHV bases must provide: "Bases must provide the location of the pickup and dropoff and can do so using either an address, intersection, or airport, or the corresponding latitude/longitude for those locations. If [bases] provide an address, intersection, or airport, then [bases] do not have to provide latitude/longitude." The FAQ elaborated: "You should use the specific address or intersection where the passenger was picked up/dropped off, for instance W 33 St. and 8 Ave., Manhattan. You may also use latitude and longitude of the location instead of exact address or intersection, if you prefer."[31]

50.    In an accompanying "Instruction Manual" on the TLC's website, the TLC explained how bases should input pickup and drop-off locations. In reporting "[t]he type of pickup address," the manual instructs: "Enter 'Exact Address' if the address is a full street address, enter 'Intersection of' if the address is an intersection, and enter 'Airport' if the address is an airport." To report the "pickup location name," bases must provide "the street address where the pickup occurred," *i.e.* "the location the customer gave the dispatcher when making the reservation. This field should include the building number, street name, city, state abbreviation, and ZIP code." The Instruction Manual also explains that if a base provides latitude and longitude coordinates, the information submitted must be where the pickup or drop-off occurred "using the WGS 1984 coordinate system with a minimum of 5 decimal places."[32] Using latitude and longitude

---

[31] *Trip Record Submission Frequently Asked Questions (FAQs)*, N.Y.C. Taxi & Limousine Comm'n, at 8-9 (Apr. 18, 2017), https://www.nyc.gov/assets/tlc/downloads/pdf/efhv_faqs.pdf.

[32] *Trip Record Submission CSV Instruction Manual*, N.Y.C. Taxi & Limousine Comm'n, at 4 (Feb. 28, 2021), https://www.nyc.gov/assets/tlc/downloads/pdf/csv_instruction_manual.pdf.

coordinates to five decimal places correlates to a precision of three feet—or approximately the width of a doorway.

51.    Thus, to comply with the location data requirement, FHV bases must submit the following for *every* passenger pickup and drop-off: either (i) precise latitude/longitude coordinates (with a minimum of 5 decimal places); (ii) an exact address; or (iii) if the pickup or drop-off takes place at a street intersection or airport, the name of the intersection or airport.

52.    Failure to comply with 35 R.C.N.Y. § 59B-19 can result in stringent penalties levied on FHV base operators. Submitting untimely, incomplete, or inaccurate trip records can lead to fines between $100 to $500 for each violation instance, with total fines not to exceed $10,000 for each specific violation, and suspension of license.

53.    In addition, because FHV bases must "collect[] or maintain[] passenger geolocation data" under the Location Reporting Rules, they must also draft and disseminate a detailed "information security and use of personal information policy." 35 R.C.N.Y. § 59B-21(g). The policy must include, at a minimum, a statement prohibiting "the use, monitoring, or disclosure of trip information, including the date, time, pick-up location, drop-off location, and real-time vehicle location . . . without such passenger's affirmative express consent." *Id.* § 59B-21(g)(5). Because FHV bases must disclose such data under the Location Reporting Rules, however, Section 59B-21(g) effectively requires them to obtain their "passenger's affirmative express consent." *Id.* In this way, the rules combine to force FHV bases to coerce passengers' consent to share their private information with the City in service of the City's vague regulatory goals.

**E.    Wheely Applies for Black Car Base Licenses in New York City**

54.    In October 2025, Wheely began the process of applying for Black Car Base licenses from the TLC for its two subsidiaries, Mayfair-NY LLC and Kensington-NY LLC. On November

18, 2025, the TLC granted Wheely's first license (for Mayfair-NY LLC) and on February 6, 2026, TLC granted Wheely's second license (for Kensington-NY LLC).

55.     As a TLC-licensed Black Car Base operator, Wheely is subject to the Location Reporting Rules and must submit passenger pickup and drop-off data for every passenger trip. As part of its application, Wheely also had to certify that it had a "personal information policy" that prohibits the disclosure of trip information, including "pick-up and drop-off location" information, without a "passenger's affirmative express consent."[33] As explained above, because Wheely must submit passenger pickup and drop-off location data under the Location Reporting Rules, it thus was compelled to require that passengers affirmatively consent to Wheely disclosing their sensitive location data to the City.

56.     Wheely intends to obtain this consent by including a prompt for new users requiring that they check a "box" to give their consent to Wheely to disclose data to the City. Given Wheely's privacy-first reputation and business model, it disagrees with the Location Reporting Rules and would not otherwise communicate to passengers that their geolocation information will be turned over to the TLC. In fact, Wheely's prompt is prefaced by a message opposing this requirement:

> *Black car bases are currently required to turn over the date, time, and locations of your trips. Wheely disagrees with these requirements, and intends not to turn over your trip information to the extent allowable by law.*

**F.     The Location Reporting Rules Threaten Privacy Without Justification or Protection**

57.     The Location Reporting Rules require Wheely to report, on a monthly basis in perpetuity, volumes of otherwise private and proprietary time-stamped geolocation data detailing the comings and goings of New York passengers. Though supposedly "anonymized," the amount

---

[33] *Information Security and Use of Personal Information Policy Affirmation*, N.Y.C. Taxi & Limousine Comm'n (Mar. 9, 2020),
https://www.nyc.gov/assets/tlc/downloads/pdf/information_security_use_personal_information_policy_affirmatio n.pdf; *see also* 35 R.C.N.Y. § 59B-21(g)-(h).

and granularity of the data collected enables the TLC (and others) to re-identify and surveil New York City residents, visitors, and drivers, often in deeply intimate and private aspects of their lives.

58.    Indeed, as a result of the Location Reporting Rules, the TLC has amassed a database of FHV trips at a trip-specific level, showing the pickup and drop-off location data for three-quarters of a billion passenger trips over the past ten years. Using online research tools, an actor with access to such data can piece together passengers' identities and trace their movements.

59.    For example, an actor may filter the trip-level data to see that a series of trips ended in front of a particular brownstone in Manhattan, as indicated by the "exact address," "intersection," or "longitude/latitude" uploaded pursuant to the CSV Instruction Manual. The actor can then cross-reference publicly available address information (through voter rolls or property records maintained in the City's Automated City Register Information System (ACRIS)), to see who lives at the brownstone and thus who is likely taking the trips that end there.[34]

60.    From this information, the actor can discern where that passenger is starting trips, ranging from the routine (grocery stores and movie theaters) to the deeply personal (doctors' offices, courts, places of worship, Planned Parenthood clinics, and political rallies).[35]

61.    These privacy risks can multiply at scale. For example, an actor can start with a sensitive location, like a medical clinic or political rally, and trace trips back to their original

---

[34] One internet user, for example, searched the TLC database for trips originating from East Hampton's Further Lane. From there, he was able to discern the "*exact* Brooklyn Heights address from which [a passenger] hailed a cab, rode 106.6 miles, and paid a $400 fare with a credit card, including a $110.50 tip." Todd W. Schneider, *Analyzing 1.1 Billion NYC Taxi and Uber Trips, with a Vengeance*, https://toddwschneider.com/posts/analyzing-1-1-billion-nyc-taxi-and-uber-trips-with-a-vengeance/ (last visited Feb. 2, 2026). A cursory Google search reveals the addresses of a number of individuals who own homes on Further Lane, including Jerry Seinfeld and the owner of Warner Music Group. *Further Lane East Hampton: Where Billions Meet the Beach*, Soc. Life Mag. (Jan. 30, 2026), https://sociallifemagazine.com/real-estate/further-lane-east-hampton/.

[35] The harm that can result from the disclosure of such data is not merely a hypothetical. In 2021, for example, a conservative Catholic media organization purchased location data from a data broker, which was successfully de-anonymized to prove that a priest had visited gay bars. Heather Kelly, *A Priests Phone Location Outed His Private Life. It Could Happen to Anyone*, Wash. Post (July 22, 2021), https://www.washingtonpost.com/technology/2021/07/22/data-phones-leaks-church/.

locations. By cross-referencing voter rolls or ACRIS, the actor can determine who may live at the original locations and generate lists of New Yorkers that may have sought certain types of health care or engaged in certain political activities.

62. These risks only amplify with the advancement of artificial intelligence, the algorithms for which will use the City's extensive location data sets and may reveal an individual passenger's entire professional and personal background, including where they live, pray, work, socialize, and seek medical care.

63. Numerous studies, research papers, and academics have already sounded the alarm that location data can be used to re-identify and reveal the most personal and intimate information about individuals:

- Professor Paul Ohm, law professor and privacy researcher at the Georgetown University Law Center, has remarked that "D.N.A. . . . is probably the only thing that's harder to anonymize than precise geolocation information."[36]

- A study published in *Nature* demonstrated that the "uniqueness of human mobility traces is high and that mobility datasets are likely to be re-identifiable using information only on a few outside locations." In fact, in a dataset where the location of an individual is specified hourly, "four spatio-temporal points are enough to uniquely identify 95% of the individuals."[37]

- Researchers Hui Zang and Jean Bolot concluded that "anonymization of location data does not work," and that "publishing or sharing anonymized location data will likely lead to privacy risks."[38]

64. That FHV bases can submit "intersection" data in certain circumstances does not mitigate the intrusion. First, intersection data can only be submitted when a pickup or drop-off

---

[36] Stuart A. Thompson & Charlie Warzel, *Twelve Million Phones, One Dataset, Zero Privacy*, N.Y. Times (Dec. 19, 2019), https://www.nytimes.com/interactive/2019/12/19/opinion/location-tracking-cell-phone.html.

[37] Yves-Alexandre de Montoye et al., *Unique in the Crowd: The privacy bounds of human mobility*, Sci. Reps. (2013), https://www.nature.com/articles/srep01376.

[38] Hui Zang & Jean Bolot, *Anonymization of Location Data Does Not Work: A Large-Scale Measurement Study*, Proceedings of the 17th Annual International Conference on Mobile Computing and Networking, at 11 (2011), https://citeseerx.ist.psu.edu/document?repid=rep1&type=pdf&doi=efa8bf558b2cec1c0838f83e8879a6b787a58be4 .

occurs at a specific intersection. For the vast majority of trips that do not start or end at an intersection, FHV bases need to submit "exact addresses" or "longitude/latitude" data. Second, trip-specific intersection data, like more precise geolocation data, can also be used to re-identify passengers.

65.    The risk of sensitive passenger location data falling into the hands of others is not theoretical. Nothing in the Location Reporting Rules prevents the TLC from sharing this data with other city agencies, including law enforcement. Indeed, the TLC has admitted that it disclosed trip record data to government authorities on 42 separate occasions, 13 of which occurred without a subpoena or warrant.

66.    Nor do the Location Reporting Rules prevent the agency from sharing the data with any member of the public who files a request under New York's Freedom of Information Law ("FOIL"). Since 2015, the TLC has received approximately 7,821 such requests and disclosed or partially disclosed available trip data in *all of them*.

67.    The TLC also publishes trip records online that can be accessed without a FOIL request.[39] In this context, and since 2016, the TLC publishes location data by zone (with approximately 60 zones covering Manhattan, with each zone spanning roughly 45 blocks)—not precise geolocation data. This demonstrates the TLC's tacit recognition of the privacy risks that attend the disclosure of precise geolocation data.[40]

---

[39] *See* TLC Trip Record Data, N.Y.C. Taxi & Limousine Comm'n, https://www.nyc.gov/site/tlc/about/tlc-trip-record-data.page (last visited Jan. 17, 2026).

[40] Before 2016, the TLC published trip records online with precise geolocation data. Despite switching to zone data in 2016, the TLC neglected to remove **seven years** of historical geolocation data—covering more than 1 billion trips—from its archives until 2022. Even now, these records are still publicly available through third-party archives of TLC's website. *See* https://github.com/toddwschneider/nyc-taxi-data/blob/master/README.md; https://web.archive.org/web/20190702094657/https://cloud.google.com/blog/products/gcp/new-york-city-public-datasets-now-available-on-google-bigquery.

68.    Worse still, while the TLC has claimed in the past that it "takes its fiduciary responsibility seriously as the guardian of all the data it collects,"[41] the agency's record suggest otherwise.[42] For example, accessing the TLC Upload Portal—where FHV base operators are able to submit location data—merely requires inputting an FHV's base number, zip code and EIN number. All of these numbers are publicly available, and the TLC Upload Portal does not require a username, password, or multi-factor authentication to login. As a result of this lapse in data security, any internet user can log into the TLC Upload Portal pretending to be an FHV base and view the base's upload history, including the dates and times when trip records were uploaded and the names of the uploaded files.

69.    As another example, in March 2014, the TLC released 20 gigabytes of data concerning 173 million taxi trips, including drop-off times and pickup locations, pursuant to a FOIL request. The TLC had attempted to anonymize personally identifiable information by applying a notoriously weak hashing algorithm. As a result, an internet user was able to quickly de-anonymize the personally identifiable information in "less than 2 minutes."[43] Another internet user then cross-referenced the TLC data with publicly available information to identify the time, date, pickup location, drop-off location, and even the fare and tip paid by individual public figures, such as Bradley Cooper, Olivia Munn, Ashlee Simpson, Kourtney Kardashian, and more.[44] In July

---

[41] September 2014 Proposed Rules, *supra* note 10, at 5.

[42] The City in general has failed to adequately protect its citizens' private data. In 2019, for example, the City published voter enrollment books online, which included every registered voter's full name, party affiliation, and home address. *See* Vivan Wang, *After Backlash, Personal Voter Information Is Removed by New York City*, N. Y. Times (Apr. 30, 2019), https://www.nytimes.com/2019/04/30/nyregion/nyc-personal-voter-information-election-board.html.

[43] *See* Vijay Pandurangan, *On Taxis and Rainbows: Lessons from NYC's improperly anonymized taxi logs*, Medium (June 21, 2014), https://medium.com/vijay-pandurangan/of-taxis-and-rainbows-f6bc289679a1.

[44] *See* J.K. Trotter, *Public NYC Taxicab Database Lets You See How Celebrities Tip*, Gawker (Oct. 23, 2014, 12:00 PM), https://www.gawkerarchives.com/the-public-nyc-taxicab-database-that-accidentally-track-1646724546.

2015, TLC released data from 4.5 million Uber trips, which included precise latitude and longitude coordinates for each trip.[45]

70.     Thus, whether through a leak, FOIL request, or unauthorized access by TLC employees or contractors, members of the public may access and use the TLC's database of FHV trips to re-identify and track passenger and driver movements—a risk that only increases with the recent proliferation of A.I. technologies. This not only infringes on the privacy interests of FHV operators, but it also risks New Yorkers' personal safety by enabling harassment, stalking, or worse. Indeed, the TLC does not allow anyone to "opt out" from the Rules, meaning location data from passengers whose addresses are suppressed under applicable laws (e.g., public officials and domestic violence victims) will be collected and risk being made available to those who wish to do them harm.

71.     Finally, the Location Reporting Rules are not tailored to accomplish their intended purpose. The TLC has vaguely reasoned that collecting time-stamped geolocation data for passenger pickups and drop-offs will help it "better understand the FHV industry"[46] and "prevent fatigued driving."[47] But the TLC has not explained how the disclosure of location data helps it "understand the FHV industry" (whatever the TLC may mean by that) or enforce anti-fatigue regulations. To serve the latter rationale, the TLC may rely on passenger pickup and drop-off *times* (rather than *locations*), which can be used to calculate how long a given driver has been driving. Or, in lieu of trip-specific times, the TLC could simply require that FHV bases collect the total number of driver hours worked per day. Either way, given the volatility of traffic conditions in

---

[45] *See* FiveThirtyEight & Ed King, *Uber Pickups in New York City*, Kaggle, https://www.kaggle.com/datasets/fivethirtyeight/uber-pickups-in-new-york-city (last visited Jan. 26, 2026).

[46] *Trip Record Submission Frequently Asked Questions (FAQs)*, *supra* note 31, at 2.

[47] *FHV Trip Records*, N.Y.C. Taxi & Limousine Comm'n, https://www.nyc.gov/site/tlc/tlc-online/fhv-trip-record-submission.page (last visited Jan. 17, 2026).

New York City, where a trip begins and ends is a highly unreliable measure of a trip's duration. It is difficult to imagine why trip *location* information—as opposed to *duration* data—would be required to monitor driver fatigue.

72.    In any event, the TLC has not articulated why collecting less invasive data—such as aggregated location data by zone—would not be sufficient to accomplish these stated goals. Although the TLC has, in the past, vaguely referred to a purported need to "audit" trip duration data by supplementing it with trip location data,[48] such a rationale does not justify the wholesale download of *all* FHV passenger location data without cause. Indeed, FHV drivers are approximately nineteen times less likely to receive passenger complaints than yellow cabs and have a near-perfect record of compliance (99.77% of FHV drivers) with anti-fatigue rules.

73.    The U.S. Supreme Court has warned of the dangers of allowing the government access to geolocation data. In *Carpenter v. United States*, 585 U.S. 296 (2018), the Supreme Court observed that geolocation data provides an "intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" *Id.* at 311 (citation omitted). Similarly, in *United States v. Jones*, 565 U.S. 412 (2012) (Sotomayor, J., concurring), Justice Sotomayor explained why this data raises such serious privacy concerns: the "Government can store such records and efficiently mine them for information years into the future," and "because GPS monitoring is cheap in comparison to conventional surveillance techniques and, by design, proceeds surreptitiously, it evades the ordinary checks that constrain abusive law enforcement practices: 'limited police resources and community hostility.'" *Id.* at 415-16 (citation omitted). As Justice Sotomayor explained, "GPS

---

[48] *See* 2017 Hearing, *supra* note 23, at 14:21, 17:10-11, 21:13, 26:6, 67:10, 71:5, 81:12, 126:17, 140:2, 149:19, 151:16, 207:21.

24

monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." *Id.* at 415 ("Disclosed in [GPS] data . . . will be trips the indisputably private nature of which takes little imagination to conjure: trips to the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or church, the gay bar and on and on." (alteration in original) (quoting *People v. Weaver*, 12 N.Y.3d 433, 441-42 (2009))).

74.    All of the above concerns are particularly acute for Wheely. As discussed above, Wheely stakes its brand and reputation on a commitment to passenger privacy and security. Wheely's passengers have come to expect that the details associated with their travel—from the phone calls they make in the back seat, to the identity of their co-passengers and the addresses at which they arrive—are kept safe and secure. It is not difficult to imagine how passenger location data can be used for nefarious purposes, such as blackmail, stalking, corporate espionage, or worse. Thus, if Wheely is compelled to disclose passenger location information, its customer base will look for alternative means of discreet travel, and Wheely may be forced to abandon its value proposition in the marketplace or leave the marketplace altogether.

## G.    The Location Reporting Rules are Unprecedented

75.    The Location Reporting Rules are unprecedented among other state regulations in the level, frequency, and manner of disclosure of FHV passenger information that they compel. Upon information and belief, no other jurisdiction in the United States requires FHV operators to submit the same type of precise geolocation data of passenger trips on a monthly basis to regulators.

76. As the City itself has admitted in the past, the TLC's "understanding of the movement of millions of passengers a year" by FHVs is "*unmatched by any other jurisdiction*."[49]

## COUNT I
**(Violation of the Fourth Amendment to the U.S. Constitution and Claim for Injunctive Relief Pursuant to 42 U.S.C. § 1983)**

77. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

78. In taking the actions described herein, Defendant acted under color of the statutes, regulations, customs, and usages of the City of New York and the State of New York for purposes of establishing "state action" under 42 U.S.C. § 1983.

79. The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment applies to state and city actors through the Fourteenth Amendment to the U.S. Constitution.

80. Wheely has a reasonable expectation of privacy in its business records. The trip records compelled pursuant to the Location Reporting Rules contain confidential and highly sensitive time-stamped location information relating to users of Wheely's platform and commercially sensitive information about Wheely's business. Wheely takes various measures to guard such confidential business information from public disclosure, which is crucial for Wheely to maintain its business success and competitive advantage as the premier, privacy-focused FHV base in the market.

81. Wheely's users also have significant privacy interests in the private personal information they disclose to Wheely. Users expect that their private information will be used only for the limited purposes outlined in Wheely's Privacy Policy. And Wheely shares the interests of

---

[49] *2016 TLC Factbook*, *supra* note 17, at 2 (emphasis added).

26

its users in maintaining their privacy, so that users will continue to have confidence in Wheely's platform and Wheely's reputation as a privacy-focused FHV base.

82. The Fourth Amendment prohibits the government from executing an administrative search unless the subject of the search has "an opportunity to obtain precompliance review before a neutral decisionmaker." *City of Los Angeles v. Patel*, 576 U.S. 409, 420 (2015); *see also Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 482-95 (S.D.N.Y. 2019).

83. The Location Reporting Rules violate the Fourth Amendment to the U.S. Constitution because they improperly authorize the City, through the TLC, to execute an administrative search of Wheely's sensitive property without any form of precompliance review. The Location Reporting Rules also violate the Fourth Amendment because they are overly broad and devoid of the tailoring required in the context of administrative subpoenas. To the contrary, they seek Wheely's geolocation data in bulk, and in perpetuity, without any meaningful restriction.

84. Pursuant to 42 U.S.C. § 1983 and the Court's equitable powers, Wheely seeks injunctive relief against the City, whose enforcement of the TLC Rules would violate the Fourth Amendment.

### <u>COUNT II</u>
**(Violation of Article I, § 12 of the New York State Constitution and Claim for Injunctive Relief Pursuant to 28 U.S.C. § 1367)**

85. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

86. Like the Fourth Amendment to the U.S. Constitution, Article I, § 12 of the New York State Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." N.Y. Const. art. I § 12.

87. In fact, the New York Constitution is more solicitous of personal privacy interests than the U.S. Constitution. "New York's State Constitution, article I, § 12, affords greater protection against warrantless searches than the U.S. Constitution." *5 Borough Pawn, LLC v. City*

27

*of New York*, 640 F. Supp. 2d 268, 278 (S.D.N.Y. 2009). And New York courts recognize the "breathtaking quality and quantity" of private information contained in trip location data: "[B]y easy inference" this information reveals one's "associations—political, religious, amicable and amorous, to name only a few. . . ." *Weaver*, 12 N.Y.3d at 442.

88.     Wheely has a reasonable expectation of privacy in its business records. The trip records compelled pursuant to the Location Reporting Rules contain confidential and highly sensitive time-stamped geolocation information relating to users of Wheely's platform and commercially sensitive information about Wheely's business. Wheely takes various measures to guard such confidential business information from public disclosure, which is crucial for Wheely to maintain its business success and competitive advantage as the premier, privacy-focused FHV base in the market.

89.     Wheely's users also have significant privacy interests in the private personal information they disclose to Wheely. Users expect that their private information will be used only for the limited purposes outlined in Wheely's Privacy Policy. And Wheely shares the interests of its users in maintaining their privacy, so that users will continue to have confidence in Wheely's platform and Wheely's reputation as a privacy-focused FHV base.

90.     The Location Reporting Rules violate Article I, § 12 of the New York State Constitution because they improperly authorize the City, through the TLC, to execute an administrative search of Wheely's sensitive property without any form of precompliance review.

91.     The requirement to comply with the TLC Rules violates Article I, § 12 of the New York State Constitution because the TLC Rules operate in practice as an administrative search that is fundamentally untailored and unreasonable, and provides no opportunity for precompliance review.

28

92.     Pursuant to Article I, § 12 of the New York State Constitution, 28 U.S.C. § 1367, and the Court's equitable powers, Wheely seeks injunctive relief against the City, whose enforcement of the TLC Rules would violate the New York State Constitution.

### COUNT III
**(Violation of and Preemption by the Stored Communications Act, 18 U.S.C. §§ 2701 *et seq.* and Claim for Injunctive Relief Pursuant to 18 U.S.C. § 2707)**

93.     Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

94.     Under the Stored Communications Act, "a provider of remote computing service or electronic communication service to the public shall not knowingly divulge a record or other information pertaining to a subscriber to or customer of such service . . . to any governmental entity," without a subpoena or other legal process, unless permitted by one of the exceptions, none of which applies here. 18 U.S.C. § 2702(a)(3), (c)(1); *id.* § 2703(c).

95.     Wheely is a provider of an electronic communication service within the meaning of the Stored Communications Act, because it provides its users with "the ability to send or receive wire or electronic communications," by, among other things, allowing passengers and drivers to privately and securely message each other through the service, including communications about passengers' pickup and drop-off locations. *Id.* § 2510(15).

96.     The City is a municipality within the State of New York, and thus qualifies as a "governmental entity" under the Stored Communications Act. *Id.* § 2711(4).

97.     The Location Reporting Rules require that for-hire vehicle bases, other than high-volume for-hire services, submit a monthly report that includes the date, time, and location of a passenger's pickup and drop-off; the driver's TLC driver license number; the dispatched vehicle's license number; the TLC license number of the for-hire base that dispatched the vehicle; the TLC license number of the for-hire base affiliated to the dispatched vehicle; whether the passenger is sharing the vehicle for part or all of the trip with a passenger from another dispatched call; and

whether the trip concluded in a cancellation by the passenger or driver. *See* 35 R.C.N.Y. § 59B-19(a).

98.     These provisions violate and conflict with the Stored Communications Act, and harm the rights of Wheely and its users, because they require Wheely to "divulge a record or other information pertaining to a subscriber to or customer of such service," including "the contents of . . . [electronic] communication[s]," to a "governmental entity" without a subpoena or other legal process. 18 U.S.C. § 2702(a)(3), (c); *id.* § 2703(a)-(c). These provisions of the Location Reporting Rules also interfere with or impede the accomplishment of the full purposes and objectives of federal law. Accordingly, these provisions violate the Supremacy Clause, U.S. Const. art. VI, cl. 2, and are thus preempted.

99.     Pursuant to 18 U.S.C. § 2707(a)-(b), 42 U.S.C. § 1983, and this Court's equitable powers, Wheely seeks injunctive relief against the City to prevent its enforcement of the TLC Rules, which would conflict with and violate the Stored Communications Act.

## COUNT IV
### (Violation of the First Amendment to the U.S. Constitution and Claim for Injunctive Relief Pursuant to 42 U.S.C. § 1983)

100.    Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

101.    The First Amendment prohibits the government from passing laws "abridging the freedom of speech." U.S. Const. amend I. The First Amendment applies to the States through the Fourteenth Amendment to the U.S. Constitution.

102.    Under the First Amendment, "the government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023); *see also Burns v. Martuscello*, 890 F.3d 77, 85 (2d Cir. 2018) ("[C]ompelled speech presents a unique affront to personal dignity.").

103.    The Location Reporting Rules require Wheely to communicate to users of Wheely's mobile app a message that is prescribed by the City. Specifically, Wheely must coerce prospective customers to consent to share their private location data with the City as a condition to using Wheely's service. *See* 35 R.C.N.Y. § 59B-19(a)(1); § 59B-21(g)-(h).

104.    The Location Reporting Rules burden Wheely's protected First Amendment speech because they require Wheely to coerce customers to sacrifice their privacy rights, which is not a message Wheely would otherwise choose to communicate. In fact, Wheely strongly disagrees with the statements that the Location Reporting Rules require it to make.

105.    The Location Reporting Rules also violate the First Amendment to the U.S. Constitution because, in requiring Wheely to disclose passenger data, the Rules compel Wheely to communicate that data to the City, which Wheely would not do absent the Rules.

106.    The City cannot establish that the Rules further a substantial government interest, nor that they are "narrowly drawn" to that interest.

107.    Pursuant to 42 U.S.C. § 1983 and the Court's equitable powers, Wheely seeks injunctive relief against the City, whose enforcement of the TLC Rules would violate the First Amendment.

## COUNT V
**(Violation of Article I, § 8 of the New York State Constitution and Claim for Injunctive Relief Pursuant to 28 U.S.C. § 1367)**

108.    Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

109.    Article I, § 8 of the New York State Constitution, similar to the First Amendment to the United States Constitution, prohibits any law "to restrain or abridge the liberty of speech." N.Y. Const. art I, § 8.

110.    "Free speech claims under the First Amendment and the New York State Constitution are subject to the same standards . . . ." *Hous. Works, Inc. v. Turner*, 179 F. Supp. 2d

31

177, 199 n.25 (S.D.N.Y. 2001), *aff'd sub nom. Hous. Works, Inc. v. Guiliani*, 56 F. App'x 530 (2d Cir. 2003).

111.    The Location Reporting Rules require Wheely to communicate to users of Wheely's mobile app a message that is prescribed by the City. Specifically, Wheely must coerce prospective customers to consent to share their private location data with the City as a condition of using Wheely's service. *See* 35 R.C.N.Y. § 59B-19(a)(1); § 59B-21(g)-(h).

112.    The Location Reporting Rules burden Wheely's protected First Amendment speech because they require Wheely to coerce customers to sacrifice their privacy rights, which is not a message Wheely would otherwise choose to communicate. In fact, Wheely strongly disagrees with the statements that the Location Reporting Rules require it to make.

113.    The Location Reporting Rules also violate Article I, § 8 of the New York State Constitution because, in requiring Wheely to disclose passenger data, the Rules compel Wheely to communicate that data to the City.

114.    The City cannot establish that the Rules further a substantial government interest, nor that they are "narrowly drawn" to that interest.

115.    Pursuant to Article I, § 8 of the New York State Constitution, 28 U.S.C. § 1367, and the Court's equitable powers, Wheely seeks injunctive relief against the City, whose enforcement of the TLC Rules would violate the New York State Constitution.

### COUNT VI
**(Declaratory Judgment Pursuant to 28 U.S.C. § 2201)**

116.    Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

117.    This action presents an actual controversy between Wheely and the City of New York concerning the validity of the Location Reporting Rules and the enforceability of the

Location Reporting Rules against Wheely. Compliance with the Location Reporting Rules will cause immediate, irreparable harm to Wheely's privacy and constitutional rights.

118.    Based on the foregoing allegations, Wheely is entitled to a declaration, pursuant to 28 U.S.C. § 2201, that the Location Reporting Rules cannot be enforced against Wheely because such enforcement would violate the Fourth Amendment to the U.S. Constitution; Article I, § 12 of the New York State Constitution; the Stored Communication Act, 18 U.S.C. §§ 2701 *et seq.*; the Supremacy Clause of the U.S. Constitution, U.S. Const. art. VI, cl. 2; the First Amendment to the U.S. Constitution; and Article I, § 8 of the New York State Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)    Declare that the Location Reporting Rules violate the Fourth Amendment to the U.S. Constitution because they improperly authorize the City to execute an administrative search on Wheely's sensitive property without any precompliance review;

(b)    Declare that the Location Reporting Rules violate Article I, § 12 of the New York State Constitution because they improperly authorize the City to execute an administrative search on Wheely's property without precompliance review;

(c)    Declare that the Location Reporting Rules violate the Stored Communications Act, 18 U.S.C. §§ 2701 *et seq.*, and the Supremacy Clause of the U.S. Constitution because they would compel Wheely, an electronic communication service provider, to divulge information pertaining to customers of such service to the City without a subpoena or any other form of legal process;

(d)    Declare that the Location Reporting Rules violate the First Amendment to the U.S. Constitution because they compel Wheely to communicate a message that Wheely would not

33

otherwise choose to communicate and compel Wheely to communicate passenger data to the City, which it would otherwise not do;

(e)    Declare that the Location Reporting Rules violate Article I, § 8 of the New York State Constitution because they compel Wheely to communicate a message that Wheely would not otherwise choose to communicate;

(f)    Preliminarily and permanently enjoin the City; its agencies, officers, agents, servants, employees, and attorneys; and all persons acting in concert or participation with them, from taking any actions to implement or enforce Sections 59B-19(a)(1)(i), 59B-19(a)(4)(i), 59B-19(a)(5)(i), and 59B-19(b) of Title 35 of the Rules of the City of New York, including any actions to deny, withhold, withdraw, or cancel a license for Wheely to operate in the City as a Black Car Base;

(g)    Award Plaintiffs their reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

(h)    Grant such other and further relief as the Court deems just and equitable.

Dated: New York, New York
    February 6, 2026

                                        /s/ Alexander C. Drylewski
                                        Alexander C. Drylewski
                                        Lara A. Flath
                                        Jacob G. Lefkowitz
                                        SKADDEN, ARPS, SLATE,
                                          MEAGHER & FLOM LLP
                                        One Manhattan West
                                        New York, NY 10001
                                        Telephone: (212) 735-3000
                                        Alexander.Drylewski@skadden.com
                                        Lara.Flath@skadden.com
                                        Jacob.Lefkowitz@skadden.com

                                        *Counsel for Plaintiffs Wheely USA, Inc.,*
                                        *Mayfair-NY LLC, and Kensington-NY LLC*