UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WHEELY USA, INC.,
MAYFAIR-NY LLC, and
KENSINGTON-NY LLC,

        *Plaintiffs*,

        v.

THE CITY OF NEW YORK,

        *Defendant*.

Case No. 1:26-cv-01057-CM

## **MEMORANDUM OF LAW IN SUPPORT OF**
## **PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Alexander C. Drylewski
Lara A. Flath
Jacob G. Lefkowitz
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000

*Counsel for Plaintiffs Wheely USA, Inc.,
Mayfair-NY LLC, and Kensington-NY
LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ............................................................................................................................ 3

    I.       The New York City For-Hire Vehicle Industry and Wheely ................................... 3

    II.      The City's Location Reporting Rules.......................................................................... 4

         A.       The Initial Location Reporting Rules Require FHVs to Report Pickup Data.......................................................................................... 4

         B.       The Fatigued Driving Amendments Require FHVs to Report Drop-Off Location Data as Well............................................................ 5

         C.       The Rules Demand Precise Location Information .................................... 6

    III.     The Location Reporting Rules Threaten the Confidentiality of Sensitive Data ............................................................................................................................... 6

    IV.     Wheely Is Granted Black Car Base Licenses ........................................................... 8

ARGUMENT................................................................................................................................... 9

    I.       WHEELY IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIMS ......... 9

         A.       The Location Reporting Rules Violate the Fourth Amendment.................. 9

         B.       The Location Reporting Rules Violate Article I, § 12 of the New York State Constitution........................................................................... 16

         C.       The Location Reporting Rules Are Preempted by the SCA ..................... 17

          D.       The Location Reporting Rules Violate the First Amendment................... 20

         E.       The Location Reporting Rules Violate Article I, § 8 of the New York State Constitution........................................................................... 21

    II.     Wheely and Its Users Will Be Irreparably Harmed Absent an Injunction ............ 22

    III.    The Balance of Equities and the Public Interest Favor an Injunction................... 24

CONCLUSION............................................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ..........................................................................................................20

*44 Liquormart, Inc. v. Rhode Island*,
517 U.S. 484 (1996) ..........................................................................................................21

*Airbnb, Inc. v. City of New York*,
373 F. Supp. 3d 467 (S.D.N.Y. 2019) ....................................................................*passim*

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*,
564 U.S. 721 (2011)...........................................................................................................20

*Arizona v. Gant*,
556 U.S. 332 (2009) ..........................................................................................................16

*Arizona v. United States*,
567 U.S. 387 (2012) ....................................................................................................17, 19

*Azam v. District of Columbia Taxicab Commission*,
46 F. Supp. 3d 38 (D.D.C. 2014)......................................................................................12

*Brenntag International Chemicals, Inc. v. Bank of India*,
175 F.3d 245 (2d Cir. 1999) .............................................................................................22

*Camara v. Municipal Court of City & County of San Francisco*,
387 U.S. 523 (1967) ..........................................................................................................14

*Can't Live Without It, LLC v. ETS Express, Inc.*,
No. 17-CV-3506 (JSR), 2017 WL 4776741 (S.D.N.Y. Oct. 10, 2017) ...........................23

*Carpenter v. United States*,
585 U.S. 296 (2018) ................................................................................................9, 10, 16

*Carroll v. Trump,*
663 F. Supp. 3d 380, 384 (S.D.N.Y. 2023) .........................................................................8

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*,
447 U.S. 557 (1980) ..........................................................................................................20

*City of Los Angeles v. Patel*,
576 U.S. 409 (2015) ..............................................................................................11, 14, 16

*Donovan v. Lone Steer, Inc.*,
    464 U.S. 408 (1984) ......................................................................................... 11, 14

*DoorDash, Inc. v. City of New York*,
    789 F. Supp. 3d 337 (S.D.N.Y. 2025) .........................................................21

*Freedman v. America Online, Inc.*,
    303 F. Supp. 2d 121 (D. Conn. 2004).........................................................19

*Hale v. Henkel*,
    201 U.S. 43 (1906) ........................................................................................9

*Hirschfeld v. Stone*,
    193 F.R.D. 175 (S.D.N.Y. 2000) ................................................................23

*Housing Works, Inc. v. Turner*,
    179 F. Supp. 2d 177 (S.D.N.Y. 2001), *aff'd sub nom. Housing Works, Inc. v. Guiliani*, 56 F. App'x 530 (2d Cir. 2003).........................................................21

*Illinois Transportation Trade Ass'n v. City of Chicago*,
    839 F.3d 594 (7th Cir. 2016) .....................................................................13

*International Dairy Foods Ass'n v. Amestoy*,
    92 F.3d 67 (2d Cir. 1996)...........................................................................20

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996) .........................................................................22

*Katz v. United States*,
    389 U.S. 347 (1967) ......................................................................................9

*Kyllo v. United States*,
    533 U.S. 27 (2001) ......................................................................................10

*Ligon v. City of New York*,
    925 F. Supp. 2d 478 (S.D.N.Y. 2013) ........................................................24

*Mitchell v. Cuomo*,
    748 F.2d 804 (2d Cir. 1984) ............................................................ 2, 22, 24

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ....................................................................................22

*Mullins v. City of New York*,
    626 F.3d 47 (2d Cir. 2010).........................................................................22

*Patel v. City of Los Angeles*,
    738 F.3d 1058 (9th Cir. 2013), *aff'd*, 576 U.S. 409 (2015) ............................10

*People v. Scott*,
 79 N.Y.2d 474 (1992) ........................................................................................17

*Progressive Credit Union v. City of New York*,
 889 F.3d 40 (2d Cir. 2018) .................................................................................13

*Riley v. California*,
 573 U.S. 373 (2014) ...........................................................................................10

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
 487 U.S. 781 (1988) ...........................................................................................20

*Sanchez v. Los Angeles Department of Transportation*,
 39 F. 4th 548 (9th Cir. 2022) .............................................................................12

*In re Search Warrant Issued to Google, Inc.*,
 264 F. Supp. 3d 1268 (N.D. Ala. 2017) ............................................................19

*See v. City of Seattle*,
 387 U.S. 541 (1967) ...........................................................................................10

*Stuhlbarg International Sales Co. v. John D. Brush & Co.*,
 240 F.3d 832 (9th Cir. 2001) .............................................................................23

*In re United States for an Order Pursuant to 18 U.S.C. § 2705(b)*,
 289 F. Supp. 3d 201 (D.D.C. 2018) ...................................................................17

*In re United States for an Order Pursuant to 28 U.S.C. § 1651(a) for Order Precluding
 Notice of Grand Jury Subpoena*,
 No. 17-mc-01604 (BAH), 2017 WL 3278929 (D.D.C. July 7, 2017)...............17

*United States v. Caronia*,
 703 F.3d 149 (2d Cir. 2012) ..............................................................................21

*United States v. Jones*,
 565 U.S. 400 (2012) .............................................................................................1

*Winter v. Natural Resources Defense Council, Inc.*,
 555 U.S. 7 (2008) ...............................................................................................22

**STATUTES**

18 U.S.C. § 2510(15) ...................................................................................................18

18 U.S.C. §§ 2702-03....................................................................................................17

18 U.S.C. § 2702(a)(3)...........................................................................................17, 18

18 U.S.C. § 2702(c)(1)............................................................................................17, 18

18 U.S.C. § 2703(c) ...................................................................................17, 18

18 U.S.C. § 2703(c)(1) .....................................................................................19

N.Y. Const. art. I, § 8...................................................................................2, 22

N.Y. Const. art. I, § 12.................................................................................2, 16

U.S. Const. art. VI..........................................................................................17

## RULES & REGULATIONS

N.Y.C. Admin. Code § 19-502(l) .....................................................................13

N.Y.C. Admin. Code § 19-502(u) ......................................................................3

N.Y.C. Admin. Code § 19-514.........................................................................13

N.Y.C. Admin. Code § 19-516......................................................................3, 13

35 R.C.N.Y. § 6-08(e) (2010) .......................................................................4, 13

35 R.C.N.Y. § 59B-03 ........................................................................................3

35 R.C.N.Y. § 59B-19 .....................................................................................1, 6

35 R.C.N.Y. § 59B-21(g)...................................................................... 6, 8, 16, 19

## OTHER AUTHORITIES

Orin S. Kerr, *A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending It*, 72 Geo. Wash. L. Rev. 1208 (2004).......................................17

S. Rep. No. 99-541 (1986)..........................................................................17, 19

## PRELIMINARY STATEMENT

Over the outcry of numerous community groups, drivers, academics, and others, New York City enacted unprecedented rules that threaten the privacy of millions of New Yorkers who use for-hire vehicles ("FHVs") for travel. Codified at 35 R.C.N.Y. § 59B-19, these "Location Reporting Rules" require FHV providers to submit reports to the Taxi and Limousine Commission ("TLC"), every month in perpetuity, which detail the precise time-stamped pickup and drop-off location for *every passenger trip performed*. This trove of sensitive data can be used to re-identify specific passengers and track their movements, revealing a "wealth of detail about [their] familial, political, professional, religious, and sexual associations." *United States v. Jones*, 565 U.S. 400, 415-16 (2012) (Sotomayor, J., concurring).

Indeed, research studies found that even limited location data can be used to re-identify 95% of individuals, with one expert remarking that "D.N.A. . . . is probably the only thing that's harder to anonymize than precise geolocation information" (Plaintiffs' Complaint, Dkt. 1 ("Compl.") ¶ 2 (citation omitted))—a risk exacerbated by the advancement of artificial intelligence de-anonymization technologies. In short, the Location Reporting Rules allow the City (as well as many other parties with whom the City shares this data) to unlawfully track New Yorkers— including their visits to courts, synagogues and mosques, Planned Parenthood clinics, political rallies, and immigration offices—while severely and unnecessarily undermining their safety.

For Plaintiffs Wheely USA, Inc., Mayfair-NY LLC, and Kensington-NY LLC ("Wheely"), new entrants in the New York FHV market, the Location Reporting Rules are particularly troubling. Wheely differentiates itself as an FHV option that emphasizes passenger privacy. Wheely's customers expect and rely on its commitment to discretion, data security, and privacy. Wheely seeks to offer its privacy commitments to New Yorkers, but the Location Reporting Rules force Wheely to either sacrifice its core mission or face crippling fines and suspensions.

Through this action, Wheely seeks to invalidate the Location Reporting Rules as unlawful under the U.S. and New York State constitutions. Wheely also seeks a preliminary injunction to prevent the enforcement of the Location Reporting Rules while Wheely's claims are adjudicated. A preliminary injunction is warranted for the following reasons:

*First*, Wheely is likely to succeed on the merits of its claims. The Location Reporting Rules violate Wheely's rights under the Fourth Amendment of the Constitution and article I, § 12 of the N.Y. Constitution because they authorize the TLC to execute a sweeping administrative search of Wheely's sensitive property without any opportunity for precompliance review. The Location Reporting Rules are also preempted by the Stored Communications Act ("SCA"), which forbids Wheely from disclosing customer information to government entities without valid legal process. Finally, the Rules force Wheely to speak to its users to obtain their consent to disclose sensitive personal information, violating the First Amendment of the Constitution and article I, § 8 of the N.Y. Constitution by compelling Wheely to communicate a message it otherwise would not speak (and, in fact, fundamentally opposes).

*Second*, the Location Reporting Rules will cause Wheely irreparable harm in the absence of a preliminary injunction because "an alleged deprivation of a constitutional right is involved." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984). The Location Reporting Rules also put Wheely in an impossible position: either comply with the City's overreach and risk permanent damage to its brand, reputation, and goodwill (to say nothing of potential liability under the SCA), or resist and face crippling penalties. Either way, the harm to Wheely will be lasting, unquantifiable, and irreparable.

*Third*, the balance of equities and public interest strongly favor a preliminary injunction. Wheely's constitutional rights will be violated by the Location Reporting Rules, while the City

2

faces only a temporary delay in access to this sensitive data. Moreover, every one of the City's purported justifications for collecting this information can be accomplished without the Location Reporting Rules and the unlawful invasion of privacy they enable.

At bottom, the unlawful Location Reporting Rules threaten Wheely's privacy and New Yorkers' personal safety without adequate justification. They should be enjoined pending a final determination of Wheely's claims.

## BACKGROUND

### I.     The New York City For-Hire Vehicle Industry and Wheely

In New York City, there are four classes of FHVs: black cars, community cars (aka liveries), luxury limousines, and high-volume for-hire services. The driver, vehicle, and "base" through which FHVs are dispatched must be licensed with the TLC. 35 R.C.N.Y. § 59B-03. Black cars are defined as FHVs "dispatched from a central facility" where "more than ninety percent of the central facility's for-hire business is on a payment basis other than direct cash payment by a passenger." N.Y.C. Admin. Code § 19-502(u). Unlike Taxis, FHVs are not permitted to accept street-hails and instead compete for pre-arranged trips. N.Y.C. Admin. Code § 19-516.

Wheely, a privacy-first FHV service with operations in various cities, will soon begin operating in New York City as a black car base. (Declaration of Anton Chirkunov ("Chirkunov Decl.") ¶¶ 1, 11.) Through Wheely's mobile app, passengers pre-arrange rides by inputting their desired pickup and drop-off locations. (*Id.* ¶ 3.) Once a ride is confirmed, passengers and drivers securely and privately message each other through the app, which is an integral part of Wheely's discreet service. (*Id.* ¶ 5.)

Passenger privacy is Wheely's "key differentiator." (*Id.* ¶ 6.) To that end, all Wheely drivers must sign NDAs and adhere to "advanced privacy" standards. (*Id.* ¶ 7.)  These measures ensure that passengers can take private personal calls in transit "without worrying about what they're

saying or who's listening," and that "where they go, and where they live or work remains private." (*Id.* Ex. A.)

Privacy is so central to Wheely's brand that it was the only ride-hailing service that refused to share passenger trip data with the Moscow Department of Transportation. (*Id.* ¶ 9.) Wheely publicly decried the disclosure law, explaining that location data can be mixed with other public data to "de-anonymize individuals," allowing regulators and hackers to infer "where you work, where you play, where you practice religion, whose houses you visit frequently, and when you've been to sensitive medical offices." (*Id.* Ex. C.) For taking this stand, Wheely's local subsidiary was suspended and its app was removed from the local App Store. (*Id.* ¶ 10.)

## II. The City's Location Reporting Rules

### A. The Initial Location Reporting Rules Require FHVs to Report Pickup Data

In 2014, the TLC introduced rules requiring FHV base owners to report to the TLC, among other things, "[t]he date, the time, and the location of the Passenger to be picked up" at a "frequency prescribed by the Commission." (Compl. ¶ 35 (citation omitted).) Before 2014, FHV base owners were required to collect the date, time, and pickup location of passenger rides, but they were *not* required to collect drop-off location data nor record pickup location data according to any prescribed format. Nor were they required to submit such data to the TLC on a regular basis. Instead, the records were required to be made available for inspection by the TLC upon request. 35 R.C.N.Y. § 6-08(e) (2010).

To justify its novel demand, the TLC cited a need to increase "accountability of FHV vehicles and drivers," and reasoned that trip data would help "better develop informed policies governing FHV service" and to enforce the "important regulatory class distinctions" between FHVs and Taxis. (Compl. ¶ 36 (citation omitted).) At a hearing on the proposal, then-TLC Commissioner Joshi explained that the reporting requirements would make enforcement of driver

accountability rules "a lot easier." (Declaration of Alexander Drylewski ("Drylewski Decl.") Ex. C. at 43:11-12.)

In response, numerous community groups, academics, and others voiced significant concerns regarding the rules, including the "consolidation of vast amounts of information about the private trip records of millions of passengers." (*Id.* Ex. A. at 1) Despite this outcry, the proposed rules were adopted and went into effect on December 31, 2014. The rules gave the City unprecedented insight into "the movement of millions of passengers a year" by FHVs, "an understanding which is unmatched by any other jurisdiction." (Compl. ¶ 41 (citations omitted).)

## B. The Fatigued Driving Amendments Require FHVs to Report Drop-Off Location Data as Well

The rules were expanded again in 2017 with the "fatigued driving" amendments. The amendments set hourly limits for FHV drivers, and also required base owners to submit passenger drop-off time and location data for every trip performed. The TLC stated that drop-off location data would allow it to "confirm the accuracy of the FHV records by considering such factors as distances traveled during and between trips, routes, and traffic conditions." (Drylewski Decl. Ex. F at 5.) The TLC also reasoned that this data would assist with "other enforcement actions," such as investigating "illegal solicitations by FHV drivers" and passenger complaints related to unsafe driving. (*Id.*)

Again, New York community groups and others expressed concerns, warning that the proposal to include drop-off data would provide the TLC "with a comprehensive view of the movements of individual New Yorkers." (*Id.* Ex. B. at 1.) Despite these objections, the TLC adopted the "fatigued driving" amendments, including the trip reporting requirements, and they went into effect in March 2017.

### C. The Rules Demand Precise Location Information

The current Location Reporting Rules for FHV base owners are codified in 35 R.C.N.Y. § 59B-19. All FHV bases must transmit voluminous records to the TLC each month, including, among other things, the precise date, time, and location of passenger pickups and drop-offs associated with *every* dispatched trip. *Id.* Submitting untimely, incomplete, or inaccurate trip records can lead to fines between $100 to $500 for *each* violation instance, with total fines not to exceed $10,000 for each specific violation, and the suspension of an FHV base's license. *Id.*

Under a related regulation, an FHV base that "collects or maintains passenger geolocation data" must also draft and disseminate a detailed "information security and use of personal information policy." 35 R.C.N.Y. § 59B-21(g). The policy must include a statement prohibiting "the use, monitoring, or disclosure of trip information, including the date, time, pickup location, drop-off location, and real-time vehicle location . . . without such passenger's affirmative express consent." *Id.* Because FHV bases must disclose such data under the Location Reporting Rules, section 59B-21(g) effectively deputizes bases to obtain their "passengers' affirmative express consent" to share location data with the City. Thus, the rules force FHV bases to speak a specific message to its passengers—one intended to coerce passengers to give consent to share their private information with the City and in service of the City's regulatory goals.

## III. The Location Reporting Rules Threaten the Confidentiality of Sensitive Data

Although the TLC claims data submitted pursuant to the Rules is "anonymized," the granularity of the information collected makes it possible to re-identify individual passengers and reconstruct their daily routines, including where they live, work, socialize, and engage in sensitive activities. (*See* Declaration of Neil Richards ("Richards Decl.") ¶¶ 24-28.) According to Professor Neil Richards, a leading expert in the field of information privacy, "the academic literature is unequivocal that the location data of people is sensitive data that can expose them to a host of

serious harms across a host of contexts"—concerns that "are not mitigated even if the data collected is 'anonymized' or made less granular." (*Id.* ¶ 6.) In his opinion, the mandate of the Location Reporting Rules "does not promote safety," yet "represents a substantial threat to the privacy of every New Yorker (and visitor) who gets in a hire car and thus has their location data shared with the government." (*Id.* ¶ 9.)

Critically, nothing in the Location Reporting Rules prevents the TLC from sharing this sensitive data with others, including other agencies and law enforcement. Indeed, the TLC has disclosed collected trip data to government authorities on 42 separate occasions, 13 of which occurred *without* any subpoena or warrant. (Drylewski Decl. Ex. E at 4.) Nor do the Rules prevent members of the public from accessing the data through FOIL requests. Since 2015, the TLC has received approximately 7,821 such requests and disclosed or partially disclosed trip data in response to **all of them**. (*Id.* at 3-4.) The TLC also publishes trip records online that can be accessed without a FOIL request. (Compl. ¶ 67.) In this context, the TLC publishes aggregated location data by zone—not precise, trip-specific geolocation data—in tacit recognition of the privacy risks that attend the disclosure of the precise pickup and drop-off data it requires FHV bases to turn over.

The risk posed by allowing public access to this information is not theoretical. In March 2014, the TLC released 20 gigabytes of data concerning 173 million taxi trips, including drop-off times and pickup locations, pursuant to a FOIL request. (Richards Decl. ¶ 8; Chirkunov Decl. Ex. G.) The TLC had attempted to anonymize personally identifiable information by applying a notoriously weak hashing algorithm. One internet user was able to quickly de-anonymize the personally identifiable information data (the driver's license number and taxi number) by running the dataset through a "hashing" algorithm in "less than two minutes." (Chirkunov Decl. Ex. G.) Another user then cross-referenced the TLC data with publicly available information to identify

the time, date, pickup location, drop-off location, and even the fare and tip paid by individual public figures. (Compl. ¶ 69.) In July 2015, the TLC released data from 4.5 million Uber trips, which included precise latitude and longitude coordinates for each trip. (*Id.*)

Risks like these will only become more pronounced as technology advances and re-anonymization efforts continue to become more sophisticated and easier to perform. (Richards Decl. ¶¶ 29-33.) As Professor Richards cautions: "the TLC's location data has never been truly anonymous—and it is getting less so as time passes and reidentification techniques advance. In turn, this means that the already serious privacy risks of the Trip Reporting Rules are getting worse." (*Id.* ¶ 33.)

Thus, whether through a leak, FOIL request, or unauthorized access by TLC employees or contractors, members of the public can access the TLC's database of FHV trips to re-identify and track individual passengers' movements—a risk that only increases with the recent proliferation of artificial intelligence technologies. This not only infringes on the private lives of New Yorkers, but also risks their personal safety by exposing their participation in civic life, thus enabling harassment, stalking, or worse. *Cf. Carroll v. Trump*, 663 F. Supp. 3d 380, 384 (S.D.N.Y. 2023) (Kaplan, J.) ("If jurors' identities were disclosed, there would be a strong likelihood of unwanted media attention to the jurors, influence attempts, and/or of harassment or worse of jurors[.]").

## IV. Wheely Is Granted Black Car Base Licenses

On October 7, 2025, Wheely applied for Black Car Base licenses from the TLC. (Chirkunov Decl. ¶ 11). On November 18, 2025, the TLC granted Wheely's first license (for Mayfair-NY LLC) and on February 6, 2026, the TLC granted Wheely's second license (for Kensington-NY LLC). (*Id.*)

Because Wheely must submit passenger pickup and drop-off location data under the TLC Reporting Rules, it thus is compelled by 35 R.C.N.Y. § 59B-21(g) to convey an information policy

to users that conditions use of its service on users' agreement to disclose their sensitive location information to the TLC. Wheely intends to obtain this consent by including a prompt for new users requiring that they check a "box" to give their consent. Given Wheely's privacy-focused reputation and business model, it disagrees with the TLC Reporting Rules and would not otherwise communicate to passengers that they must consent to have their sensitive location information turned over to the TLC. (Chirkunov Decl. ¶ 28.) In fact, Wheely's prompt is prefaced by a message opposing this requirement:

> *Black car bases are currently required to turn over the date, time and location of your trips. Wheely disagrees with these requirements, and intends not to turn over your trip information to the extent allowable by law.*

Although Wheely received its black car base licenses, it has not started dispatching for-hire trips for New York City passengers. Thus, not one customer from Wheely's potential New York user base has affirmatively consented to the disclosure of their personal geolocation information.

## ARGUMENT

### I. WHEELY IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIMS

#### A. The Location Reporting Rules Violate the Fourth Amendment

The Location Reporting Rules violate the Fourth Amendment because they authorize the TLC to execute a sweeping administrative search of Wheely's sensitive property without an opportunity for precompliance review. The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Carpenter v. United States*, 585 U.S. 296, 303 (2018). Its protection extends to physical spaces, *id.* at 304, business records, *see Hale v. Henkel*, 201 U.S. 43, 76-77 (1906), and all information that a person "seeks to preserve as private," so long as her expectation of privacy is "reasonable," *Katz v. United States*, 389 U.S. 347, 351, 360-61 (1967). If the state's action invades a constitutionally protected privacy interest, thereby constituting a

"search," it will be invalidated unless it is deemed "reasonable" under the circumstances. *Riley v. California*, 573 U.S. 373, 381 (2014) ("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" (citation omitted)).

### 1. Wheely Has an Expectation of Privacy

Wheely has a reasonable expectation of privacy in the sensitive geolocation data it holds, and which the Location Reporting Rules force it to disclose. The essential inquiry under the Fourth Amendment is whether the state's intrusion "violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001); *see also Carpenter*, 585 U.S. at 304 ("When an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' we have held that the official intrusion into that sphere generally qualifies as a search. . . ." (citation omitted)).

It is well-settled that businesses have a reasonable expectation of privacy in their own records. In *Patel v. City of Los Angeles*, 738 F.3d 1058, 1061-63 (9th Cir. 2013) (en banc), *aff'd*, 576 U.S. 409 (2015), the Ninth Circuit held that searches of hotel records "involve[d] both a physical intrusion upon a hotel's papers and an invasion of the hotel's protected privacy interest in those papers." As the Ninth Circuit explained, "businesses do not ordinarily disclose, and are not expected to disclose, the kind of commercially sensitive information contained in the records— *e.g.*, customer lists, pricing practices, and occupancy rates." *Id.* at 1061-62.

This principle is also reflected in longstanding Supreme Court decisions, which hold that the Fourth Amendment limits the government's ability to subpoena company records. *See Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984) (employer must be able to "question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it"); *See v. City of Seattle*, 387 U.S. 541, 544 (1967) ("[W]hen an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently

limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome."). Indeed, this principle is so firmly rooted that, in affirming the Ninth Circuit's decision in *Patel*, the Supreme Court treated as self-evident that a hotel had a Fourth Amendment interest in its business records before analyzing the reasonableness of the government's search. *City of Los Angeles v. Patel*, 576 U.S. 409, 419-22 (2015).

Wheely's interests in the records targeted by the Location Reporting Rules are particularly acute. Passenger privacy is the cornerstone of Wheely's brand and service. Wheely differentiates its business by promising a discreet passenger service that allows passengers to travel without worry that their personal calls, conversations, or destinations will be disclosed. Accordingly, Wheely has a cognizable privacy interest in its passenger data.

Judge Engelmayer's decision in *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467 (S.D.N.Y. 2019), is instructive. There, the City of New York argued that home-sharing platforms did not have a privacy interest in their databases because the data belonged to the platforms' users. The court squarely rejected that argument under *Patel* because customer-facing businesses have an independent privacy interest in their customers' data. *Id.* at 484. In granting Airbnb's motion for a preliminary injunction, the court identified "at least two very good reasons" to keep the company's customer data private:

> One is competitive: Keeping such data confidential keeps such information from rivals (whether competing platforms or hotels) who might exploit it. The other involves customer relations: Keeping such data private assuredly promotes better relations with, and retention of, a platform's users.

*Id.* Applying *Patel*, the court concluded that platforms "have privacy interests in their user-related records that 'are more than sufficient to trigger Fourth Amendment protection.'" *Id.* (citing *Patel*, 738 F.3d at 1062).

The same reasoning applies with even greater force here. Wheely's "key differentiator" in the FHV market is its commitment to passenger data security and privacy. "Keeping such [geolocation] data private" is thus integral to Wheely's core mission, brand, and value proposition. *Airbnb, Inc.*, 373 F. Supp. 3d at 484. If forced to disclose its sensitive passenger location data, Wheely may be forced to exit the New York market altogether. (Chirkunov Decl. ¶ 27.) Accordingly, Wheely has a fervent interest in maintaining the privacy of its customers' data, which is "more than sufficient to trigger Fourth Amendment protection." *Airbnb, Inc.*, 373 F. Supp. 3d at 484.

Wheely's privacy interest is not diminished because of the industry in which it operates. Although some cases have declined to extend Fourth Amendment protection to location data associated with taxicabs and other modes of transport, they are distinguishable for several reasons.

First, unlike here, the plaintiffs in those cases were passengers and drivers themselves who voluntarily conveyed their location data to third parties as a condition for using the particular vehicle. Applying the so-called "third party doctrine," such courts held that passengers and drivers had no reasonable expectation of privacy in information they voluntarily turned over to third parties.[1] Here, by contrast, Wheely is a platform that does not voluntarily turn over its user geolocation data to third parties. Thus, the third party doctrine does not preclude Wheely's independent privacy interest in that data, as the court in *Airbnb* emphasized. *Airbnb, Inc.*, 373 F. Supp. 3d at 485 ("[A] quotidian notification to customers does not deprive the *platforms* of the right to claim a reasonable expectation of privacy in their business records chronicling their dealings with customers.").

---

[1]  *See, e.g.*, *Sanchez v. L.A. Dep't of Transp.*, 39 F. 4th 548, 559 (9th Cir. 2022); *Azam v. D.C. Taxicab Comm'n*, 46 F. Supp. 3d 38, 43, 50 (D.D.C. 2014).

Second, regardless, taxicabs are meaningfully different from FHVs like Wheely, as the Second Circuit and other courts have repeatedly recognized in the equal protection context. *See, e.g.*, *Progressive Credit Union v. City of New York*, 889 F.3d 40, 50 (2d Cir. 2018) (identifying "numerous differences between medallion taxicabs and FHVs" that justify their differentiated treatment under law); *Ill. Transp. Trade Ass'n v. City of Chicago*, 839 F.3d 594, 598 (7th Cir. 2016) ("There are enough differences between taxi service and [ridesharing] service to justify different regulatory schemes."). Taxis are required to serve any passenger who hails a ride within the five boroughs of New York City at a set fare. N.Y.C. Admin. Code § 19-502(l). They are subject to strict regulations regarding color, make and model, external markings and decals. *Id.* § 19-514. In contrast, FHVs operate in a competitive market in which customers have the opportunity to compare services, price, driver ratings, vehicle make, and availability across multiple platforms before booking a ride. FHVs compete only for pre-arranged rides and are not permitted to accept street hails. *Id.* § 19-516. FHV operators also typically offer safety features that taxis lack, such as driver photo verification with real-time trip tracking, and rating systems that hold drivers accountable.

Additionally, unlike taxicabs, FHVs do *not* have a long history of data reporting requirements. Indeed, before 2014, FHV base owners were not required to collect any drop-off location data at all. And while base owners were required to collect the date, time, and pickup location of passenger rides, there was no prescribed format or specificity for the data and bases were not required to submit such data to the TLC on a regular basis. 35 R.C.N.Y. § 6-08(e) (2010). Instead, the records were only required to be made available for inspection by the TLC upon request. *Id.* Accordingly, Wheely's privacy interest in its sensitive user information is significant, reasonable, and should be upheld. *Airbnb, Inc.*, 373 F. Supp. 3d at 483.

**2.      The City's Warrantless Search Scheme Is Unreasonable**

The Location Reporting Rules transgress the Fourth Amendment's "reasonableness" requirement because they authorize a sweeping and recurring collection of sensitive data without any opportunity for precompliance review, as is required. Reporting regimes like the Location Reporting Rules resemble two related categories of "administrative searches" circumscribed by the Fourth Amendment: investigative subpoenas and civil inspections. *See Camara v. Mun. Ct. of City & Cnty. of S.F.*, 387 U.S. 523, 534 (1967) ("[A]dministrative searches . . . are significant intrusions upon the interests protected by the Fourth Amendment.").

Administrative searches require that the "subject of the search [] be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Patel*, 576 U.S. at 420; *Airbnb, Inc.*, 373 F. Supp. 3d at 493. For a subpoena, this means an opportunity to "question the reasonableness of the subpoena . . . by raising objections in an action in district court" to ensure the subpoena is "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *Donovan*, 464 U.S. at 415 (citation omitted). For a civil inspection, this means some opportunity to review and challenge an officer's demand for a search before a neutral decisionmaker. *Patel*, 576 U.S. at 423. Courts thus invalidate administrative searches that do not meet this minimal requirement. *Id.* at 420 (invalidating ordinance authorizing warrantless inspections of hotel registries on demand because the ordinance failed to provide hotel operators with an opportunity for precompliance review).

*Airbnb* is again on all fours. Applying the Supreme Court's rulings for agency subpoenas and administrative searches, Judge Engelmayer held that the ordinance at issue was likely unconstitutional because, like here, it authorized the vast collection of information without precompliance review. *Airbnb, Inc.*, 373 F. Supp. 3d at 474-75. The court emphasized that the ordinance was "devoid of any tailoring" and failed to offer home sharing platforms the opportunity

to argue "before a monthly production deadline, that the demand for user data was unreasonable under the Fourth Amendment (e.g., because of its scale or lack of tailoring)." *Id.* at 493. In light of these deficiencies, the court concluded that the ordinance's expansive data production requirement likely violated the Fourth Amendment and granted the platforms' motion for a preliminary injunction.

Like the ordinance in *Airbnb*, the Location Reporting Rules violate Wheely's Fourth Amendment rights by imposing a sweeping demand for business records without affording Wheely any precompliance review. The Rules are also "devoid of any tailoring" due to (1) the "sheer volume of . . . records implicated"; (2) the "monthly production demand"; and (3) the demand's "infinite time horizon." *Id.* at 491. Indeed, the Rules require Wheely to submit passenger location data for *every* passenger pickup and drop-off. In other words, Wheely must give the City a replica of its database of passenger movements each month or face fines and suspension. The Rules also contain no temporal limitation and apply indiscriminately, regardless of any reasonable suspicion that a particular base, passenger, or driver has engaged in unlawful activity. In their indiscriminate breadth, the Location Reporting Rules far exceed the scope of a tailored administrative subpoena.

The City also cannot justify such a sweeping search. The TLC has vaguely claimed that trip-level geolocation data helps it improve FHV "accountability," enforce "fatigued driving" initiatives, and generally monitor FHV compliance with TLC rules and regulations. But the TLC has not explained how the precise, trip-specific location data called for by the Rules serves any of these purported goals. Indeed, given the volatility of traffic conditions in New York City, where a trip begins and ends is a highly unreliable measure of a trip's duration. It is difficult to imagine why per-trip *location* information—as opposed to per-trip *duration* data or even driver hours worked per day—would be required to monitor driver fatigue. The TLC also has not provided any

justification as to why it needs location data on top of the comprehensive driver data it already possesses to investigate routine customer complaints and ensure compliance. Nor has the TLC articulated why collecting less invasive data—such as the "zone" data it already publishes—would not be sufficient to accomplish these stated goals.

Regardless, the Supreme Court has repudiated such vague enforcement rationales to support broad and suspicionless data seizures. *See Patel*, 576 U.S. at 427 (rejecting the government's argument that invalidating an ordinance would impede law enforcement operations); *Carpenter*, 585 U.S. at 316-17 (noting warrantless subpoenas for cell-site records violate the Fourth Amendment despite clear benefit to police investigations); *Arizona v. Gant*, 556 U.S. 332, 349 (2009) ("The mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment." (citation omitted)).

Finally, the Rules are not saved by the provision that FHV base operators are prohibited from sharing location data "without such passenger's affirmative express consent." 35 R.C.N.Y. § 59B-21(g). Even if *passengers* must consent to the sharing of their location data (and Wheely's customers do not), that does not mean that *Wheely* consents to disclosing its sensitive business records. *Airbnb, Inc.*, 373 F. Supp. 3d at 485. Accordingly, the Rules should be invalidated as unconstitutional.

### B. The Location Reporting Rules Violate Article I, § 12 of the New York State Constitution

Like the Fourth Amendment to the U.S. Constitution, article I, § 12 of the New York State Constitution protects "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." The State Constitution affords "even greater protection" to personal privacy interests than the U.S. Constitution. Thus, the Rules violate

section 12 for the same reasons that they violate the Fourth Amendment, as discussed above. *People v. Scott*, 79 N.Y.2d 474, 498-99 (1992).

### C.     The Location Reporting Rules Are Preempted by the SCA

Wheely is also likely to prevail on its claim under the SCA, which was enacted to "update and clarify the Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies." S. Rep. No. 99-541, at 1-2 (1986). The SCA "creates a set of Fourth Amendment-like privacy protections by statute, regulating the relationship between government investigators and service providers in possession of users' private information." Orin S. Kerr, *A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending It*, 72 Geo. Wash. L. Rev. 1208, 1212-14 (2004). Under the SCA, "a provider of remote computing service or electronic communication service to the public shall not knowingly divulge a record or other information pertaining to a subscriber to or customer of such service . . . to any governmental entity" without a warrant, court order, consent, or other legal process. 18 U.S.C. §§ 2702(a)(3), (c)(1); 2703(c).

As the "supreme Law of the Land," U.S. Const. art. VI, the SCA preempts any conflicting state or local law. *See Arizona v. United States*, 567 U.S. 387, 398-99 (2012). That includes the Location Reporting Rules, which force FHVs like Wheely to disclose private user information to the government in direct violation of the SCA.

Wheely is subject to the SCA. The SCA's regulatory framework applies to providers of both a remote computing service ("RCS") or an electronic communication service ("ECS") (collectively, "covered service providers"). *See* 18 U.S.C. §§ 2702-03. When a company provides messaging systems, it qualifies as an ECS provider, even if such messaging services are ancillary to the company's primary business. *See In re United States for an Ord. Pursuant to 18 U.S.C. § 2705(b)*, 289 F. Supp. 3d 201, 211 (D.D.C. 2018); *see also In re United States for an Ord.*

*Pursuant to 28 U.S.C. § 1651(a) for Ord. Precluding Notice of Grand Jury Subpoena*, No. 17-mc-01604 (BAH), 2017 WL 3278929, at *1 n.1 (D.D.C. July 7, 2017) (applying SCA to FHV operator because it allows users "the ability to send and receive electronic communications regarding ride requests and acceptances").

Here, Wheely is both an ECS and an RCS because it provides users with "the ability to send or receive wire or electronic communications" by allowing passengers and drivers to privately and securely message one another through the platform, and because it stores those electronic communications on behalf of its users. 18 U.S.C. § 2510(15). Indeed, messaging between passengers and drivers is an essential feature of Wheely's services, as it is necessary to allow passengers and drivers to coordinate or re-route pickups, find one another on crowded streets, or discuss traffic delays and other unexpected conditions. (Chirkunov Decl. ¶ 5.) This is far more than the ancillary messaging components that courts have held are sufficient to trigger the SCA.

The Location Reporting Rules, however, require Wheely to divulge user data without the legal process required by the SCA. Under section 2703(c)(2) of the SCA, even basic user information—such as a user's name, address, and telephone number—may be obtained only if the government presents a grand jury subpoena, trial subpoena, or administrative subpoena authorized by federal or state law, or obtains valid user consent. 18 U.S.C. §§ 2702(a)(3), (c)(1); 2703(c). As a covered service provider, Wheely cannot produce user information pursuant to the Location Reporting Rules, including pickup and drop-off geolocation data, without the legal process required by the SCA.

The Location Reporting Rules also do not furnish the requisite legal process. While the City can and does serve subpoenas and other legal process in connection with investigations or enforcement actions, the Location Reporting Rules neither contemplate nor provide for any kind

of warrant, grand jury request, or administrative subpoena. This leaves only a single potential avenue for compliance with the SCA: user consent. To that end, the City's rules have attempted to conscript FHVs into doing something the City cannot or will not do itself—i.e., force users to provide their consent to turn over their sensitive information to the City. *See* 35 R.C.N.Y. § 59B-21(g). Such legislative dragooning not only violates the First Amendment (*see infra*), but is also ineffective in obtaining "user consent" under the SCA for the following reasons.

First, it is the government—not the ECS or RCS—that must obtain consent of the subscriber or customer under the SCA. 18 U.S.C. § 2703(c)(1). As the court emphasized in *Freedman v. America Online, Inc.*, 303 F. Supp. 2d 121 (D. Conn. 2004), the SCA "clearly instructs that the burden is on *the governmental entity* to obtain consent." *Id.* at 129 (emphasis added). Thus, the City cannot outsource its responsibility to obtain user consent in this manner.

Second, compelling user consent undermines the very purpose of the SCA. Congress designed the SCA to (1) protect personal privacy against unwarranted government searches and (2) preserve the legitimate needs of law enforcement. S. Rep. No. 99-541 (1986). These procedural protections thus reflect Congress's judgment about the circumstances in which government actors can seize vast quantities of electronically stored information. The Location Reporting Rules undermine that judgment by deputizing FHV bases to obtain consent and then funnel their users' data to the City. Transforming covered service providers into middlemen for user data thus conflicts with the core purpose of the SCA—i.e., "to protect private communications and prevent invasions of privacy" by the government. *In re Search Warrant Issued to Google, Inc.*, 264 F. Supp. 3d 1268, 1277 (N.D. Ala. 2017).

As a result of the above, the Location Reporting Rules are facially preempted by the SCA and must be invalidated. *Arizona*, 567 U.S. at 399 (federal law preempts state and local laws that

"stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (citation omitted)).

### D. The Location Reporting Rules Violate the First Amendment

Wheely is also likely to succeed on its First Amendment claim. Under the First Amendment, "the government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). This protection applies to "commercial speech" by companies such as Wheely. *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996).

Here, by requiring Wheely to produce user data but forbidding it from doing so without users' "affirmative express consent," the Location Reporting Rules effectively force Wheely to convey a message it does not want to speak—i.e., one seeking to obtain consent from customers as a condition of using the Wheely service. (*See* Chirkunov Decl. ¶ 28.) For Wheely, a company defined by its commitment to user privacy, coercing customers to sacrifice their privacy rights in the service of vague regulatory oversight is "mandat[ing] speech" that Wheely "would not otherwise make." *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988).

Because the Reporting Rules burden Wheely's First Amendment rights, they cannot pass constitutional muster unless the government's interest is "substantial" and the rules are "narrowly drawn" and not more extensive than necessary to serve that interest. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564-65 (1980). The City has not pointed to any substantial interest served by the Rules or the mechanism for compelled consent. Of course, evading the federal protections embodied in the SCA is not a legitimate interest, much less a substantial one. The City's other vague rationales—such as promoting regulatory "accountability" or facilitating policy development—serve generic efficiency interests that do not justify intrusions on speech. *See Riley*, 487 U.S. 781 at 795 ("[T]he First Amendment does not permit the State to sacrifice speech for efficiency."); *see also Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,

564 U.S. 721, 747 (2011) ("[T]he fact that [a state law provision] may be more efficient than other alternatives—that it may help the State in 'finding the sweet-spot' or 'fine-tuning' its financing system to avoid a drain on public resources—is of no moment." (citation omitted)).

But even if the City could point to a substantial interest, the Rules still would not survive First Amendment scrutiny because the City's regulation of speech is not sufficiently tailored to its goal. The government's regulation cannot be "narrowly drawn" if "less speech-restrictive alternatives are available." *United States v. Caronia*, 703 F.3d 149, 167 (2d Cir. 2012). Here, there unquestionably is such an alternative: the SCA itself. The City can comply with the SCA and obtain user information through the legal process Congress prescribed. As the SCA provides an "alternative form[] of regulation" that does "not involve any restriction on speech" and is equally "likely to achieve the State's goal," the City's choice to compel Wheely's speech violates the First Amendment. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507 (1996).[2]

### E. The Location Reporting Rules Violate Article I, § 8 of the New York State Constitution

Similarly, article I, § 8 of the New York State Constitution prohibits any law "to restrain or abridge the liberty of speech." "Free speech claims under the First Amendment and the New York State Constitution are subject to the same standards . . . ." *Hous. Works, Inc. v. Turner*, 179 F. Supp. 2d 177, 199 n.25 (S.D.N.Y. 2001), *aff'd sub nom. Hous. Works, Inc. v. Guiliani*, 56 F. App'x 530

---

[2] The Location Reporting Rules separately violate the First Amendment by requiring Wheely to disclose passenger data to the City. As recognized in *DoorDash, Inc. v. City of New York*, 789 F. Supp. 3d 337, 353 (S.D.N.Y. 2025), when a law requires a business to disclose customer data, "it compels speech that falls within the First Amendment's protection." *Id.* at 358-59 (invalidating regulation under First Amendment after finding that it was not "appropriately tailored" because there were less restrictive alternatives to promoting the City's interest than mandating that businesses disclose, or "communicate," that data). As discussed, the Rules are not appropriately tailored to any substantial interest.

(2d Cir. 2003). Thus, for the reasons described above, the Location Reporting Rules also violate article I, § 8 of the New York State Constitution.

## II.      Wheely and Its Users Will Be Irreparably Harmed Absent an Injunction

Wheely is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Irreparable harm exists if, "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). A plaintiff need show only "a *threat* of irreparable harm, not that irreparable harm already [has] occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) (emphasis in original). Wheely will suffer irreparable harm in multiple ways.

First, it is well established that "[w]hen an alleged deprivation of a constitutional right is involved, . . . *no further showing of irreparable injury is necessary*" to secure a preliminary injunction. *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (emphasis added) (citation omitted). Indeed, the Second Circuit has held that the mere *possibility* of a violation of constitutional rights is sufficient to demonstrate irreparable harm. *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("[I]t is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm." (emphasis in original)). The Location Reporting Rules violate the United States and New York constitutions, and these violations would reoccur with each compelled submission of private business records to the TLC. This ends the irreparable harm inquiry. *Id.*

Even putting aside the constitutional nature of the violations at issue, Wheely faces irreparable harm in other ways. Absent an injunction, Wheely faces an untenable choice: either disclose sensitive user information to the government or refuse to comply and face heavy financial penalties and suspension of its licenses. Injunctive relief exists to protect parties from facing such a choice while the validity of a regulation is being litigated. *See, e.g.*, *Morales v. Trans World*

*Airlines, Inc.*, 504 U.S. 374, 381 (1992) (finding irreparable injury where the plaintiffs faced "a Hobson's choice: continually violate [the preempted law] and expose themselves to potentially huge liability; or . . . suffer the injury of obeying the law during the pendency of the proceedings and any further review").

Moreover, Wheely will suffer irreparable harm if forced to divulge sensitive user information to the City because "the confidentiality of those records will be irreversibly lost even if plaintiffs ultimately prevail on the merits of their claim." *Airbnb, Inc.*, 373 F. Supp. 3d at 499. Indeed, the disclosure of private, confidential information "is the quintessential type of irreparable harm that cannot be compensated or undone by money damages." *Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000). The threat to privacy interests is particularly acute in this case because the Location Reporting Rules do not impose any meaningful restrictions on the City's ability to share the sensitive geolocation data it collects. The City may disseminate this information to other government agencies, law enforcement, or even to members of the public through requests under New York's FOIL—just as it has in the past. (*See* Drylewski Decl. Ex. E.) Once released, this data can be used to identify, exploit, and potentially harm individual passengers. (*See supra* pp. 6-8.) Absent an injunction, Wheely faces an immediate and irreversible loss of confidentiality in its business records containing sensitive personal information about its users.

Finally, if forced to divulge geolocation data, Wheely will permanently damage its customer relations, reputation, and goodwill. These harms are well-recognized as irreparable. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *Can't Live Without It, LLC v. ETS Express, Inc.*, No. 17-CV-3506 (JSR), 2017 WL 4776741, at *2 (S.D.N.Y. Oct. 10, 2017) ("It is well recognized that the inability of a

party to supply its products to customers as a result of a dispute will often result in a loss of goodwill sufficient to establish irreparable harm." (citations omitted)). This harm is neither speculative nor remote: Wheely's reputation and goodwill are inextricably linked to its privacy commitments. Wheely has deliberately positioned itself as a *privacy-first* ride-hailing service, emphasizing discretion and data security at every level of its operations. (*See supra* pp. 3-4.) And given the unique nature of location data and its susceptibility to de-anonymization, Wheely customers would have every reason to lose trust in the Company if it were forced to divulge its geolocation records.

## III. The Balance of Equities and the Public Interest Favor an Injunction

In considering whether to grant injunctive relief, "[t]he Court should balance the equities to reach an appropriate result protective of the interests of both parties." *Ligon v. City of New York*, 925 F. Supp. 2d 478, 540 (S.D.N.Y. 2013) (citation omitted). A denial of a preliminary injunction would subject Wheely to immediate, irreparable, and continuous violation of its constitutional rights and harm to its passengers and business. The City, by contrast, would face at most a temporary delay in access to Wheely's data and can use other tools to regulate FHVs in the meantime. In these circumstances, the balance of hardships favors Wheely. *See Mitchell*, 748 F.2d at 807-08 ("Faced with such a conflict between the state's financial and administrative concerns on the one hand, and the risk of substantial constitutional harm to plaintiffs on the other, we have little difficulty concluding . . . that the balance of hardships tips decidedly in plaintiffs' favor.").

The public interest also strongly favors an injunction here. The public has a strong interest in upholding constitutional protections, preventing government overreach, preventing diminished safety and harm to New Yorkers, and ensuring that sensitive personal data is not disclosed without adequate safeguards. *Ligon*, 925 F. Supp. 2d at 541 (finding that the public had a strong interest "in liberty and dignity under the Fourth Amendment").

## **CONCLUSION**

The Location Reporting Rules represent a stark example of unjustified governmental overreach—one that fundamentally threatens the privacy and safety of New Yorkers and is untethered to any cognizable governmental interest. This Court should issue a preliminary injunction enjoining the City from enforcing the Location Reporting Rules pending the resolution of Wheely's claims.

Dated:  New York, New York
            February 12, 2026

Respectfully submitted,

 */s/ Alexander C. Drylewski*
Alexander C. Drylewski
Lara A. Flath
Jacob G. Lefkowitz
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Alexander.Drylewski@skadden.com
Lara.Flath@skadden.com
Jacob.Lefkowitz@skadden.com


*Counsel for Plaintiffs Wheely USA, Inc.,*
*Mayfair-NY LLC, and Kensington-NY*
*LLC*