UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WHEELY USA, INC.,
MAYFAIR-NY LLC, and
KENSINGTON-NY LLC,

               *Plaintiffs*,

        v.

THE CITY OF NEW YORK,

               *Defendant*.

Case No. 1:26-cv-01057-CM

**BRIEF OF AMICUS CURIAE THE LEGAL AID SOCIETY IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF**

Laura Moraff
Shona Hemmady
THE LEGAL AID SOCIETY
49 Thomas Street
New York, NY 10013
(929) 536-1637
LMoraff@legal-aid.org
SHemmady@legal-aid.org

*Counsel for Amicus Curiae The Legal Aid Society*

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................................1

ARGUMENT ..................................................................................................................................3

    I.    The Location Reporting Rules Intrude Upon Passengers' Privacy. ..................................... 3

    II.   The Location Reporting Rules Intrude Upon Drivers' Privacy........................................... 8

CONCLUSION ..............................................................................................................................9

# TABLE OF AUTHORITIES

**Rules**

35 R.C.N.Y. § 59B-19 ........................................................................................................ 1

35 R.C.N.Y. § 59B-19(a)(1) ............................................................................................. 8

NYC Administrative Code Code § 10-178(c) ................................................................... 8

**Other Authorities**

Alex Hern, *New York Taxi Details Can Be Extracted from Anonymised Data, Researchers* Say, The Guardian (June 27, 2014) ......................................................................................... 8

Anna Johnston, *Bradley Cooper's Taxi Ride: A Lesson in Privacy Risk*, Helios Salinger (Apr. 19, 2015) ...................................................................................................... 4, 5

Anthony Tockar, *Riding With the Stars: Passenger Privacy in the NYC Taxicab Dataset* (Sep. 15, 2014) ........................................................................................................ 4, 5

Arya Sundaram, *The Annual 'Check-In' With ICE: Now a Fraught Event for Migrants*, Gothamist (Oct. 27, 2025) .......................................................................................... 7

Beth LeBlanc, *Tracking Michigan Protesters Raises Privacy, COVID-19 Spread Questions*, The Detroit News (Jun. 2, 2020) ...................................................................................... 7

CassWorld, *Further Lane East Hampton 2026: Where Billions Meet the Beach* (Jan. 27, 2026).. 3

Charlie Warzel & Stuart A. Thompson, *How Your Phone Betrays Democracy*, New York Times Opinion (Dec. 21, 2019) ............................................................................................. 7

Dave Maass & Rindala Alajaji, *How Cops Are Using Flock Safety's ALPR Network to Surveil Protesters and Activists*, Electronic Frontier Foundation (Nov. 20, 2025) ................................. 6

Faiza Patel & Matthew Ruppert, *ICE Wants to Go After Dissenters As Well As Immigrants*, Brennan Center (Nov. 21, 2025)................................................................................ 7

*How Mobile Device Capture-to-Social Works to Save Lives*, Veritas Society ................................. 6

J.K. Trotter, *Public NYC Taxicab Database Lets You See How Celebrities Tip*, Gawker (Oct. 23, 2014) ................................................................................................................. 4

Jason Koebler & Joseph Cox, *ICE Taps Into Nationwide AI-Enabled Camera Network, Data Shows*, 404 Media (May 27, 2025) ........................................................................ 7

Joseph Cox & Jason Koebler, *A Texas Cop Searched License Plate Cameras Nationwide for a Woman Who Got an Abortion*, 404 Media (May 29, 2025) .......................................... 6

Joshua Brustein, *Uber Doesn't Want to Give NYC (or Anyone) More Data*, Bloomberg (Jan. 5, 2017) ................................................................................................................. 1

Laura Romero et al., *In a New Tactic, ICE Is Arresting Migrants at Immigration Courts, Attorneys Say*, ABC News (Jan. 4, 2025)................................................................................. 7

Letter from American-Arab Anti-Discrimination Comm., Electronic Frontier Found., Cent. for Democracy and Tech., The Const. Project, Const. All., and Defending Dissent Found., to N.Y.C. Taxi & Limousine Comm'n (Nov. 19, 2014)............................................................ 1

Letter from Cent. for Democracy and Tech., Future of Privacy Forum, Electronic Frontier Found., Tech Freedom, and The Const. Project, to N.Y.C. Taxi & Limousine Comm'n (Dec. 26, 2016) ................................................................................................................. 1

Lorenzo Franceschi-Bicchierai, *Redditor Cracks Anonymous Data Trove to Pinpoint Muslim Cab Drivers*, Mashable (Jan. 28, 2015)................................................................................. 9

MAS Staten Island (@massicenter), *Mommy & Me*, Instagram (Oct. 15, 2024) .......................... 6

Muslim American Society: Staten Island, Contact Us................................................................. 5

*PA James Opposes Dangerous Data Collection Move by De Blasio Administration*, Public
 Advocate for the City of New York (Feb. 1, 2017)....................................................................... 2

Todd W. Schneider, *Analyzing 1.1 Billion NYC Taxi and Uber Trips, with a Vengeance* (Nov. 2015)
 ...................................................................................................................................................... 3

Transcript of the New York City Taxi & Limousine Commission, N.Y.C. Taxi & Limousine
 Comm'n (Jan. 5, 2017) ........................................................................................................... 1

Transcript of the New York City Taxi & Limousine Commission, N.Y.C. Taxi & Limousine
 Comm'n (Oct. 16, 2014)......................................................................................................... 1

Vijay Pandurangan, *On Taxis and Rainbows: Lessons from NYC's improperly anonymized taxi
 logs*, Medium (June 21, 2014) .............................................................................................. 8

<u>**INTRODUCTION AND SUMMARY OF ARGUMENT**</u>

The New York Taxi and Limousine Commission's (TLC's) Location Reporting Rules require all FHV base owners to collect and transmit to the TLC the date, time, and location of every passenger pickup and drop-off, the driver's TLC license number, and the vehicle's license number. 35 R.C.N.Y. § 59B-19. This means that no New Yorker can take an Uber without the TLC knowing when and where they went. No Lyft driver in the City can keep their driving schedule private from the government. And troves of sensitive data are available for all government and private actors to use and abuse as they like.

Since the TLC's Location Reporting Rules were introduced, riders, drivers, privacy advocates, and companies have raised concerns about their impact on New Yorkers' privacy, warning that "the compilation of such vast databases by the TLC can reveal very private geolocation information about who is traveling and precisely when and where."[1] Groups like the

---

[1] Letter from American-Arab Anti-Discrimination Comm., Electronic Frontier Found., Cent. for Democracy and Tech., The Const. Project, Const. All., and Defending Dissent Found., to N.Y.C. Taxi & Limousine Comm'n (Nov. 19, 2014), https://media.bizj.us/view/img/4423681/tlcletter.pdf; *see also* Transcript of the New York City Taxi & Limousine Commission at 35:5-6, N.Y.C. Taxi & Limousine Comm'n (Oct. 16, 2014), https://www.nyc.gov/assets/tlc/downloads/pdf/transcript_10_16_14.pdf (The requirement that base owners transmit trip records to the TLC "potentially undermin[es] the privacy of drivers, passengers and bases."); Joshua Brustein, *Uber Doesn't Want to Give NYC (or Anyone) More Data*, Bloomberg (Jan. 5, 2017), https://www.bloomberg.com/news/articles/2017-01-05/uber-doesn-t-want-to-give-nyc-or-anyone-more-data ("Uber described the requirement as an invasion of privacy"); Letter from Cent. for Democracy and Tech., Future of Privacy Forum, Electronic Frontier Found., Tech Freedom, and The Const. Project, to N.Y.C. Taxi & Limousine Comm'n (Dec. 26, 2016), https://fpf.org/wp-content/uploads/2016/12/TLC-Fatigue-Comments-from-FPF-CDT-EFF-Constitution-Project-and-Tech-Freedom.pdf (the addition of drop-off data to the TLC's data set "would provide the TLC and the public with a comprehensive view of the movements of individual New Yorkers."); Transcript of the New York City Taxi & Limousine Commission at 66:17-67:2, N.Y.C. Taxi & Limousine Comm'n, 161 (Jan. 5, 2017),

Center for Democracy and Technology urged the TLC to consider purpose, specification, and use limitations—largely absent in the TLC's proposal.[2] And Uber riders called the data collection "creepy" and believed it would "lead to an Orwellian state."[3]

In 2017, when the TLC first proposed to collect drop-off locations, then-Public Advocate Letitia James warned that "[t]he new proposed rules by the TLC could compromise New Yorkers' privacy without any proof that such regulations will increase overall safety."[4] She believed that "[i]nstead of attempting this data grab, our government should work to preserve New Yorkers' privacy."[5] Her sentiments were echoed by Tech NYC, the Center for Democracy and Technology, Future of Privacy Forum, Via, and others.[6]

These concerns about government collection of location data are all the more pressing today. While data never existed in a vacuum, modern technology has made it cheaper and easier to aggregate data from various sources and draw inferences about people's private lives. In 2026, the TLC is not just learning about New Yorkers' car rides—it is collecting and sharing puzzle pieces that will be used to uncover individuals' religious practices, medical conditions, political protest activity, and more.

---

https://www.nyc.gov/assets/tlc/downloads/pdf/transcript_01_05_17.pdf ("It's no secret that growing public concerns over privacy issues with the current process are escalating at a rapid pace.").

[2] Transcript of the New York City Taxi & Limousine Commission, N.Y.C. Taxi & Limousine Comm'n, 154 (Jan. 5, 2017), https://www.nyc.gov/assets/tlc/downloads/pdf/transcript_01_05_17.pdf.

[3] *Id.* at 137.

[4] *PA James Opposes Dangerous Data Collection Move by De Blasio Administration*, Public Advocate for the City of New York (Feb. 1, 2017), available at https://web.archive.org/web/20170206013811/http://pubadvocate.nyc.gov/news/articles/pa-james-opposes-dangerous-data-collection-move-de-blasio-administration.

[5] *Id.*

[6] *Id.*

Amicus Curiae The Legal Aid Society respectfully urges the Court to rule in favor of Plaintiffs and put an end to the TLC's invasive and dangerous data collection practices.

## ARGUMENT

### I. The Location Reporting Rules Intrude Upon Passengers' Privacy.

The time and location of a passenger's pickup and drop-off can be deeply revealing—especially when combined with other trips and other sources of data. When the TLC proposed collecting such information, privacy advocates opposed the proposal so fervently, in part because similar information that the TLC collected about taxi trips had already been used to track individuals' movements and reveal sensitive information about them.

As advocates explained to the TLC in 2017, drop-off locations—particularly in places like Bay Ridge, Bayside, Staten Island, and other neighborhoods with many single-family homes—can be used to identify passengers.[7] Using the TLC's data on taxi trips, which includes drop-off and pickup times and locations, Todd Schneider found one trip where a rider went from Brooklyn Heights (the data showed the exact location) to an oceanfront home on East Hampton's Further Lane (again, the exact address was provided in the TLC's data).[8] The owners of many houses on Further Lane can be easily identified using a simple online search.[9] Thanks to the TLC's data set, Schneider also knew that the person paid $400 for the cab ride, including a $110.50 tip.[10]

---

[7] Transcript of the New York City Taxi & Limousine Commission, *supra* note 2, at 130.

[8] Todd W. Schneider, *Analyzing 1.1 Billion NYC Taxi and Uber Trips, with a Vengeance* (Nov. 2015), https://toddwschneider.com/posts/analyzing-1-1-billion-nyc-taxi-and-uber-trips-with-a-vengeance/.

[9] *See* CassWorld, *Further Lane East Hampton 2026: Where Billions Meet the Beach* (Jan. 27, 2026), https://sociallifemagazine.com/real-estate/further-lane-east-hampton-2026/.

[10] Schneider, *supra* note 8.

Anthony Tockar used the TLC's taxi dataset to identify certain celebrities' taxi trips, see where they went, and determine much they tipped their drivers. He accomplished this by Googling images of celebrities getting into or out of taxis and consulting celebrity gossip blogs, and then comparing locations and times of celebrity sightings to the TLC's dataset—which includes locations, times, fares and tips.[11] For example, on July 8, 2013, Bradley Cooper hailed a cab in order to escape photographers.[12] But Tockar used the TLC's dataset to figure out that that Bradley Cooper had taken the cab to the restaurant Melibea in Greenwich Village, and that Cooper paid $10.50 with no recorded tip.[13] Jessica Alba also hailed a taxi outside the Trump SoHo hotel and paid $9 with no recorded tip. [14]

Using the same technique, J.K. Trotter found that, on June 26, 2013 at 11:23AM, Karolina Kurkova hailed a cab at 112 Hudson St, and at 11:32, she arrived at her destination: 624 W. 26th St.[15] Her fare was $10 and she left a $2 tip. On May 6, 2013 at 2:52PM, Jessica Biel hailed a cab from 342 Bowery, and took it to 8 E. 23 St, where she arrived at 3:07.[16] Emma Roberts and Evan Peters hailed a cab at 875 Park Avenue on May 21, 2013 at 2:46 PM, and arrived at 533 E 84th St at 2:53.[17] Their fare was $6.50, and they tipped $1.

---

[11] Anna Johnston, *Bradley Cooper's Taxi Ride: A Lesson in Privacy Risk*, Helios Salinger (Apr. 19, 2015), https://www.heliossalinger.com.au/2015/04/19/bradley-coopers-taxi-ride-a-lesson-in-privacy-risk/.

[12] Anthony Tockar, *Riding With the Stars: Passenger Privacy in the NYC Taxicab Dataset* (Sep. 15, 2014), https://agkn.wordpress.com/2014/09/15/riding-with-the-stars-passenger-privacy-in-the-nyc-taxicab-dataset/.

[13] *Id.*

[14] *Id.*

[15] J.K. Trotter, *Public NYC Taxicab Database Lets You See How Celebrities Tip*, Gawker (Oct. 23, 2014), https://www.gawkerarchives.com/the-public-nyc-taxicab-database-that-accidentally-track-1646724546.

[16] *Id.*

[17] *Id.*

The TLC's data can do more than reveal celebrities' and homeowners' travels. It can also be used to identify people who visit a particular establishment—which can then be used to infer their religion, sexuality, and other sensitive information about them.

For example, Tockar developed a map showing the drop-off addresses for each trip that had begun at a particular strip club: Larry Flynt's Hustler Club.[18] He then identified the most frequent drop-off spots, implying frequent customers.[19] Because some of those drop-off locations had very few—or only one—residence(s) around them, Tockar was able to identify a customer's address.[20] Using the address, he was able to Google the customer's name, and using websites like Facebook and Spokeo, he was able to find the customer's photo, ethnicity, relationship status, property value, and court records.[21] Tockar also used the TLC's data to find the customer's other taxi trips, which included rides to "Rick's Cabaret" and "Flashdancers."[22] As Tockar concluded, "[e]quipped with this dataset, and just a little auxiliary information about you, it would be quite trivial for someone to follow your movements, collecting data on your whereabouts and habits, while you remain blissfully unaware."[23]

Tockar's same technique could be used to identify likely Muslims by searching for all trips where the drop-off location was at or about 180 Burgher Ave—the Muslim American Society in Staten Island.[24] The TLC's data could even be used to identify Muslim women with young children

---

[18] Johnston, *supra* note 11; Tockar, *supra* note 12.
[19] Tockar, *supra* note 12.
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] Muslim American Society: Staten Island, Contact Us, https://massic.org/contact-us/.

by filtering the data for trips where the drop-off occurred around 11am on Mondays—the start of the Muslim American Society's Mommy & Me program.[25]

The data could also be used to identify people who may have sought abortions or other reproductive healthcare, by searching for all trips where the drop-off location was a reproductive healthcare clinic. Both government actors and private actors have demonstrated an interest in tracking such visits,[26] and the TLC's dataset could be a major boon to such efforts.

The same tactic could be used to identify and track individuals who went to an Alcoholics Anonymous program, lawyer's office, court, jail, prison, sex shop, news office, political party's headquarters, or protest.

In fact, there are numerous instances of location information being used to identify and track people who attend protests. The Electronic Frontier Foundation analyzed searches of data collected through Flock Safety's automated license plate readers between December 2024 and October 2025, and found that more than 50 federal, state, and local agencies searched the network in connection with protest activity.[27] In 2019, Times Opinion obtained cell phone location data

---

[25] *See* MAS Staten Island (@massicenter), *Mommy & Me*, Instagram (Oct. 15, 2024), https://www.instagram.com/p/DBKoUTvMGdZ/.

[26] *See, e.g.*, Joseph Cox & Jason Koebler, *A Texas Cop Searched License Plate Cameras Nationwide for a Woman Who Got an Abortion*, 404 Media (May 29, 2025), https://www.404media.co/a-texas-cop-searched-license-plate-cameras-nationwide-for-a-woman-who-got-an-abortion/; *How Mobile Device Capture-to-Social Works to Save Lives*, Veritas Society, available at https://web.archive.org/web/20211203103204/https://veritassociety.com/digital-technology/.

[27] Dave Maass & Rindala Alajaji, *How Cops Are Using Flock Safety's ALPR Network to Surveil Protesters and Activists*, Electronic Frontier Foundation (Nov. 20, 2025), https://www.eff.org/deeplinks/2025/11/how-cops-are-using-flock-safetys-alpr-network-surveil-protesters-and-activists.

that allowed it to track the paths of demonstrators from the 2017 Women's March to their homes.[28] In 2020, a liberal advocacy group used anonymized cellphone location data to track more than 400 individuals who had attended an American Patriots Rally against the Michigan governor's COVID-19 stay-home orders.[29] Upon finding out about the tracking, one protester said he "would have left [his] phone at home."[30] Indeed, many of today's protest guides advise people not to take smartphones with them, precisely so that they can avoid this type of location tracking. But no one who takes an Uber, Lyft, or another FHV can avoid being in the TLC's dataset.

There is also nothing stopping federal agents from using the TLC's dataset to identify and track immigrants. ICE has demonstrated an interest in using location information to track immigrants.[31] And federal agents have arrested people in immigration courts.[32] The TLC's dataset contains every FHV trip to and from New York City immigration court, immigration lawyers' offices, and organizations dedicated to serving immigrants. This data can help streamline agents'

---

[28] Charlie Warzel & Stuart A. Thompson, *How Your Phone Betrays Democracy*, New York Times Opinion (Dec. 21, 2019), https://www.nytimes.com/interactive/2019/12/21/opinion/location-data-democracy-protests.html.

[29] Beth LeBlanc, *Tracking Michigan Protesters Raises Privacy, COVID-19 Spread Questions*, The Detroit News (June 2, 2020), https://www.detroitnews.com/story/news/local/michigan/2020/06/02/tracking-michigan-capitol-protesters-raises-privacy-covid-19-spread-questions/5224425002/.

[30] *Id.*

[31] *See, e.g.*, Faiza Patel & Matthew Ruppert, *ICE Wants to Go After Dissenters As Well As Immigrants*, Brennan Center (Nov. 21, 2025), https://www.brennancenter.org/our-work/research-reports/ice-wants-go-after-dissenters-well-immigrants; Jason Koebler & Joseph Cox, *ICE Taps Into Nationwide AI-Enabled Camera Network, Data Shows*, 404 Media (May 27, 2025), https://www.404media.co/ice-taps-into-nationwide-ai-enabled-camera-network-data-shows/.

[32] Laura Romero et al., *In a New Tactic, ICE Is Arresting Migrants at Immigration Courts, Attorneys Say*, ABC News (Jan. 4, 2025), https://abcnews.com/US/new-tactic-ice-arresting-migrants-immigration-courts-attorneys/story?id=122513021; Arya Sundaram, *The Annual 'Check-In' With ICE: Now a Fraught Event for Migrants*, Gothamist (Oct. 27, 2025), https://gothamist.com/news/the-annual-check-in-with-ice-now-a-fraught-event-for-migrants.

attempts to surveil and apprehend immigrant New Yorkers, undermining the City's status as a sanctuary city.[33]

The Location Reporting Rules mandate the collection and reporting of information that many New Yorkers prefer to keep private. In New York City, where many people do not own cars and have no access to other forms of private transportation, FHVs are often their only option. The Location Reporting Rules thus put New Yorkers in an impossible position—coerced to share private information in order to travel—and Amicus Curiae supports Plaintiffs' request to enjoin their enforcement.

**II.    The Location Reporting Rules Intrude Upon Drivers' Privacy.**

The TLC's dataset can also be used to learn sensitive, private information about drivers. For each trip, base owners must provide the TLC with the driver's TLC Driver License number and the dispatched Vehicle's License number. 35 R.C.N.Y. § 59B-19(a)(1). Even if the TLC attempts to anonymize the data, it will still be apparent which trips were completed by the same vehicle, and it will sometimes be possible to identify the driver from that information. For example, it might be possible to infer which neighborhood a driver lives in based on where the majority of their trips start. Notably, the TLC also has a history of improperly anonymizing its data. In 2014, Vijay Pandurangan was able to de-anonymize the TLC's entire taxi trip dataset such that it was possible to see which driver drove every trip, calculate a driver's gross income, or infer where a driver lived.[34]

---

[33] *Cf.* NYC Administrative Code Code § 10-178(c) (prohibiting the use of city resources for immigration enforcement).

[34] Vijay Pandurangan, *On Taxis and Rainbows: Lessons from NYC's improperly anonymized taxi logs*, Medium (June 21, 2014), https://medium.com/vijay-pandurangan/of-taxis-and-rainbows-f6bc289679a1; Alex Hern, *New York Taxi Details Can Be Extracted from Anonymised Data, Researchers* Say, The Guardian (June 27, 2014),

Patterns in the TLC's data can also reveal sensitive information about drivers. For example, Noah Deneau searched the TLC's taxi data for drivers that had low activity within 30–45 minutes of Muslim prayer times in order to identify devout Muslim drivers.[35] Luckily, Deneau's goal wasn't to out specific drivers—it was "about proving that . . . very personal information always lurks in supposedly anonymous data troves."[36] But similar techniques could easily be used to out, dox, track, and otherwise harm drivers with certain behavioral patterns.

Unlike Plaintiffs in this case, many individual drivers lack the resources and means to sue the City to vindicate their rights infringed upon by the Location Reporting Rules. Amicus Curiae respectfully contends that the Location Reporting Rules put drivers' privacy at risk, and New Yorkers would be safer without them.

## **CONCLUSION**

In 2026, it is clearer than ever that amassing data on New Yorkers' travel patterns can and will cause real harm. Amicus Curiae thus supports Plaintiffs' motion to preliminarily and permanently enjoin the TLC's Location Reporting Rules.

Dated: New York, New York
      March 19, 2026

Respectfully submitted,

/s/ Laura Moraff

Laura Moraff
Shona Hemmady
THE LEGAL AID SOCIETY

---

https://www.theguardian.com/technology/2014/jun/27/new-york-taxi-details-anonymised-data-researchers-warn.

[35] Lorenzo Franceschi-Bicchierai, *Redditor Cracks Anonymous Data Trove to Pinpoint Muslim Cab Drivers*, Mashable (Jan. 28, 2015), https://mashable.com/archive/redditor-muslim-cab-drivers.

[36] *Id.*

49 Thomas Street
New York, NY 10013
(929) 536-1637
LMoraff@legal-aid.org
SHemmady@legal-aid.org

*Counsel for Amicus Curiae The Legal Aid Society*

**CERTIFICATION OF WORD COUNT**

In compliance with Local Civil Rule 7.1(c) of the Joint Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, the undersigned hereby certifies that the word count in this Brief (excluding the caption, index, table of contents, table of authorities, signature block, certificate of service, and this certification), as established using the word-count function of the word-processing system used to prepare it, is 2,496 words.

Dated:      March 19, 2026
            New York, New York

                                          */s/ Laura Moraff*

                                          Laura Moraff
                                          *Counsel for Amicus Curiae The Legal Aid Society*

**CERTIFICATE OF SERVICE**

I certify that on March 19, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which automatically sends email notification of such filing to registered participants.

*/s/ Laura Moraff*

Laura Moraff
*Counsel for Amicus Curiae The Legal Aid Society*