**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WHEELY USA, INC., MAYFAIR-NY LLC, and KENSINGTON-NY LLC, <br><br>                *Plaintiffs,* <br><br>    v. <br><br> CITY OF NEW YORK, <br><br>                *Defendant.* | 26-cv-01057-CM |

**BRIEF OF *AMICUS CURIAE***
**SURVEILLANCE TECHNOLOGY OVERSIGHT PROJECT**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR A PERMANENT INJUNCTION**

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* is a 501(c)(3) nonprofit organization. It has no stock and no parent corporation, and no corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iv

INTEREST OF *AMICUS CURIAE* ....................................................................1

SUMMARY OF ARGUMENT .............................................................................1

ARGUMENT ........................................................................................................2

    I. THE TLC'S GEOLOCATION MANDATE VIOLATES THE FOURTH

    AMENDMENT AND EXPANDS THE CITY'S SURVEILLANCE APPARATUS ........2

        A. New York City has constructed the most comprehensive municipal

        surveillance apparatus in American history ..............................................4

        B. The TLC's geolocation mandate threatens the privacy of all New Yorkers and

        disproportionately harms vulnerable communities ..................................8

        C. Data-sharing pipelines ensure that rideshare geolocation data reaches law

        enforcement ...........................................................................................11

        D. *Carpenter* compels warrant protection for geolocation data, and the sole

        contrary precedent is fatally undermined ..............................................15

    II. ANONYMIZATION DOES NOT CURE THE CONSTITUTIONAL

    VIOLATION...................................................................................................19

    III. PROVEN ALTERNATIVES EXPOSE THE TLC'S MANDATE AS

    CONSTITUTIONALLY UNNECESSARY ...................................................23

CONCLUSION..................................................................................................28

CERTIFICATE OF SERVICE ....................................................................................................29

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                  **Page(s)**

*Arizona v. Gant*, 556 U.S. 332 (2009) ....................................................................................23

*Boyd v. United States*, 116 U.S. 616 (1886) ............................................................................3

*Carpenter v. United States*, 585 U.S. 296 (2018) ..........................2, 3, 8, 9, 15, 16, 17, 18, 19, 22

*Chatrie v. United States*, No. 25-112 (cert. granted Jan. 16, 2026)................................18

*City of Indianapolis v. Edmond*, 531 U.S. 32 (2000)................................................................26

*City of Los Angeles v. Patel*, 576 U.S. 409 (2015) .................................................................17, 23

*El-Nahal v. Yassky*, 835 F.3d 248 (2d Cir. 2016) ..........................................................3, 13, 16, 17

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330 (4th Cir. 2021)........17, 18

*Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978)................................................................26

*OOIDA v. U.S. Dep't of Transp.*, 840 F.3d 879 (7th Cir. 2016)................................................24

*People v. Weaver*, 12 N.Y.3d 433 (2009) .................................................................................18

*United States v. Jones*, 565 U.S. 400 (2012) ..........................................................................8, 16

*United States v. Moore-Bush*, 36 F.4th 320 (1st Cir. 2022) (en banc)............................................18

*United States v. Smith*, 110 F.4th 817 (5th Cir. 2024) .............................................................17, 19

*United States v. Tuggle*, 4 F.4th 505 (7th Cir. 2021) ...................................................................18

*Wheely USA, Inc. v. City of New York*, No. 1:26-cv-01057 (S.D.N.Y. Feb. 6, 2026) ...............7, 25

**Statutes and Rules**

18 U.S.C. § 2518(3)(c)......................................................................................................23

35 R.C.N.Y. § 59B-19(a) ....................................................................................................6

49 C.F.R. pt. 395 ..............................................................................................................24

49 C.F.R. § 395.8(i) ..........................................................................................................24

49 C.F.R. § 395.26(b) .......................................................................................................24

80 Fed. Reg. 78,292 ..........................................................................................................24

N.Y.C. Admin. Code § 14-106 ..........................................................................................12

Private Hire Vehicles (London) Act 1998, c. 34 (UK) .....................................................25

Pub. L. No. 112-141, § 32301(b), 126 Stat. 405, 786 (2012) ..........................................24

**Other Authorities**

Barry Friedman, *Lawless Surveillance*, 97 N.Y.U. L. Rev. 1143 (2022).........................27

Barry Friedman, *The Constitutionality of Indiscriminate Data Surveillance*, 174 U. Pa. L. Rev.

(forthcoming 2026) .....................................................................................................27

Vicki C. Jackson, *Constitutional Law in an Age of Proportionality*,

124 Yale L.J. 3094 (2015) ..........................................................................................27

Paul Ohm, *Broken Promises of Privacy: Responding to the Surprising Failure of Anonymization*,

57 UCLA L. Rev. 1701 (2010) ....................................................................................20

Scott R. Skopek, *Reasonable Expectations of Anonymity*, 101 Va. L. Rev. 691 (2015)...............22

Christopher Slobogin, *Let's Not Bury Terry: A Call for the Rejuvenation of the Proportionality Principle*, 72 St. John's L. Rev. 1053 (1998) .......................................................27

Christopher Slobogin, *Proportionality, Privacy, and Public Opinion*, in Surveillance, Privacy, and Trans-Atlantic Relations (Russell Miller ed., Cambridge Univ. Press, 2017)............27

The Surveillance Technology Oversight Project ("S.T.O.P.") respectfully submits this brief in support of Plaintiffs' motion for a permanent injunction. S.T.O.P. is a nonpartisan, not-for-profit civil liberties and privacy organization that works to end discriminatory surveillance through research, legislative advocacy, and litigation. S.T.O.P. works to ensure that government agencies do not erode constitutional protections by compelling private companies to collect and surrender sensitive data on their users—circumventing the Fourth Amendment safeguards that would apply if the government sought to gather such information directly. S.T.O.P. has engaged extensively with the geolocation surveillance practices at the center of this case. It has championed legislation at the state and city level to ban geolocation tracking, publicly opposed expansions of the New York City Taxi and Limousine Commission's ("TLC")'s Location Reporting Rules, and documented how mass collection of ride-hail trip data can be used to track individuals based on the healthcare providers, houses of worship, and political gatherings they visit.

This record of sustained engagement with the constitutional and policy dimensions of location-based surveillance positions S.T.O.P. to offer the Court a unique perspective from which to evaluate the constitutional questions in this case.

**SUMMARY OF ARGUMENT**

The TLC's Location Reporting Rules are not an ordinary regulatory reporting requirement—instead, they expand New York City's existing mass surveillance apparatus, in violation of Wheely and their passengers' Fourth Amendment rights. The Rules compel private

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than *amicus curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

companies to build and surrender a comprehensive database of the movements of millions of New Yorkers—precise to three feet, collected monthly, retained indefinitely, and accessible to law enforcement, in and outside the city, without a warrant. Given the granularity and sensitivity of these data, the Rules' reporting requirement creates precisely the kind of continuous, comprehensive, and suspicionless surveillance system that the Supreme Court proscribed as an unreasonable search in *Carpenter v. United States*, 585 U.S. 296 (2018).

The constitutional harms extend far beyond the commercial interests of any single for-hire vehicle ("FHV") operator. The Rules implicate the Fourth Amendment rights of every passenger whose trip data enters the TLC's database and disproportionately burden the communities most vulnerable to government surveillance, including domestic violence survivors, journalists, and religious worshippers. Data sharing pipelines both within New York and with federal agencies all but ensure that such data will reach law and immigration enforcement. Furthermore, "anonymization" is functionally impossible and insufficient to cure the Fourth Amendment violation. Research demonstrates the ease with which precise geolocation data can be deanonymized to reveal sensitive personal information. Other jurisdictions across the United States and internationally achieve the TLC's regulatory objective of addressing driver fatigue with dramatically less intrusion into personal privacy—demonstrating that the Rules are neither necessary nor proportionate. For these reasons, S.T.O.P. urges this Court to hold that the TLC's Location Reporting Rules constitute an unreasonable search under the Fourth Amendment and to enjoin their enforcement.

<center>**ARGUMENT**</center>

## I. THE TLC'S GEOLOCATION MANDATE VIOLATES THE FOURTH AMENDMENT AND EXPANDS THE CITY'S SURVEILLANCE APPARATUS.

"When the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Carpenter v. United States*, 585 U.S. 296, 311-12 (2018). That language describes a cell-site simulator, a technology that merely approximates a phone's position within the coverage area of a cell tower. The TLC's Location Reporting Rules demand something far more precise: the exact GPS coordinates of every FHV trip's origin and destination, collected in real time, for every licensed driver in the city. If approximated cell-tower data trigger the Fourth Amendment, a mandatory regime of exact GPS surveillance over millions of passengers cannot escape its reach.

The TLC's Location Reporting Rules impose precisely the kind of continuous, comprehensive location surveillance that the Supreme Court held requires a warrant in *Carpenter v. United States*, 585 U.S. 296 (2018). Under *Carpenter*, the government conducts a Fourth Amendment search when it accesses records that provide "a comprehensive chronicle of the user's past movements," *id.* at 300, because such data reveal "the privacies of life," *id.* at 305 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). But the TLC geolocation mandate at issue does not operate in isolation; it feeds the most comprehensive municipal surveillance apparatus in the nation, fills gaps that cameras and license plate readers cannot reach, and generates a geolocation dataset whose sensitivity has already been demonstrated through catastrophic privacy failures. *Carpenter*'s logic compels the conclusion that the TLC's requirement that FHV operators report precise GPS coordinates for every trip constitutes a search. *Carpenter* overrules precedent in this court to the contrary and repudiates its reasoning. *El-Nahal v. Yassky*, 835 F.3d 248 (2d Cir. 2016) (finding that plaintiff had failed to establish a property interest in any particular taxicab at the time

<center>3</center>

the device was installed and declining to consider whether the mandate intruded on any reasonable expectation of privacy). The accelerating trend across federal circuits and state courts confirms that continuous geolocation tracking triggers full Fourth Amendment protection.

### A. New York City has constructed the most comprehensive municipal surveillance apparatus in American history.

New York City has assembled, piece by piece, a surveillance infrastructure without parallel in American history. At its center sits the Domain Awareness System ("DAS"), a public-private partnership between the New York Police Department ("NYPD") and Microsoft launched in August 2012 that integrates data from across the city's security landscape into a single, searchable platform.[2] But DAS is only the hub of a far larger apparatus. Radiating outward from it is a vast network of distinct technologies, each contributing a different dimension of data about the movements, associations, and daily lives of eight million residents.

Consider the scale of each component and how they interlock:

- *Closed-Circuit Television Cameras.* CCTV cameras and more than 25,500 cameras at traffic intersections across the city feed directly into the DAS, recording the movements of pedestrians and vehicles.[3]
- *Automated License Plate Readers.* Approximately 500 NYPD-operated ALPRs,[4] supplemented by access to Vigilant Solutions' national database of 2.2 billion plate

---

[2] *See New York City Police Department and Microsoft Partner to Bring Real-Time Crime Prevention and Counterterrorism Technology Solution to Global Law Enforcement Agencies*, Microsoft Source (Aug. 8, 2012), https://news.microsoft.com/source/2012/08/08/new-york-city-police-department-and-microsoft-partner-to-bring-real-time-crime-prevention-and-counterterrorism-technology-solution-to-global-law-enforcement-agencies; E. S. Levine et al., *The New York City Police Department's Domain Awareness System*, 47(1) INFORMS J. on Computing 70 (2017), https://doi.org/10.1287/inte.2016.0860.

[3] *Inside the NYPD's Surveillance Machine*, Amnesty Int'l (2022), https://banthescan.amnesty.org/decode/index.html.

[4] John J. Miller, Deputy Comm'r of Intelligence & Counterterrorism, N.Y.C. Police Dep't, *Testimony Before the N.Y.C. Council Committees on Public Safety and Fire and Criminal Justice*

readings,[5] catalogue the movements of every vehicle on the city's streets. Metadata and plate data are retained for five or more years, and possibly indefinitely.[6]

- ***Acoustic Gunshot Detection.*** ShotSpotter (now SoundThinking) maintains a network of over 2,000 always-on microphones across all five boroughs that continuously monitor ambient sound in public spaces, ostensibly to detect and triangulate gunfire in real time.[7] The system has cost the city more than $54 million, yet the NYC Comptroller's 2024 audit found it identified confirmed shootings in only 13 percent of cases in the final month of data considered by the audit, June 2023.[8]

- ***Facial Recognition and Social Media Monitoring.*** The NYPD uses facial recognition technology to match images from surveillance cameras, social media, and other sources against databases of photographs to identify individuals—without their knowledge or consent.[9] The department has also invested over $8 million in artificial intelligence contracts with Voyager Labs to scrape and analyze individuals' social media activity.[10] NYPD investigators on the Social Media Analysis and Research Team can then recommend New Yorkers be included in the Department's database[11] that labels individuals as gang-affiliated based on criteria

*Services*, New York Civil Liberties Union (Nov. 12, 2014), https://assets.nyclu.org/DC_Miller_Testimony.pdf.

[5] *Automated License Plate Readers*, New York Civil Liberties Union (Jul. 23, 2015), https://www.nyclu.org/report/automatic-license-plate-readers.

[6] NYPD, *License Plate Readers: Impact and Use Policy*, NYC.gov, 6 (Apr. 11, 2021), https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/post-final/license-plate-readers-lpr-nypd-impact-and-use-policy_4.9.21_final.pdf [hereinafter *ALPR IUP*].

[7] Maura Hayes-Chaffe, *Audit Report on the New York City Police Department's Oversight of Its Agreement with ShotSpotter Inc. for the Gunshot Detection and Location System*, NYC Comptroller Brad Lander, 3 (Jun. 20, 2024), https://comptroller.nyc.gov/reports/audit-report-on-the-new-york-city-police-departments-oversight-of-its-agreement-with-shotspotter-inc-for-the-gunshot-detection-and-location-system/.

[8] *Id.* at 11.

[9] Eleni Manis et al., *Scan City: A Decade of NYPD Facial Recognition Abuse*, S.T.O.P., 4-7 (July 8, 2021), https://www.stopspying.org/scan-city.

[10] Johana Bhuiyan, *NYPD spent millions to contract with firm banned by Meta for fake profiles*, The Guardian (Sep. 8, 2023), https://www.theguardian.com/us-news/2023/sep/08/new-york-police-tracking-voyager-labs-meta-contract.

[11] *Criminal Group Database: Impact and Use Policy*, NYPD (Apr. 11, 2021) ("Only a limited number of NYPD personnel can recommend a subject be entered into the database: a precinct field

as thin as their social media connections, clothing, or neighborhood of residence.[12] As of February 2025, the database contained approximately 16,000 entries—99 percent of whom are Black or Latino—and includes minors as young as 13 years old.[13]

Beyond the above technologies purposely built for, or that directly feed the DAS, the system also ingests vast volumes of administrative and operational records collected by other city agencies for purposes entirely unrelated to law enforcement—54 million 911 calls, 15 million civilian complaints, 12 million detective case reports, 11 million arrest records, and 2 million warrants[14]—consolidating them into a single searchable platform that allows officers in every police precinct to pull up a detailed profile of any individual or location in seconds.[15] The system is unprecedented: no other city in the country has ever amassed this much data from its residents. And yet, even this apparatus has not been subjected to meaningful democratic oversight.

The TLC's Location Reporting Rules feed into this surveillance ecosystem. In February 2017, the TLC adopted amended rules requiring every licensed FHV base to report the precise GPS coordinates of both pickup and drop-off for every trip. 35 R.C.N.Y. § 59B-19(a). TLC's

---

intelligence officer; an investigator assigned to a Detective Bureau Gang Squad; or an investigator assigned to Social Media Analysis and Research Team.")

[12] Corinne Worthington et al., *Dragnet City: NYPD's Omnipresent Domain Awareness System*, S.T.O.P., 5 (Oct. 28, 2025) [hereinafter *DAS Report*].

[13] *NYC Public Advocate Calls to End Flawed NYPC Gang Database, Improve Actual Public Safety*, NYC Public Advocate Jumaane D. Williams (Feb. 24, 2025), https://advocate.nyc.gov/press/nyc-public-advocate-calls-to-end-flawed-nypc-gang-database-improve-actual-public-safety.

[14] E. S. Levine et al., *supra* note 2, at 73.

[15] *DAS Report*, *supra* note 12, at 2.

stated justification was to combat driver fatigue by enforcing limits on driving hours.[16] But as Princeton's Center for Information Technology Policy warned at the time, the rule's data collection far exceeds what fatigue enforcement requires: "the relevant data would be shift length . . . not pick up/drop off locations."[17] The TLC requires timestamped, trip-level GPS reporting from all licensed drivers and their passengers.[18] Wheely USA, Inc., a platform that sought to offer privacy-respecting FHV service, has documented that the TLC disclosed precise trip location data to law enforcement at least 42 times, 13 of those without a warrant or judicial authorization, and responded to over 7,800 FOIL requests for trip records. Compl. ¶¶ 65-66, *Wheely USA, Inc. v. City of New York*, No. 1:26-cv-01057 (S.D.N.Y. Feb. 6, 2026). Thus, the data collected under these rules do not stay within the TLC's regulatory domain. Upon disclosure to the NYPD, the database can stream into the DAS and become available to agencies across the city government for purposes far beyond those disclosed to the platforms that transmit it or the drivers and passengers whose movements records. And neither group has meaningful knowledge of, let alone any say in, how the data is ultimately used.

The TLC cannot credibly claim to stand apart from this system. When an agency compels an entire industry to generate timestamped location data, channels those data into centralized law

---

[16] *Notice of Public Hearing and Opportunity to Comment on Proposed Rules*, N.Y.C. Taxi & Limousine Comm'n, 3-4 (Nov. 28, 2016), https://www.nyctaxinews.com/sedDriverFatigueRule-PreliminarilyCertifed-11-28-16CLEAN.pdf.

[17] *NYC to Collect GPS Data on Car Service Passengers—Good Intentions Gone Awry or Something Else?*, Center for Information Technology Policy (Jan. 4, 2017), https://blog.citp.princeton.edu/2017/01/04/nyc-to-collect-gps-data-on-car-service-passengers-good-intentions-gone-awry-or-something-else/ (Warning that the rule would create "a surveillance data trove that makes an end run around judicial oversight").

[18] *Trip Records Submission Frequently Asked Questions (FAQs)*, N.Y.C. Taxi & Limousine Comm'n, at 4 (Feb. 28, 2021), https://www.nyc.gov/assets/tlc/downloads/pdf/efhv_faqs.pdf.

enforcement platforms, and does so without the knowledge or consent of the people whose movements it captures—that agency is not regulating transportation. It is conducting surveillance on a scale no court has ever sanctioned.

The TLC's Location Reporting Rules therefore do exactly what *Carpenter* warned against. They supplement the surveillance mosaic—sealing the gaps between pole cameras, license plate readers, and transit records so that no New Yorker can move through the city untracked.

**B. The TLC's geolocation mandate threatens the privacy of all New Yorkers and disproportionately harms vulnerable communities.**

The TLC's geolocation mandate is not a narrow regulatory measure affecting only FHV operators. It is a mass surveillance program that captures the movements of millions of New Yorkers, supplements a web of government tracking from which no resident can escape, and generates data that has already been weaponized against the city's most vulnerable communities.

Under the mosaic theory of the Fourth Amendment, supported by Justice Sotomayor's concurrence in *United States v. Jones*, 565 U.S. 400, 415–16 (2012), the constitutional harm of surveillance cannot be assessed by examining any single data point in isolation.[19] Rather, the aggregation of individually innocuous data points into a comprehensive record of movement is itself the constitutional injury, because it enables the government to "ascertain, more or less combatively, [an individual's] political and religious beliefs, sexual habits, and so on." *Jones*, 565 at 416 (Sotomayor, J., concurring). *Carpenter* adopted this reasoning for the majority, holding that location records merit Fourth Amendment protection precisely because they provide an "intimate window into a person's life, revealing not only his particular movements, but through them his

---

[19] Orin S. Kerr, *The Mosaic Theory of the Fourth Amendment*, 111 Mich. L. Rev. 311, 314 (2012).

'familial, political, professional, religious, and sexual associations.'" 585 U.S. at 311 (quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)).

Consider how the surveillance mosaic operates in the daily life of an ordinary New Yorker. She leaves her apartment under the gaze of NYPD pole cameras aimed at her building. She enters the subway, where the Metropolitan Transportation Authority ("MTA") logs her MetroCard or OMNY access. She emerges onto a street lined with automated license plate readers that catalogue every passing vehicle, building a database of vehicular movement stored for years.[20] She hails a rideshare at midday, and the TLC mandate records the precise GPS coordinates of her pickup and her destination, timestamped and preserved indefinitely. At no point in this journey has she been free from government surveillance.

Gaps that once existed between one surveillance technology and the next have been filled; and it is the TLC's geolocation rules that supply an additional, particularly revealing piece. No privacy-respecting rideshare product can legally operate in New York City, because compliance with the Location Reporting Rules requires the very data collection that *Carpenter* forbids absent a warrant. The result is a market that has been cornered into submission: every licensed FHV operator must generate this surveillance data as a condition of doing business, and there is no opt-out.

The experience of vulnerable communities further illustrates that geolocation data is not merely a theoretical privacy concern but a tool that has been actively weaponized by the government. Domestic violence survivors face existential danger when transportation records

---

[20] *ALPR IUP*, *supra* note 6, at 6.

reveal their movements.[21] LGBTQ individuals have learned that location data from dating applications can be purchased to track and identify them: a Catholic nonprofit spent over $4 million purchasing location data from dating apps like Grindr to systematically identify gay priests.[22] Data brokers sell information about visitors to Planned Parenthood facilities, including where those visitors came from and where they went afterwards, for as little as $160 per week, enabling identification of visitors and their home addresses.[23] Immigration enforcement agencies have purchased access to commercial location data on a massive scale, tracking 250 million devices and processing 15 billion location data points per day,[24] while spending an estimated $2.8 billion on surveillance initiatives over a 13-year period.[25] Journalists face the compromise of their sources,[26]

---

[21] Kashmir Hill, *Your Car Is Tracking You. Abusive Partners May Be, Too.*, The New York Times (Dec. 31, 2023), https://www.nytimes.com/2023/12/31/technology/car-trackers-gps-abuse.html.

[22] Michelle Boorstein & Heather Kelly, *Catholic Group Spent Millions on App Data that Tracked Gay Priests*, Wash. Post (Mar. 9, 2023), https://www.washingtonpost.com/dc-md-va/2023/03/09/catholics-gay-priests-grindr-data-bishops/.

[23] Joseph Cox, *Data Broker Is Selling Location Data of People Who Visit Abortion Clinics*, Vice Motherboard (May 3, 2022), https://www.vice.com/en/article/location-data-abortion-clinics-safegraph-planned-parenthood/.

[24] Shreya Tewari & Fikayo Walter-Johnson, *New Records Detail DHS Purchase and Use of Vast Quantities of Cell Phone Location Data*, ACLU (July 18, 2022), https://www.aclu.org/news/privacy-technology/new-records-detail-dhs-purchase-and-use-of-vast-quantities-of-cell-phone-location-data.

[25] Nina Wang et al., *American Dragnet: Data-Driven Deportation in the 21st Century*, Georgetown Law Center on Privacy & Technology, at 4 (May 10, 2022).

[26] Julie Posetti, *Protecting Journalism Sources in the Digital Age*, UNESCO Series on Internet Freedom, at 24 (2017) (documenting how location surveillance, specifically by third-party intermediaries, can result in identification of sources and whistleblowers).

and Muslim Americans have discovered that prayer apps transmit their location data to military and intelligence contractors.[27]

These abuses involve the purchase of commercial location data—but the TLC mandate is more troubling still. The agency does not merely acquire data that happened to exist; it compels private companies to create it, at government direction, as a condition of operating a lawful transportation business.

The TLC's geolocation mandate thus reaches every New Yorker who steps into a FHV, and it falls hardest on those least able to bear it: the domestic violence survivor fleeing to a shelter, the immigrant traveling to work, the patient visiting a health clinic, the worshipper heading to a mosque. No amount of regulatory justification can render reasonable a surveillance regime this broad, this precise, and this unrelenting. It is the kind of continuous and silent intrusion that the Fourth Amendment was written to forbid.

**C. Data-sharing pipelines ensure that rideshare geolocation data reaches law enforcement.**

Once collected, TLC geolocation data reaches law enforcement through multiple established channels; and nothing in the regulations prevents it.

The agency's own structure enables this data sharing: as of last reporting, the TLC's Uniformed Services Bureau employed approximately 240 officers designated as New York City Special Patrolmen whose authority derives from the NYPD Police Commissioner.[28] These officers

---

[27] Joseph Cox, *How the U.S. Military Buys Location Data from Ordinary Apps*, Vice Motherboard (Nov. 16, 2020), https://www.vice.com/en/article/us-military-location-data-xmode-locate-x/, (revealing Muslim Pro, with nearly 100 million downloads, sold data to X-Mode Social, which sold it to U.S. military contractors).

[28] N.Y.C. Taxi & Limousine Comm'n, Enforcement, https://web.archive.org/web/20250308191316/https://www.nyc.gov/site/tlc/about/enforcement.page (page no longer exists; more recent figure unavailable) ("Currently, the Enforcement Division

are not, in any functional sense, separated from the police. In 2019 alone, the Bureau conducted 148 joint operations with the NYPD.[29] The NYPD has, for its part, operated undercover taxicabs in collaboration with the TLC.[30] TLC data also moves through Joint Terrorism Task Forces, where NYPD officers, once deputized under federal authority, are removed from the Handschu oversight provisions that nominally constrain local police surveillance.[31]

Federal agencies more than likely have access to TLC data too. Take just two examples: (1) The New York State Intelligence Center maintains a gang registry accessible to Immigration

---

of the USB has about 240 field officers and supervisors covering a twenty-four hour workday, seven days a week"); *see also* N.Y.C. Admin. Code § 14-106.

[29] , *New York City Taxi and Limousine Commission 2019 Annual Report*, New York City Taxi and Limousine Commission (2019), https://www.nyc.gov/assets/tlc/downloads/pdf/annual_report_2019.pdf.

[30] Matt Guariglia, *Next Time You See a Taxi, Ask Yourself, Is This a Cop?*, Vice (Mar. 28, 2016, at 8:00 AM), https://www.vice.com/en/article/the-nypd-does-not-want-to-reveal-how-many-undercover-cop-cabs-it-has/ (this email revealed that the NYPD had at least five vehicles that needed new TLC decals. Presumably, these five vehicles all look like taxicabs).

[31] Daniel Schwartz & Simon McCormack *Trump Is Using Task Forces to Criminalize Activists and Non-Profits. Why Is NY Funding Them?,* New York Civil Liberties Union (Dec. 3, 2025), https://www.nyclu.org/commentary/trump-is-using-task-forces-to-criminalize-activists-and-non-profits-why-is-ny-funding-them#:~:text=JTTFs%20are%20FBI-operated%20task%20forces%20that%20are,both%20federal%20law%20enforcement%20and%20immigration%20enforcement%E2%80%9D ("[W]e know very little about what JTTFs do" and raising the specific question "to what extent can the New York City JTTF access the vast surveillance systems of the NYPD?"); Daniel Boguslaw, *Intelligence Bureau Watchdog Warns of FBI Overreach in NYC*, The American Prospect (Mar. 6, 2025), https://prospect.org/2025/03/06/2025-03-06-intelligence-bureau-watchdog-warns-fbi-overreach-new-york-policing/ ([Muhammad] Faridi pointed out, saying that it "operates with minimal oversight and scant accountability, and has a long history of wrongly targeting activists and communities of color, often associating protest with 'terrorism,' without evidence of wrongdoing."); Ayyan Zubair, *The Handschu Agreement & NYPD Surveillance*, Surveillance Technology Oversight Project (Jul. 5, 2019), https://www.stopspying.org/latest-news/2019/7/5/the-handschu-agreement-amp-nypd-surveillance (The Handschu agreement prohibits the NYPD from targeting suspect for their political preferences).

and Customs Enforcement ("ICE") that has never been audited;[32] and (2) a December 2025 Department of Investigation report found that at least one NYPD officer had built a system to automatically notify federal authorities whenever a person of interest had any contact with the department.[33] Geolocation data that enters through the TLC does not, in short, remain with the TLC; it migrates upward and outward through interagency arrangements whose outer boundaries no one has troubled to map.

What happens when such data simply sits available to an agency is not a matter of speculation. In the *El-Nahal v. Yassky*, the TLC drew on its GPS database to identify 21,819 drivers and prosecute 59 for alleged fare overcharging. 835 F.3d at 251. The data was there; the temptation to use it proved sufficient.

At national scale, the fusion center network is the terminus to which data collected under the Location Reporting Rules inevitably travels. Fusion centers are hubs designed for the seamless exchange of intelligence across jurisdictional lines—aggregating data from local, state, and federal agencies and disseminating it to law enforcement partners across the country.[34] As such, an agency that never collected a set of records—and has no connection to the one that did—may nonetheless

---

[32] Patricio Robayo, *NY FOCUS: ICE Collaboration and Prisons in Crisis: Four Questions for State Law Enforcement*, Radio Catskill (Feb. 19, 2026), https://wjffradio.org/ny-focus-ice-collaboration-and-prisons-in-crisis-four-questions-for-state-law-enforcement/ (The State Police said last year that its gang database has never been audited).

[33] Ben Feuerherd, *NYC Investigation Flags Sanctuary Law Breach by NYPD Officer, Calling for Reforms*, Gothamist (Dec. 7, 2025), https://gothamist.com/news/nyc-investigation-flags-sanctuary-law-breach-by-nypd-officer-calling-for-reforms (A review by New York City's Department of Investigation found an NYPD officer violated the city's sanctuary laws by setting up a system where he would be notified if people federal immigration authorities were looking for interacted with the police department).

[34] *See generally* Mike German, Rachel Levinson-Waldman, & Kaylana Mueller-Hsia, *Ending Fusion Center Abuses*, Brennan Center (Dec. 15, 2022), https://www.brennancenter.org/our-work/policy-solutions/ending-fusion-center-abuses.

receive and act on that data.[35] The NYPD participates in the New York State Intelligence Center ("NYSIC"), the state's primary center designated by the U.S. Department of Homeland Security, which connects more than a dozen state and federal agencies, including Customs and Border Protection ("CBP") and ICE.[36] Once TLC trip data reaches NYPD, through routine interagency sharing or by a direct request, it becomes part of that exchange. NYSIC transmits information to agencies that face no warrant requirement of their own. The precise movements of millions of New Yorkers, collected under the guise of driver fatigue regulation, become available to federal enforcement agencies by no more complicated a mechanism than a memo between agencies with no connection to the TLC.

Given the TLC's documented misuse of geolocation data, Compl. ¶¶ 68-69, its established pipelines to law enforcement at every level of government, and the absence of independent oversight, the geolocation mandate is less a regulatory program than a standing warrant, issued to no one and served on everyone.[37]

---

[35] *Id.*

[36] Chis Gelardi, *Kathy Hochul Is Ready to Spend Millions on New Surveillance*, New York Focus (Mar. 29, 2022), https://nysfocus.com/2022/03/29/kathy-hochul-budget-fusion-centers-crime-gun-intelligence-centers-police-surveillance. *See also* GAO-08-35, *Homeland Security: Federal Efforts Are Helping to Alleviate Some Challenges Encountered by State and Local Information Fusion Centers* (Oct. 2007).

[37] Joseph Cox, *Inside ICE's Tool to Monitor Phones in Entire Neighborhoods*, 404 Media (Jan. 8, 2026); Sheera Frenkel & Aaron Krolik, *Trump Taps Palantir to Compile Data on Americans*, N.Y. Times (May 30, 2025).

**D. *Carpenter* compels warrant protection for geolocation data, and the sole contrary precedent is fatally undermined.**

The TLC's GPS mandate compels the collection of data far more precise, and far more intrusive, than the cell-site location information ("CSLI") at issue in *Carpenter*. If CSLI triggers Fourth Amendment protection, then TLC GPS data does so a fortiori.

In *Carpenter*, 585 U.S. at 320, the Supreme Court held that government acquisition of historical CSLI constitutes a Fourth Amendment search requiring a warrant supported by probable cause. Chief Justice Roberts emphasized that CSLI provides "a detailed, encyclopedic, and effortlessly compiled" record of a person's movements, *id.* at 309, and that "seismic shifts in digital technology" expand the scope and ease of location tracking, *id.* at 313. Thus, careful examination of new modes of digital surveillance is necessary to ensure that "a person does not surrender all Fourth Amendment protection by venturing into the public sphere," *id.* at 310. The Court declined to extend the third-party doctrine, holding that cell phones are "indispensable to participation in modern society" and that CSLI is logged "without any affirmative act by the user." *Id.* at 315.

The distinction in precision is dispositive. GPS coordinates pinpoint location to within meters; CSLI approximates location only within the service area of a cell tower, an area that may span several square miles. GPS records collected under the TLC mandate are generated at the moment a trip begins and ends, creating granular snapshots of where a person was at specific times. Moreover, the TLC mandate covers every trip by every licensed driver, generating a comprehensive, retrospective record of the movements of over 170,000 drivers[38] and their millions of passengers. Where *Carpenter*'s CSLI logs were imprecise and incidental, the TLC's geolocation

---

[38] *For Hire Vehicles (FHV) – Active Drivers*, NYC Open Data (Updated Mar. 5, 2026), https://data.cityofnewyork.us/Transportation/For-Hire-Vehicles-FHV-Active-Drivers/xjfq-wh2d/about_data.

data is targeted, exact, and no less revealing of the patterns of life that the Fourth Amendment protects.

The sole federal appellate precedent to have considered the TLC's previous attempts to collect GPS data never reached the constitutional question this case presents; and it cannot survive *Carpenter*. In *El-Nahal*, a taxi driver challenged the TLC's mandate that all taxicabs install a Taxicab Technology System, a physical device that collected trip data via GPS. The Second Circuit disposed of the case on the narrow ground that El-Nahal had failed to establish a property interest in any particular taxicab at the time the device was installed, as required under *Jones*' trespass framework. *El-Nahal*, 835 F.3d at 253. The court never reached the reasonableness of the data collection itself and expressly declined to consider whether the mandate intruded on any reasonable expectation of privacy. *Id.* at 253 n. 3. That decision predated *Carpenter* by two years. *Carpenter* moved the doctrine beyond the property-based inquiry on which *El-Nahal* turned, holding that the Fourth Amendment protects not merely against physical intrusion but against the government's acquisition of comprehensive digital location records that reveal the privacies of life, 585 U.S. at 320.

Even on its own facts, *El-Nahal* is a poor vehicle for the question this case presents. That case involved yellow taxicabs, which cruise public streets looking for fares. They are hailed by strangers on sidewalks and at stands. The passenger chooses neither the vehicle nor the driver in advance; the encounter is spontaneous, anonymous, and confined to whatever route the traffic allows. The GPS record of a taxi trip, while not trivial, reveals little more than the movements of a roving commercial vehicle through public thoroughfares.

FHVs are fundamentally different. Riders pre-arrange trips to and from specific locations—often their own doorstep—generating a far more intimate record of daily movements

and associations. The car comes to the passenger. It waits outside her apartment, her doctor's office, her place of worship. It takes her there and brings her back, trip after trip, week after week, building a longitudinal diary of exactly where she lives, where she sleeps, whom she visits, and how often. The reasonable expectation of privacy in FHV geolocation data is correspondingly greater than in the taxi context *El-Nahal* considered.

Given this distinction, the TLC's geolocation mandate presents precisely the question *El-Nahal* left open: whether compelling the collection of GPS data from thousands of vehicles constitutes an unreasonable search. The theory here is not the trespass theory that failed for want of standing, but the expectation-of-privacy analysis that *Carpenter* made dispositive. The Supreme Court's reasoning in *City of Los Angeles v. Patel*, 576 U.S. 409 (2015), underlines this: even in a regulated industry, the government cannot compel operators to surrender records without precompliance review. If hotels cannot be required to hand over guest registries absent any judicial process, the TLC cannot compel monthly reporting of pickup and drop-off GPS data without comparable safeguards.

In the years since *Carpenter*, lower court decisions have broadened its reach. The Fifth Circuit, in *United States v. Smith*, 110 F.4th 817, 840 (5th Cir. 2024), held that geofence warrants are "modern-day general warrants" categorically prohibited by the Fourth Amendment, rejecting the argument that opting into Google Location History constitutes voluntary disclosure: "a user simply cannot forfeit the protections of the Fourth Amendment for years of precise location information by selecting 'YES, I'M IN' at midnight while setting up Google Assistant." *Id.* at 836. The Fourth Circuit, sitting en banc in *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330, 341 (4th Cir. 2021) (en banc), held that Baltimore's aerial surveillance program constituted a search under *Carpenter* because it was "more like 'attach[ing] an ankle

monitor' to every person in the city." If aerial surveillance of blurry dots constitutes a search because it can reveal "the whole of individuals' movements," *id.* at 344, GPS tracking of individual drivers, far more precise, must qualify as well.

The First Circuit split 3–3 on whether eight months of pole-camera surveillance constituted a search, with three judges finding it was a search under *Carpenter*'s reasoning. *United States v. Moore-Bush*, 36 F.4th 320 (1st Cir. 2022) (en banc) (Barron, J., concurring). The Seventh Circuit declined to find a search in 18 months of pole-camera surveillance but acknowledged "unease" and suggested "it might soon be time to revisit the Fourth Amendment test established in *Katz*." *United States v. Tuggle*, 4 F.4th 505, 526, 528 (7th Cir. 2021). New York's own Court of Appeals anticipated *Carpenter* by nearly a decade, holding in *People v. Weaver*, 12 N.Y.3d 433, 441–42 (2009), that warrantless GPS tracking violates the New York State Constitution because GPS data will disclose trips of an "indisputably private nature" from which the government can infer not simply where we go, but our "political, religious, amicable, and amorous" associations.

The Supreme Court's pending decision in *Chatrie v. United States*, No. 25-112 (cert. granted Jan. 16, 2026; oral argument scheduled Apr. 27, 2026), will address whether geofence warrants violate the Fourth Amendment, and may reshape the landscape of digital location privacy.[39] The direction of doctrinal development is clear. Continuous location tracking crosses the constitutional line set forth by the Fourth Amendment, and the TLC mandate sits squarely on the wrong side of it.

* * *

---

[39] At issue in *Chartrie* are geofence warrants, which seek to compel a private company—in *Chartrie*'s case, Google—to provide location data for all devices near the scene of a crime during a given time window around the commission of the crime.

*Amicus* respectfully submits that these considerations strongly favor granting Plaintiffs' motion for a permanent injunction. The differing perspectives on TLC geolocation data in the lower courts stem from contrasting interpretations of *Carpenter* and divergent views on how Fourth Amendment principles developed in the context of cell-site location information apply to government-mandated GPS surveillance. This case presents an opportunity for this Court to clarify how *Carpenter*'s protections apply when the government does not merely acquire location records but compels their creation, at a level of precision and scale that *Carpenter* itself did not confront.

## II.  ANONYMIZATION DOES NOT CURE THE CONSTITUTIONAL VIOLATION.

Anonymization cannot cure the constitutional violation of the TLC's geolocation mandate because location data is inherently reidentifiable. The promise that stripping names and identifiers from GPS records will protect individual privacy has been refuted by over a decade of peer-reviewed research, shattered by New York's own catastrophic experience with taxi trip data, and rejected by federal courts.

*Carpenter*'s reasoning focuses on the nature of the data and its capacity for surveillance, 585 U.S. at 311–12, not on whether the government has subjected it to post-collection anonymization. The Fifth Circuit has squarely addressed and rejected this defense. In *United States v. Smith*, 110 F.4th 817, 834 n. 9 (5th Cir. 2024), the Court held that anonymization of location data at the point of collection does not defeat a Fourth Amendment claim, because "the effectiveness of data anonymization has been called into question by researchers, given that anonymous data can be cross-referenced to reveal identities."

The scientific literature confirms this. In an influential 2013 study, de Montjoye et al. demonstrated that just four spatiotemporal data points are sufficient to identify 95 percent of

19

individuals in a dataset of 1.5 million people.[40] The margin has only narrowed since: subsequent research showed that 99.98 percent of Americans can be correctly re-identified using only 15 demographic attributes, even in incomplete datasets.[41] De Montjoye and his team returned to the question a decade later and concluded that "no perfect solution exists" for anonymizing location data without destroying its analytical utility.[42] Or as privacy scholar Paul Ohm has put it: "Data can be either useful or perfectly anonymous but never both."[43]

New York City itself has furnished the most devastating proof. In 2014, a single FOIL request yielded 173 million taxi trip records, including GPS coordinates and MD5-hashed medallion numbers.[44] Because taxi medallion numbers follow a predictable format, researchers reversed the hashes through a rainbow table attack in under two minutes and de-anonymized the

---

[40] Yves-Alexandre de Montjoye et al., *Unique in the Crowd: The Privacy Bounds of Human Mobility*, 3 Sci. Rep. 1376 (2013), https://doi.org/10.1038/srep01376.

[41] Luc Rocher et al., *Estimating the Success of Re-identifications in Incomplete Datasets Using Generative Models*, 10 Nature Commc'ns 3069 (2019), https://doi.org/10.1038/s41467-019-10933-3; *see also* Caroline Brogan, *Anonymising Personal Data 'Not Enough to Protect Privacy', Shows New Study*, Imperial College London (Jul. 23, 2019), https://www.imperial.ac.uk/news/192112/anonymising-personal-data-enough-protect-privacy/ ("Companies and governments downplay the risk of re-identification by arguing that the datasets they sell are always incomplete. Our findings show this might not help.").

[42] Andrea Gadotti, Luc Rocher, Florimond Houssiau, Ana-Maria Crețu, & Yves-Alexandre de Montjoye., *Anonymization: The Imperfect Science of Using Data While Preserving Privacy*, 10 Sci. Advances eadn7053 (Jul. 17, 2024), https://doi.org/10.1126/sciadv.adn7053.

[43] Paul Ohm, *Broken Promises of Privacy: Responding to the Surprising Failure of Anonymization*, 57 UCLA L. Rev. 1701, 1706 (Aug. 18, 2010) ("Data can be either useful or perfectly anonymous but never both."); *see also* Rishabh Poddar & Ian Chang, *Anonymized Datasets Aren't As Anonymous As You Think*, Opaque (Oct. 2, 2024), https://www.opaque.co/resources/articles/anonymized-datasets-arent-as-anonymous-as-you-think.

[44] *See* Vijay Pandurangan, *On Taxis and Rainbows: Lessons from NYC's improperly anonymized taxi logs,* Medium (June 21, 2014), https://medium.com/vijay-pandurangan/of-taxis-and-rainbows-f6bc289679a1.

entire dataset within an hour.[45] Once de-anonymized, the records enabled researchers to track celebrities by cross-referencing trip data with paparazzi photographs, to identify where regular patrons of adult entertainment establishments lived, and to calculate individual drivers' annual incomes.[46] Later research confirmed that even perfect pseudonymization yields only marginal improvement: a spatiotemporal joint attack re-identified 91 percent of taxis "even when using a perfect pseudonymization of medallion numbers."[47] The TLC continues to publish trip data monthly, covering over 1.1 billion trips since 2009.[48]

Advances in artificial intelligence have only accelerated the problem; a 2026 study found that large language models were able to deanonymize "pseudonymous online accounts at scale, outperforming classical methods."—a process that would otherwise take human investigators hours[49] Hidden Markov Model-based attacks now achieve 88 to 90 percent re-identification rates

---

[45] *Id.*

[46] Anthony Tockar, *Riding with the Stars: Passenger Privacy in the NYC Taxicab Dataset*, Neustar Research (Sept. 15, 2014). https://perma.cc/5LZG-YZM8.

[47] Marie Douriez, Harish Doraiswamy, Juliana Freire & Cláudio T. Silva, *Anonymizing NYC Taxi Data: Does It Matter?*, IEEE Int'l Conf. on Data Science and Advanced Analytics (DSAA) 140–48 (2016), https://doi.org/10.1109/DSAA.2016.21 ("[U]nless the utility of the data set is significantly compromised, it will not be possible to maintain the privacy of taxi medallion owners and drivers.").

[48] Todd W. Schneider, *Analyzing 1.1 Billion NYC Taxi and Uber Trips, with a Vengeance* (Mar. 2018) https://toddwschneider.com/posts/analyzing-1-1-billion-nyc-taxi-and-uber-trips-with-a-vengeance/.

[49] *See also* Simon Lermen, Daniel Paleka, Joshua Swanson, Michael Aerni, Nicholas Carlini, & Florian Tramèr, *Large-Scale Online Deanonymization with LLMs*, arXiv (Feb. 18, 2026), https://arxiv.org/abs/2602.16800 (demonstrating that AI-based tools can conduct fully automated deanonymization attacks on publicly visible information, correctly identifying up to 68% of anonymous users at 90% precision, and concluding that "the assumption that deanonymization … is too costly to execute broadly … no longer holds").

on supposedly anonymized trajectory data.[50] Aggregated fitness data from the Strava application, which the company claimed was anonymous, inadvertently revealed the locations of military bases and soldiers' patrol routes..[51] Against this, Professor Skopek has argued that the constitutional problem with surveillance should be framed in terms of "reasonable expectations of anonymity," proposing that locational surveillance violates those expectations regardless of post-collection processing steps.[52]

If the TLC could not protect 173 million anonymized taxi records from de-anonymization in under one hour, there is no rational basis for trusting that it will protect even more granular rideshare GPS data. The TLC's own track record establishes that anonymization is not a constitutional shield but a fig leaf. *Carpenter* instructs courts to look at the nature of the data and its capacity for surveillance; by that measure, the TLC's GPS records are no less constitutionally sensitive for having been run through a de-identification algorithm that peer-reviewed research has shown to be ineffective.

---

[50] *See* Yi Zhang, Yaobang Gong, Madeline Shi, & Xianfeng Yang, *Privacy Risk of Transportation Location-Based Data: Re-identification and De-anonymization*, 183 Transportation Research Part C: Emerging Technologies 1, 3 (2026), https://www.sciencedirect.com/science/article/pii/S0968090X25004991; Samuel Eshun & Paolo Palmieri, *De-anonymisation of Real-World Location Traces: Two Attacks Based on the Hidden Markov Model*, 18 J. Location Based Servs. 51–79 (2024),https://doi.org/10.1080/17489725.2024.2385312.

[51] *See* Alex Hern, *Fitness Tracking App Strava Gives Away Location of Secret US Army Bases*, The Guardian (Jan. 28, 2018, at 4:51 PM), https://www.theguardian.com/world/2018/jan/28/fitness-tracking-app-gives-away-location-of-secret-us-army-bases; Jeremy Hsu, *The Strava Heat Map and the End of Secrets*, WIRED (Jan. 29, 2018, at 7:14 PM), https://www.wired.com/story/strava-heat-map-military-bases-fitness-trackers-privacy/.

[52] *See generally* Scott R. Skopek, *Reasonable Expectations of Anonymity*, 101 Va. L. Rev. 691 (2015).

## III. PROVEN ALTERNATIVES EXPOSE THE TLC'S MANDATE AS CONSTITUTIONALLY UNNECESSARY.

Jurisdictions across the United States and internationally achieve the same regulatory objectives that the TLC pursues, but with dramatically less intrusion into personal privacy. The existence of these proven alternatives compels the conclusion that the TLC's GPS mandate is neither necessary nor proportionate.

Constitutional proportionality principles require the government to adopt the least restrictive means available to achieve a legitimate regulatory purpose. *City of Los Angeles*, 576 U.S. (holding facially unconstitutional an administrative scheme requiring hotels to make guest registries available to police on demand, even in a regulated industry). The federal Wiretap Act codifies this principle, requiring the government to demonstrate that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed" before resorting to more intrusive surveillance tools. 18 U.S.C. § 2518(3)(c). *Arizona v. Gant* further instructs that "[w]arrantless searches are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 332 (2009).

In particular, the experience of other American jurisdictions demonstrates that less invasive approaches are both feasible and effective. For example, Chicago requires rideshare companies to

23

report data at the census-tract level, rounding times to 15-minute intervals and fares to the nearest $2.50.[53] Seattle asks only for ZIP code-level reporting on a quarterly basis.[54]

Federal transportation regulations reinforce the point. The Federal Motor Carrier Safety Administration's Electronic Logging Device ("ELD") requires commercial truck drivers to record their duty status electronically, but with privacy protections the TLC mandate entirely lacks: location data recorded at 60-minute intervals rather than in real time, precision deliberately insufficient to identify street addresses, anti-harassment provisions limiting law enforcement use, and a congressional directive restricting the data to enforcement of driving-time regulations. 49 C.F.R. pt. 395.[55] The Seventh Circuit upheld the ELD mandate in *OOIDA v. U.S. Department of Transportation*, precisely because its privacy intrusion was proportionate to its safety purpose. *OOIDA v. U.S. Department of Transportation*, 840 F.3d 879 (7th Cir. 2016). The TLC mandate, which collects data monthly and at full precision with no anti-harassment provisions and no use limitations, fails that proportionality test.

---

[53] *How Chicago Protects Pricacy in TNP and Taxi Open Data* (2019), City of Chicago, https://data.cityofchicago.org/stories/s/82d7-i4i2, (describing census-tract aggregation and 15-minute time rounding; for trips in low-volume census tracts, locations are further generalized to the community area level); Chicago Data Portal, *Transportation Network Providers-Trips (2023-2024)* (Feb. 27, 2025), https://data.cityofchicago.org/Transportation/Transportation-Network-Providers-Trips-2023-2024-/n26f-ihde/about_data, (describing how dares are rounded to the nearest $2.50).

[54] *See Business Regulations: Regional Dispatch Agencies and Transportation Network Companies: Data Reporting*, City of Seattle, https://www.seattle.gov/business-regulations/regional-dispatch-agencies-and-tncs/data-reporting (last visited Mar. 5, 2026) (requiring ZIP code-level quarterly reporting).

[55] *See* Electronic Logging Devices and Hours of Service Supporting Documents, 80 Fed. Reg. 78,292 (Dec. 16, 2015), implementing MAP-21, Pub. L. No. 112-141, § 32301(b), 126 Stat. 405, 786 (2012), codified at 49 C.F.R. pt. 395. Vehicle location is "not sufficiently precise to identify street addresses."; 49 C.F.R. § 395.26(b).. 49 C.F.R. § 395.8(i) (Anti-harassment provisions strictly prohibit driver harassment based on ELD data).

Several other countries also do not require precise geolocation reporting. In 2016, the French Senate rejected a provision that would have required FHV companies to share trip and passenger data with regulators, finding that the scope of the data collection—including information about trips to and from recurring addresses—was "disproportionate to the objective pursued," even though anonymization was planned.[56] Other nations, like the United Kingdom[57] and Singapore,[58] manage their FHV markets through licensing-based oversight.

The TLC itself recognizes the danger of transmitting geolocation data. When the agency releases trip records through its public data portal, it strips exact GPS coordinates and aggregates locations to approximately 60 taxi zones—because it understands that such data, combined with other publicly available information, are sufficient to reidentify riders the data purports to anonymize.[59] Yet the Location Reporting Rules force rideshare companies to collect and transmit for the TLC the very coordinates the agency has decided are too revealing to publish. The agency

---

[56] Sénat [Senate], Rapport n° 60, *Proposition de loi relative à la régulation, à la responsabilisation et à la simplification dans le secteur du transport public particulier de personnes* [Bill on Regulation, Accountability, and Simplification in the Private Passenger Transport Sector] (2016–2017) (Fr.), https://www.senat.fr/rap/l16-060/l16-060_mono.html.

[57] Private Hire Vehicles (London) Act 1998, c. 34 (UK) (requiring drivers and vehicles to be licensed, without mandating that companies collect and transmit real-time GPS data).

[58] *Written Reply to Parliamentary Question on Cap on Number of Hours Spent on the Road by Private Hire Car or Taxi Drivers*, Singapore Ministry of Transport (Jan. 9, 2024), https://www.mot.gov.sg/news-resources/newsroom/written-reply-to-parliamentary-question-on-cap-on-number-of-hours-spent-on-the-road-by-private-hire-car-or-taxi-drivers/ (saying that there is no regulatory limit to how long drivers can work continuously and encouraging adherence to Fatigue Management Guidelines).

[59] Compl. ¶ 67, *Wheely USA, Inc v. The City of New York*, No. 1:26-cv-01057, (S.D.N.Y. 2/06/2026). (The TLC itself publishes trip data aggregated to approximately 60 taxi zones in Manhattan, tacitly acknowledging that precise geolocation poses privacy risks that zone-level aggregation avoids).

cannot maintain both positions. If the data is sensitive enough to suppress in one context, it is sensitive enough to warrant constitutional scrutiny in the other.

The TLC's former Commissioner conceded as much. Commissioner Meera Joshi testified in 2016 that the proposed fatigue rule was "enforceable with data that is available to the TLC today," referring to aggregate trip-duration metrics rather than precise GPS coordinates.[60] The TLC's own fatigue rules enforce limits of 10 hours of passenger time per 24-hour period and 60 hours per calendar week by counting trip duration alone. When an agency's own leadership acknowledges that its regulatory objective can be met with less invasive data, constitutional principles demand that it use those less invasive means.

Indeed, where less intrusive means achieve the same regulatory end, the Fourth Amendment does not permit the government to default to the more invasive one. *See Marshall v. Barlow's, Inc.*, 436 U.S. 307, 316 (1978) (striking Occupational Safety and Health Administration's warrantless workplace inspection program as unconstitutional because requiring inspectors to obtain a warrant first would have achieved the same administrative goals); *City of Indianapolis v. Edmond*, 531 U.S. 32, 37–38 (2000) (invalidating checkpoint program where the scope of intrusion was untethered to the asserted regulatory purpose). Similarly, the leading scholarship in this field converges on a single principle: the burden falls on the state to justify the scope of its collection, not on the individual to prove harm from it. Professor Slobogin has argued

---

[60] Shireen Allicot, *NYC Putting Limits on Cab Driver Hours to Reduce Fatigue,* ABC 7 News (May 24, 2016(, https://abc7ny.com/post/nyc-putting-limits-on-cab-driver-hours-to-reduce-driver-fatigue/1353642/, ("[The proposed fatigue rule is] enforceable with data that is available to the TLC today."); *see also Notice of Promulgation of Rules: Limits on Hours of Driving and Additional FHV Trip Data Reporting Requirements,* N.Y.C. Taxi & Limousine Comm'n (Feb. 2, 2017), https://www.nyc.gov/assets/tlc/downloads/pdf/proposed_rule_rev_driver_fatigue_2_2_17.pdf (The TLC's own analysis determined that "a calculation based on trip duration provides a more accurate way to identify drivers at risk of fatigue.").

that government surveillance must be "roughly proportionate to the level of intrusion associated with the police action."[61] Likewise, Professor Friedman has demonstrated that government surveillance is "almost entirely unregulated" and has proposed that the default rule should prohibit collection absent legislative authorization, rather than permitting it absent prohibition.[62] And, finally, Professor Jackson has argued that "the greater the intrusion on rights, the greater must be the need and justification for the challenged measure."[63]

GPS tracking represents the most intrusive conceivable method for enforcing driving-hour limits. Trip-level logging, interval-based recording, zone-level aggregation, and safety management systems all achieve the same regulatory objective with dramatically less privacy intrusion. The TLC's GPS mandate is not necessary; it is merely convenient to regulators. And the Fourth Amendment has never permitted the government to sacrifice constitutional rights on the altar of administrative convenience.

---

[61] Christopher Slobogin, *Let's Not Bury Terry: A Call for the Rejuvenation of the Proportionality Principle,* 72 St. John's L. Rev. 1053, 1054 (Summer-Fall 1998*)*; Christopher Slobogin, *Proportionality, Privacy, and Public Opinion*, in *Surveillance, Privacy, and Trans-Atlantic Relations* (Russell Miller ed., Cambridge Univ. Press, 2017).

[62] Barry Friedman, *Lawless Surveillance*, 97 N.Y.U. L. Rev. 1143, 1214 (2022); Barry Friedman, *The Constitutionality of Indiscriminate Data Surveillance*, 174 U. Pa. L. Rev. (forthcoming 2026) (concluding that indiscriminate data surveillance is unconstitutional under both originalist and doctrinal approaches).

[63] Vicki C. Jackson, *Constitutional Law in an Age of Proportionality*, 124 Yale L.J. 3094, 3117 (2015) ("[T]he greater the intrusion on rights, the greater must be the need and justification for the challenged measure.").

## CONCLUSION

For the above reasons, the TLC's Location Reporting Rules compel warrantless mass geolocation surveillance that poses critical risks to the Fourth Amendment privacy rights of thousands of FHV drivers and riders. The Court should grant Plaintiffs' motion for a permanent injunction.

Date: March 10, 2026

<div style="margin-left:40%">

Respectfully submitted,

*/s/ Michelle Dahl*
Michelle Dahl
Darío Maestro *(admission pending)*
SURVEILLANCE TECHNOLOGY OVERSIGHT PROJECT
1350 Avenue of the Americas
FL 2, Box 1089
New York, NY 10019
(212) 518-7573
michelle@stopspying.org
dario@stopspying.org

*Counsel for Amicus Curiae*

</div>

# CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will provide electronic notice and an electronic link to this document to all attorneys of record.

<div align="right">

*/s/ Michelle Dahl*
Michelle Dahl
Darío Maestro *(admission pending)*
SURVEILLANCE TECHNOLOGY OVERSIGHT PROJECT
1350 Avenue of the Americas
FL 2, Box 1089
New York, NY 10019
(212) 518-7573
michelle@stopspying.org
dario@stopspying.org

*Counsel for Amicus Curiae*

</div>