UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x

WHEELY USA, INC., MAYFAIR-NY LLC, AND
KENSINGTON-NY LLC,

           Plaintiffs,                              26-cv-1057 (CM)

    -against-

THE CITY OF NEW YORK,

           Defendant.

————————————————————————x

## OPINION AND ORDER

McMahon, J.:

Plaintiffs Wheely USA, Inc., Mayfair-NY LLC, and Kensington-NY LLC (collectively, "Wheely") challenge the New York City Taxi and Limousine Commission's ("TLC" or the "Commission") Location Reporting Rules (the "Rules"), 35 R.C.N.Y. § 59B-19, alleging violations of the Fourth Amendment, the Stored Communications Act, and the First Amendment. Plaintiffs allege that these Rules – which require for-hire vehicle ("FHV") bases (*i.e.*, TLC-licensed business entities that dispatch rides to drivers) to submit detailed trip-level data, including the precise locations where they pick up and drop off passengers – violate the Fourth Amendment to the United States Constitution and Article I, § 12 of the New York Constitution, are preempted by the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701 *et seq.*, and impermissibly compel speech in violation of the First Amendment and Article I, § 8 of the New York Constitution.

Plaintiffs seek declaratory relief and an injunction barring enforcement of the challenged Rules. By Order dated February 13, 2026, the Court directed that Plaintiffs' request for a preliminary injunction be consolidated with a determination on the merits of their request for

1

permanent injunctive relief, concluding that the issues presented are legal rather than factual in nature and that discovery would not materially aid their resolution.

This case arises against the backdrop of rapid technological change. Advances in data collection, storage, and analysis have expanded the volume of information about a person's everyday activities that can be generated, retained, and later examined. Discrete bits of information that once existed in disconnected form can now be aggregated across datasets, stored indefinitely, and analyzed using increasingly sophisticated tools to identify patterns, correlations, and trends over time. As a result, even data that does not identify individuals on its face may, when combined with other information, allow someone to infer another person's identity, location, or individual behavior.

In addressing Plaintiff's claims, the Court is mindful that this case, like others involving modern data technologies, arises in a "challenging new context" that counsels judicial caution. *See TikTok Inc. v. Garland*, 604 U.S. 56, 62–63 (2025). In applying established legal principles to "totally new problems," courts should take care not to "embarrass the future." *Id.* (quoting *Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 300 (1944)). That caution is particularly appropriate where, as here, the Court evaluates a longstanding regulatory requirement in an evolving technological environment.

The Fourth Amendment inquiry, however, remains anchored in the standards articulated in *Katz v. United States*, 389 U.S. 347 (1967), which held that "the Fourth Amendment protects people, not places," *id.* at 351, and which asks whether the challenged government conduct intrudes upon an expectation of privacy that "society is prepared to recognize as 'reasonable,'" *id.* at 361 (Harlan, J., concurring). To the extent that evolving technologies both generate increasingly detailed records of human activity and, through their widespread use, normalize the collection of

2

such information, they affect assessments of what expectations of privacy remain reasonable. That tension between expanding informational capacity and shifting societal expectations has become a recurring feature of modern Fourth Amendment cases. *See, e.g.*, *United States v. Chatrie*, 136 F.4th 100 (4th Cir. 2025), *cert. granted in part*, No. 25-112, 2026 WL 120676 (U.S. Jan. 16, 2026).

The Supreme Court's decisions reflect both the persistence of the *Katz* framework and the difficulty of applying it in the digital age. In *Kyllo v. United States*, 533 U.S. 27, 34 (2001), the Court held that the use of a thermal imager to detect heat emanating from a home constituted a search where the technology was "not in general public use." In *United States v. Jones*, 565 U.S. 400 (2012), the Court held that the physical attachment of a GPS tracking device onto a vehicle, and the use of that device to monitor the vehicle's movements, constituted a search, *id.* at 404, while separately acknowledging the privacy implications of prolonged location monitoring. In *Riley v. California*, 573 U.S. 373, 403 (2014), the Court held that the search-incident-to-arrest exception does not permit warrantless searches of digital information on a cell phone, emphasizing that modern devices contain "the privacies of life." And in *Carpenter v. United States*, 585 U.S. 296, 311 (2018), the Court held that the government's acquisition of historical cell-site location information from wireless carriers pursuant to court orders issued under the Stored Communications Act, which compelled those carriers to disclose time-stamped location records reflecting the movements of the defendant's cell phone over an extended period, constitutes a search, explaining that such data provides an "intimate window into a person's life."

This case, however, arises in a far different context. It does not involve physical intrusion, the monitoring of a personal device, or the compelled production of data that tracks an identifiable individual's movements over time. It concerns a prospective regulatory requirement on licensed commercial actors who are participating in a pervasively regulated industry. Plaintiffs emphasize

the risks of aggregation, retrospective analysis, and the increasing ability to reconstruct patterns of individual movement. Those risks do not control the Fourth Amendment analysis here. Rather, the principles governing administrative searches apply. Under these principles, the relevant inquiry is not whether information lawfully collected under the Rules might, if combined with data from other sources, yield insights into the activities of private citizens, but whether the reporting requirement itself, considered in light of its scope, purpose, and regulatory setting, satisfies the Fourth Amendment's reasonableness requirement.

Although Plaintiffs frame their challenge as presenting a novel application of these principles, the regulatory context in which this case arises is anything but new. The TLC's requirement that for-hire vehicle bases generate and report trip-level data has existed in materially similar form for more than a decade, has been publicly promulgated, and has operated as a routine condition of participation in New York City's For-Hire transportation industry. What has changed is not the reporting requirement itself, but the broader informational environment in which it operates.

For the reasons that follow, the Court concludes that the challenged Rules do not constitute an unlawful search under the Fourth Amendment, are not preempted by the Stored Communications Act, 18 U.S.C. §§ 2701–2712, and do not violate the First Amendment or Article I, §§ 8 and 12 of the New York Constitution. Accordingly, Plaintiffs have not demonstrated entitlement to declaratory or injunctive relief. Their motion is denied, and the complaint is dismissed.

## I.     BACKGROUND

### A.  The Parties

Plaintiff Wheely USA, Inc. is part of a global ride-hailing enterprise headquartered in London and operating internationally, including in London, Paris, and Dubai, and seeks to expand into the New York City market through its affiliated entities Mayfair-NY LLC and Kensington-NY LLC, which have applied for and obtained TLC black-car-base licenses.  Dkt. No. 12-2, Declaration of Anton Chirkunov ("Chirkunov Decl."), ¶¶ 2–4.

Wheely operates a digital platform through which passengers request pre-arranged rides via a mobile application.  To use the service, a customer creates an account and provides identifying and payment information.  Rides are booked through the app by entering a pickup location (and optionally a destination), selecting a vehicle class, and communicating with the assigned driver through in-app messaging.  *Id.*, ¶¶ 3–6.  The platform is designed to facilitate pre-arranged, app-based transportation services rather than street hails, placing it within the regulatory category of for-hire vehicle ("FHV") bases subject to TLC oversight.

Wheely contends that maintaining the personal privacy of its passengers is central to its business model.  In operating its platform, Wheely necessarily collects and processes location data in order to match passengers with drivers and complete rides.  *See* Dkt. No. 12-2, Wheely Privacy Policy, at 2.  However, its corporate privacy policy states that it processes only data "that it needs to provide and personalize its services," including "location data, pickup and drop-off address, dates, times, [and] distances travelled."  Dkt. No. 12-2, Wheely Privacy Policy, at 2.  It further states that Wheely is "committed to opposing government and third-party requests for rider data to the extent reasonably permitted under applicable laws."  *Id.* at 6.

So strongly does Wheely emphasize its privacy commitment that it has declined to operate in jurisdictions where compliance with local law would require broader disclosure of user data.

For example, Wheely previously operated in the Russian Federation, where it was subject to regulatory requirements imposed by the Moscow Department of Transportation. According to Plaintiffs, those authorities required ride-hailing companies to provide access to passenger geolocation data as a condition of operating in Moscow. Wheely refused to comply with that requirement, asserting that such data can reveal "where you work, where you play, where you practice religion, whose houses you visit frequently, and when you've been to sensitive medical offices." Press Release, Wheely, *Debunking MDOT's anti-privacy argument* (Aug. 6, 2020), https://wheely.com/en/newsroom/debunking-mdots-anti-privacy-argument. Wheely's refusal to comply resulted in the suspension of its operations in Russia. Plaintiffs rely on this episode to demonstrate that their position in this litigation is consistent with their prior business practices and reflects a longstanding objection to government-mandated disclosure of mobility data.

New York City (the "City") regulates the for-hire vehicle industry through the Taxi and Limousine Commission ("TLC"). The New York City Charter provides that there "shall be a New York City taxi and limousine commission," whose purpose is "the continuance, further development and improvement of taxi and limousine service in the city of New York," and to "adopt and establish an overall public transportation policy" governing such services. N.Y.C. Charter § 2300. Pursuant to that authority, and in accordance with Charter § 1043 and Administrative Code § 19-503, the TLC promulgates rules governing FHV bases.

### B. History of the New York City Taxi and Limousine Commission's Reporting Rules

The TLC's current trip-data reporting requirements represent an evolution of recordkeeping obligations that have long governed the for-hire vehicle industry.

As early as 1997, TLC rules – found at Title 35 of the Rules of the City of New York – required FHV bases to maintain operational records and to make them available for

6

inspection.  The version of Section 6-08 then in effect provided that a base owner "shall comply with all record-keeping procedures established and required by the Commission," and that such records "shall be safeguarded and maintained at the base for a period of six (6) months," during which period, "All such records may be inspected by Commission representatives during regular business hours."  Dkt. No. 34-1.  Thus, prior to the adoption of the challenged Rules, FHV bases were already required to generate and retain trip-related information that was subject to regulatory oversight – though those records remained with the bases unless requested by the TLC.

In 2004, the TLC promulgated rules requiring medallion taxicabs to use a Taxicab Technology System ("TTS") – a physical device located in the backseat of the cab that provided, among other things, credit- and debit-card payment services, and transmitted trip data to the TLC by means of a global positioning system ("GPS").  The rule required medallion owners to procure TTSs by August 1, 2007.  The TTS rule requires drivers to provide substantially the same information that had been required under the 1997 rule.  *See El-Nahal v. Yassky*, 993 F. Supp. 2d 460, 462 (S.D.N.Y. 2014), *aff'd*, 835 F.3d 248 (2d Cir. 2016).  Through the TTS, the TLC collected – only while drivers were on duty – "the taxicab license number; the taxicab driver's license number; the location of trip initiation; the time of trip initiation; the number of passengers; the location of trip termination; the time of trip termination; the metered fare for the trip; and the distance of the trip." *El-Nahal v. Yassky*, 835 F.3d 248, 250 (2d Cir. 2016) (quoting 35 R.C.N.Y. § 1-01 (2010)).  Under the 2004 rule, drivers were still required to create handwritten trip records if the TTS failed to operate properly.  *See El-Nahal*, 993 F. Supp. at 462.  As the TLC later explained, the technology was "replacing the current hand-written trip sheets with automatic electronic trip sheets" by collecting information that was "already required." *Id.* at 463.  Notably,

7

the TTS did not provide the TLC with passenger names or other identifying information, such as their credit card information.

In 2014, the TLC amended its rules to extend trip-data reporting requirements to the FHV sector, albeit through a different reporting mechanism than the one used in taxicabs. Instead of installing a system that provided the TLC with automatic reports about trip data, the 2014 rules required FHV bases to compile and periodically submit trip records to the Commission. Specifically, the 2014 rules required bases to transmit to the TLC, on a regular reporting schedule, the following information for each dispatched trip: (1) the date, time, and location of the passenger pick-up; (2) the driver's For-Hire license number; (3) the dispatched vehicle's license number; and (4) the TLC license numbers of both the dispatching base and the base affiliated with the vehicle. *See* 35 R.C.N.Y. § 59B-19(a) (2014). The rule did not, at that time, require the reporting of passenger drop-off location or time; those requirements were added in 2017.

At no time have the TLC Rules required the collection or transmission of any information identifying the passenger, such as the passenger's name, contact information, or payment data. Although the passenger may have provided such information to a base in the ordinary course of requesting a ride through Wheely's mobile application, the TLC Rules themselves have never mandated that such information be reported to the Commission.

The 2014 amendments were approved by the Commission in November 2014 and were published in the City Record on December 1, 2014, becoming effective 30 days thereafter. In its Notice of Promulgation, the TLC explained that "in response to changing industry dispatching practices resulting from the introduction of smart phones" it would "require FHV bases to submit trip records to the TLC." *Notice of Promulgation of Rules*, 141 N.Y. City Rec. 229 (Dec. 1, 2014). The TLC further explained that, unlike taxis equipped with in-vehicle technology, which

automatically transmitted trip data to the TLC, "no such mechanism exist[ed]" for FHVs, leaving an "accountability gap" in enforcement and oversight.  *Id.*  To address that gap, the Commission determined that obtaining trip records would allow it to "identify the driver in each trip," "enforce its rules," and ensure that passengers could "get [rides] safely and reliably."  *Id.*

In 2017, the TLC expanded these reporting requirements as part of its adoption of "driver fatigue" rules.  In its Notice of Promulgation, the Commission explained that the rule "adds new reporting requirements for the for-hire vehicle (FHV) sector that will support the regulation of fatigued driving and assist TLC with enforcement initiatives in other areas."  *Notice of Promulgation of Rules*, 144 N.Y. City Rec. 29 (Feb. 13, 2017).  The Commission determined that additional trip information was necessary, including "drop-off time and location," which would allow it to calculate "trip duration" and more accurately assess driver fatigue.  *Id.*  The Commission explained this information would also assist in "investigating passenger complaints or complaints from a pedestrian or other motorist about unsafe driving."  *Id.*

As with the earlier iterations of the rule, the TLC did not require bases to collect, maintain, or transmit any passenger-identifying information, such as names or payment data.  The 2017 regulation is the Rule that is challenged as unconstitutional in this action.

### C.  The Challenged Location Reporting Rules

The Location Reporting Rules, 35 R.C.N.Y. § 59B-19, impose a mandatory data-collection and reporting regime on FHV bases.  Under TLC regulations, a "Base" is defined as a "business entity licensed by the Commission to dispatch For-Hire Vehicles."  35 R.C.N.Y. § 59B-03(g).  The Rule provides:

> A Base Owner . . . must make sure that the following records are collected and transmitted to the Commission on a monthly basis . . . [including] . . . (i) The date, the time, and the location of the Passenger pickup and drop-off.

35 R.C.N.Y. § 59B-19(a)(1)(i).  As currently in effect, the Rule requires the reporting of both pickup and drop-off date, time, and location.  Critically, however, the Location Reporting Rule does not require bases to collect or transmit any information identifying the passenger, such as the passenger's name, contact information, or payment data.

The TLC specifies the format in which such data must be submitted.  As reflected in TLC datasets produced in this case, trip-level records include fields such as "dispatching_base_num," "pickup_datetime," "dropOff_datetime," "PUlocationID," and "DOlocationID."  Dkt. No. 34-6, FHV Open Data Production.  These location identifiers correspond to geographic zones defined by the TLC.  The Commission maintains a mapping of location identifiers to specific neighborhoods – for example, "LocationID 213" corresponds to "Tribeca," and "LocationID 90" corresponds to "Flatiron."  Dkt. No. 34-7, Data Dictionary, at 5, 10.

The Rule requires every licensed FHV base to generate and transmit a comprehensive, time-stamped record about each trip it dispatches, including when the trip occurred and where it began and ended, along with identifying information about the driver and vehicle.  Because the reporting obligation applies across the FHV industry and recurs on a monthly basis, the system

results in the continuous aggregation of trip-level data across the City's for-hire vehicle industry into a centralized database maintained by the TLC.

The record reflects that this reporting occurs through standardized electronic submission processes. No later than the last day of the following month, *see* 35 R.C.N.Y. § 59B-13(a)(3)(i), base owners must transmit monthly trip data in comma-separated value ("csv") format, either through a secure File Transfer Protocol ("FTP") client or through the TLC's FTP. Dkt. No. 35, Declaration of Amit Agarwal ("Agarwal Decl."), ¶ 3. Once submitted, the data is stored in an encrypted database and is not accessible to the submitting base through the portal; only authorized TLC personnel can access the uploaded files. *Id.*, ¶ 4.

In addition to the reporting requirements set forth in Section 59B-19, TLC rules impose separate obligations governing the handling and disclosure of passenger-identifying information. Section 59B-21(g) requires any base that "collects or maintains passenger 'Personal Information'" or "passenger geolocation data" to "file with the Commission a current detailed information security and use of personal information policy." It incorporates by reference New York General Business Law § 899-aa(1)(a), which defines "personal information" as "any information concerning a natural person which, because of name, number, personal mark, or other identifier, can be used to identify such natural person."

The rule mandates that such policy include, at a minimum, "a statement that, except to the extent necessary to provide credit, debit, and prepaid card services and services for any application that provides for electronic payment, personal information will only be collected and used with such passenger's affirmative express consent and that such personal information will not be used, shared, or disclosed, except for lawful purposes," § 59B-21(g)(2), and "a statement of the Base's policies regarding the use of passenger geolocation information, which must include, at a

11

minimum, a prohibition on the use, monitoring, or disclosure of trip information, including the date, time, pick-up location, drop-off location, and real-time vehicle location and any retained vehicle location records, without such passenger's affirmative express consent," § 59B-21(g)(5).

These provisions draw a clear distinction between (i) identifying or consent-protected passenger information and (ii) the standardized trip-level data that must be reported to the TLC. Section 59B-21(g) regulates the former by requiring consent-based limitations on its use and disclosure to third parties; it does not require that such information be collected in the first instance, nor does it require – or authorize – its disclosure to the TLC.

Put otherwise, Section 59B-21(g) requires bases to adopt policies limiting the disclosure of passenger-identifying information without passenger consent to *non-TLC third parties*.  It does not require bases to maintain passenger-identifying information at all, and it most certainly does not compel its disclosure to the TLC.

The complaint in this action pleads that the compelled reporting of trip-level data (including time and location) – even without personally identifying information like names or payment information – creates a risk that individual passengers could be identified if someone combined the TLC data with data derived from other, unspecified non-TLC sources.  According to Plaintiffs, this "reidentification" risk means that what appears to be non-identifying trip data can be used to reveal individual movement patterns without passenger consent.  Wheely characterizes this reporting regime as one that creates a large-scale system of mass surveillance encompassing hundreds of millions of trips "*unmatched by any other jurisdiction.*"  *See, e.g.*, Dkt. No. 1, Complaint, ¶ 75–76.  Plaintiffs further contend that the reporting requirement is inconsistent with their privacy-focused business model, notwithstanding that they elected to enter the New York City market subject to these regulations.

Wheely challenges a reporting regime that has been in place since 2015, and whose core requirement – that trip-level data be transmitted to the TLC – has governed the FHV industry for more than a decade, without prior constitutional challenge.  Wheely, by contrast, is a recent entrant into the New York City FHV industry; to the Court's knowledge, it has not yet commenced operations in New York City.  It brings this pre-enforcement challenge to avoid complying with reporting requirements that have long applied to other major FHV bases, such as Lyft and Uber.

The issue for decision is whether Plaintiffs have established that the challenged Rules, 35 R.C.N.Y. § 59B-19, are unconstitutional or otherwise unlawful.  They have not.  Accordingly, Plaintiffs are not entitled to the relief they seek, and the complaint must be dismissed.

## II.    LEGAL STANDARDS

Because the Court has consolidated the hearing on Plaintiffs' motion with a trial on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, the Court evaluates Plaintiffs' entitlement to permanent, rather than preliminary, injunctive relief.  *See Rosenberg v. Meese*, 622 F. Supp. 1451, 1476 (S.D.N.Y. 1985).

In the Second Circuit, a party seeking permanent injunctive relief must demonstrate (1) actual success on the merits and (2) irreparable harm.  *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2012); *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 889 F. Supp. 2d 606, 611 (S.D.N.Y. 2012).

Where, as here, Plaintiffs allege constitutional violations, the irreparable harm inquiry is closely tied to the merits.  The Second Circuit has recognized that "the alleged violation of a constitutional right triggers a finding of irreparable harm."  *Ognibene*, 671 F.3d at 182.  But that principle presupposes that such a violation has in fact been established; absent a constitutional

violation, there is no basis to presume irreparable injury. *See Seventh Regiment Armory Conservancy, Inc. v. Knight*, 811 F. Supp. 3d 467, 478 (S.D.N.Y. 2025).

Plaintiffs advance several theories of irreparable harm. They contend that they face a coercive "Hobson's choice" if they wish to operate in New York City – either comply with the challenged reporting regime and disclose non-passenger-identifying, trip-level data to the TLC, as required by the Rules, or incur substantial civil penalties if they wish to adhere to their self-proclaimed business model, *see Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). They argue that compelled disclosure of trip information data leads to irreparable injury because passenger confidentiality may be lost if that information is combined with other sources, and passenger confidentiality, once lost, cannot be restored. *See Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 482–83 (S.D.N.Y. 2019)**.** And they contend that compliance will harm their customer relationships, which are built on an expectation of personal privacy.

But the ordinary burdens of complying with a regulatory regime do not, without more, constitute irreparable harm. *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) ("[O]rdinary compliance costs are typically insufficient to constitute irreparable harm."). Thus, a plaintiff cannot establish irreparable injury merely by pointing to the costs or business consequences of conforming its conduct to a duly enacted law. *See id.*; *cf. Council for Responsible Nutrition v. James*, 159 F.4th 155, 171–72 (2d Cir. 2025) (rejecting compliance costs and speculative loss of sales as sufficient irreparable harm where plaintiffs failed to demonstrate a likelihood of success on the merits). Moreover, several of Plaintiffs' asserted harms depend on the premise that the challenged regime is unlawful. But Plaintiffs cannot establish irreparable harm by assuming the invalidity of the very regime they challenge. Where that premise is not

14

established, Plaintiffs' asserted harms do not provide a basis for injunctive relief. *See Seventh Regiment Armory Conservancy*, 811 F. Supp. 3d at 478.

The Court is satisfied that Plaintiffs have Article III standing to pursue their claims, for the reasons explained below. The irreparable harm inquiry thus turns on whether Plaintiffs succeed on the merits of their constitutional and statutory challenges. They do not.

### III.    DISCUSSION

#### A.  Plaintiffs Have Article III Standing

"To obtain a determination on the merits in federal court, parties seeking relief must show that they have standing under Article III of the Constitution." *Arizona Christian School Tuition Organization v. Winn,* 563 U.S. 125, 129 (2011). To establish Article III standing, Plaintiffs must demonstrate "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (citation modified); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

Plaintiffs, who are not yet operating in New York City, bring a pre-enforcement challenge to the TLC's Location Reporting Rules. In this context, a plaintiff need not violate a law before challenging it. Rather, a plaintiff may establish injury in fact if it alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and faces "a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159 (internal quotation marks omitted). Where a plaintiff plausibly alleges plans to engage in conduct covered by a challenged law and faces a credible threat of enforcement, Article III injury is satisfied. *See, e.g.*, *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 137–38 (2d Cir. 2023); *Cerame v. Slack*, 123 F.4th 72, 75–76 (2d Cir. 2024).

15

### 1.    Intention to Engage in a Course of Conduct Arguably Affected with a Constitutional Interest

The first requirement is easily met.  The record demonstrates that Plaintiffs are not merely contemplating a hypothetical entry into the regulated market; they have obtained licenses from the city and are actively preparing to operate FHV bases that will be subject to the challenged Rules. As attested by Plaintiffs' CEO, Anton Chirkunov, "On November 18, 2025, the TLC granted Wheely's first license (for Mayfair-NY LLC)" and "On February 6, 2026, the TLC granted Wheely's second license (for Kensington-NY LLC)."  Dkt. No. 12, ¶ 11; *see also* Dkt. No. 12-4, Mayfair's TLC License; Dkt. No. 12-5, Kensington's TLC License.  Plaintiffs' business records corroborate Chirkunov's declaration.

Plaintiffs have secured a physical operating location in New York.  Both Mayfair and Kensington identify the same dispatch address – "28-07 Jackson Avenue, Long Island City, New York 11101" – in their TLC filings, and Kensington's application specifies that this is "The address from which [it] *will* dispatch vehicles."  Dkt. No. 34-10, at 5 (emphasis added); *see also* Dkt. No. 34-9, at 46–47.  Kensington submitted a formal TLC Business Lease Affirmation for that address, effective January 1, 2026 through December 31, 2026, as well as a Certificate of Occupancy issued October 1, 2025, designating the premises for "B - BUSINESS" use.  Dkt. No. 34-10, at 105.

Kensington has also executed TLC's "Affirmation to Operate Black Car Base Station," representing that it "functions as a black car base," that "There will be a minimum of ten (10) vehicles" affiliated with the base, and that "more than 90% of this base's business is currently on a payment basis other than direct cash payment by the passenger."  *Id.* at 8.  These sworn representations confirm present operational readiness – not a mere abstract, future aspiration.

16

Plaintiffs have satisfied additional ancillary regulatory requirements to operate. Kensington's application reflects bond coverage through "RLI Insurance Company," effective December 18, 2025 through December 18, 2028.  Dkt. No. 34-10, at 7.  The same submission reflects proof of membership status with the "New York Black Car Fund," marked "Membership Pending."  *Id.*  And an email from the New York Black Car Fund confirms receipt of "a completed application for membership" for "KENSINGTON-NY LLC" and instructs that the email be provided to the TLC so that the base can "continue with [its] licensing requirements with the TLC such as registering the vehicles."  Dkt. No. 34-10, at 69.  Similarly, Mayfair submitted a "Merchant's Bonding Company" bond naming the New York City Taxi & Limousine Commission as obligee for a "For-Hire Vehicle Base Station," in the amount of $5,000, effective August 11, 2025 through August 11, 2028.  Dkt. No. 34-9, at 13–14.

Plaintiffs have also complied with TLC-mandated data governance requirements imposed pursuant to 35 R.C.N.Y. § 59B-21(g).  Mayfair executed TLC's "Information Security and Use of Personal Information Policy Affirmation," certifying that it maintains a policy governing passenger geolocation data and prohibiting "the use, monitoring, or disclosure of trip information, including the date, time, pick-up location, drop-off location, and real-time vehicle location and any retained vehicle location records, without such passenger's affirmative express consent."  Dkt. No. 34-9, at 48–49.  This Affirmation demonstrates that Plaintiffs have already complied with the regulatory obligations concerning disclosure to third parties of the very category of data – trip-level location information – that lies at the heart of this litigation.

The record also reflects that Plaintiffs already have a functioning dispatch platform.  Both Mayfair and Kensington identify "wheely" as the passenger-facing app the proposed base will use, and both identify the app as "Proprietary."  Dkt. No. 34-9, at 48; Dkt. No. 34-10, at 7.

Finally, Plaintiffs have already assembled a driver network capable of immediate dispatch. In sworn interrogatory responses, Plaintiffs state that "as of March 6, 2026, there are 33 TLC-licensed drivers with active Wheely accounts eligible to be dispatched from any Plaintiff base," all of whom have completed training and background checks. Dkt. No. 34-12, at 3–5.

Taken together, this record establishes a fully operational business, as evidenced by licensed entities, secured premises, executed leases, insurance and bonding in place, completed regulatory certifications, a functioning dispatch platform, and a trained driver pool. This is not a case involving "some day intentions." *See Lujan*, 504 U.S. at 564. It is a case in which Plaintiffs have crossed nearly every material regulatory threshold necessary to commence operations.

Because the challenged Rules apply to licensed bases and require them to collect and transmit trip-level location data, Plaintiffs' operations subject them directly to the regulatory requirements they challenge. Plaintiffs are not seeking advisory relief about a law that might one day apply to them; they are TLC-licensed entities preparing to operate under TLC's reporting rules now.

### 2.    Credible Threat of Enforcement

Plaintiffs also face a credible threat of enforcement. The regulatory scheme applies automatically to licensed bases, and Plaintiffs are already licensed. They have submitted to the TLC's regulatory process, executed required certifications, and structured their operations in accordance with TLC rules. *See* Dkt. No. 34-9, at 48–49; Dkt. No. 34-10, at 7–8. There is therefore nothing speculative about Plaintiffs' exposure to the challenged rules. Once they dispatch trips – as the record shows they are prepared to do – the reporting requirements will apply to them by operation of law.

Defendant argues that Plaintiffs' injuries are speculative because Plaintiffs have not yet begun dispatching rides. But that argument is foreclosed by controlling precedent. A plaintiff "should not be required to await and undergo" enforcement proceedings before seeking relief. *Susan B. Anthony List*, 573 U.S. at 158. Nor must Plaintiffs demonstrate that enforcement is certain; a credible threat suffices. *See Vitagliano*, 71 F.4th at 137–38.

Plaintiffs face the immediate choice between complying with the challenged regime or refraining from launching operations for which they are otherwise fully prepared. Thus, this case is unlike *Clapper v. Amnesty International USA*, 568 U.S. 398, 409 (2013), where the alleged injury depended on a speculative chain of possibilities and was not "*certainly* impending." Here, the regulatory obligations attach directly and imminently to Plaintiffs' conduct.

The remaining question is whether Plaintiffs have identified an injury that they themselves will suffer from compliance with the challenged Rules. They did not originally, but they have now.

Plaintiffs' theory of injury has evolved over the course of the proceeding. In their complaint, Plaintiffs framed the challenged Rules primarily, although not exclusively, as an intrusion on the privacy *of their passengers*. *See* Dkt. No. 1, Compl. ¶¶ 1–5 (alleging that the Rules "threaten[] the privacy of millions of New Yorkers," threaten to "reveal some of the most sensitive, intimate facets of their private lives," and that TLC's retention of customer data "leav[es] serious questions regarding the ability of nefarious actors to gain access to the data in order to harass, blackmail, or harm unsuspecting New Yorkers."). Consistent with that theory of harm, the expert testimony submitted by Plaintiffs in support of their motion for injunctive relief emphasizes the sensitivity of passenger location data, and the risk that such data – even if nominally anonymized – can be reidentified or used to ascertain movements and associations of particular

individuals.  *See, e.g.*, Dkt. No. 13, Declaration of Neils Richards ("Richards Decl."), ¶¶ 6–8 (opining that location data is "sensitive data" and may be reidentified through "evolving technological developments in data science and artificial intelligence"); *see also* Dkt. No. 43, Supplemental Declaration of Neils Richards, ¶ 7 (stating that "advances in reidentification techniques since the TLC Location Data Rules went into place mean that reidentification is even easier than it was in 2017").

When responding to the motion for preliminary injunctive relief, the City challenged Plaintiffs' standing to assert Fourth Amendment claims on behalf of their passengers.  Apparently, Plaintiffs understand that the City's argument has merit; Plaintiffs cannot assert the Fourth Amendment rights of their passengers directly.  *See Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014) ("Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.").

In their reply, Plaintiffs emphasized their own asserted privacy interest in the data they collect as part of their business operations.  *See* Dkt. No. 41, Pls.' Reply Mem. L. Supp. Mot. for Inj. Relief, at 9 (arguing that "FHVs have privacy interests independent of their users").  That shift brings Plaintiffs' Fourth Amendment claim back within its permissible bounds.  The Fourth Amendment inquiry here turns on whether *Plaintiffs* – regulated entities required to produce business records – have a cognizable privacy interest in the information they are required to turn over to the TLC, and whether the challenged Rules are reasonable as applied to them.

Plaintiffs also identify a business injury traceable to the challenged Rules.  Their position, in substance, is that Wheely markets itself as a privacy-protective service and that compelled reporting to the TLC – particularly if the reported data were later disclosed or reidentified – would undermine that privacy-centered business model, deter privacy-sensitive customers, and erode the competitive distinction on which Plaintiffs seek to compete.  That asserted injury is sufficiently

20

concrete and tied to the challenged Rules to satisfy Article III, and would be redressed by the declaratory and injunctive relief they seek. *See Lujan*, 504 U.S. at 560–61.

Of course, the passenger privacy concerns originally advanced by Plaintiffs and echoed by the several *amici* who have filed briefs in support of their position are not without some relevance. Plaintiffs' theory – that trip-level data, when combined with other datasets, could allow someone to infer individual identities and patterns of movement – bears on the sensitivity of the data at issue. *See infra* Section III(B)(5) (addressing "mosaic" theory-based contention that aggregated trip-level data may permit reidentification when combined with other datasets).

But those concerns do not alter whose constitutional rights are at issue. And the appearance of *amici* neither expands the scope of Plaintiffs' claims nor allows Plaintiffs to assert Fourth Amendment rights on behalf of their potential passengers. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445 (2d Cir. 2001); *United States v. Michigan*, 2025 WL 764613, at *4 (6th Cir. Mar. 11, 2025) ("Amicus curiae may not and . . . has never been permitted to rise to the level of a named party/real party in interest nor has an amicus curiae been conferred with the authority of an intervening party of right without complying with the requirements of Fed. R. Civ. P. 24(a)."). The Court thus considers passenger privacy concerns only insofar as they bear on the sensitivity of the information contained in Plaintiffs' records and, in turn, on the scope of any reasonable expectation of privacy Plaintiffs may assert in those records.

In sum, Plaintiffs have established Article III standing to pursue this pre-enforcement challenge. They have demonstrated a concrete and imminent injury arising from the regulatory obligations imposed by the challenged Rules, a credible threat of enforcement, and injury that is fairly traceable to the Rules and redressable by the relief sought. The Court proceeds to the merits.

### B.  The Location Reporting Rules Do Not Violate the Fourth Amendment

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.  Few protections are as essential to individual liberty as the right to be free from unreasonable searches and seizures.  The Framers made that protection explicit in the Bill of Rights in response to the abuses of general warrants and arbitrary intrusions.  The Fourth Amendment's "basic purpose" is "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials."  *Camara v. Mun. Ct. of City & Cnty. of S.F.*, 387 U.S. 523, 528 (1967).  The Supreme Court has repeatedly emphasized that the "ultimate touchstone of the Fourth Amendment is 'reasonableness.'"  *Riley*, 573 U.S. at 381.

Plaintiffs contend that the TLC's Location Reporting Rules effect an unconstitutional administrative search because they compel the recurring production of trip-level location data without a warrant, subpoena, or opportunity for pre-compliance review.  They rely principally on *City of Los Angeles v. Patel*, 576 U.S. 409 (2015), *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467 (S.D.N.Y. 2019), and the Supreme Court's modern digital-privacy cases, especially *Carpenter v. United States*, 585 U.S. 296 (2018).

Trip-level location data can reveal a great deal; when combined with data from other sources, it can be used to reveal, or at least suggest, the identity or location of an FHV passenger.

But the question before this Court is not whether such data is sensitive in the abstract.  It is whether the City's reporting regime – viewed in its actual regulatory setting, its actual operation, and under the Fourth Amendment doctrines that govern commercial recordkeeping requirements – constitutes an unreasonable search.  It does not.

22

1.     **Administrative Reporting Requirements Are Evaluated for Reasonableness Under the Fourth Amendment**

There are two principal paths by which government conduct may constitute a Fourth Amendment search.  One is a physical intrusion upon protected property for the purpose of obtaining information.  *See Jones*, 565 U.S. at 404.  The other is an invasion of a reasonable expectation of privacy.  *See Katz*, 389 U.S. at 360–61 (Harlan, J., concurring).

This case plainly does not involve the first category.  Compliance with the Rule will not involve any physical entry onto Plaintiffs' premises, the attachment of a device to their property to collect or transmit data without their knowledge or consent, or otherwise the sort of trespass that was at issue in *Jones*.  Nor does it resemble *Kyllo v. United States*, 533 U.S. 27 (2001), where the government used sense-enhancing technology to obtain information from inside a home, or *Riley*, where police examined the contents of a seized cell phone.  Those cases involved direct, physical intrusion into protected spaces or access to intensely personal digital content.  The TLC's Rules do not authorize any comparable intrusion.

The analysis therefore proceeds under the standards governing administrative searches.  That line begins with the recognition that the Fourth Amendment applies in the administrative setting.  In *Camara v. Municipal Court*, 387 U.S. 523, 534 (1967), the Supreme Court held that administrative inspections are "significant intrusions upon the interests protected by the Fourth Amendment."  And *See v. City of Seattle*, 387 U.S. 541, 543 (1967), decided the same day, extended that principle to commercial premises, explaining that "The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property."

Most recently, the Supreme Court clarified the limits of administrative inspection regimes, including in contexts involving regulated businesses, in *City of Los Angeles v. Patel*, 576 U.S. 409

23

(2015).  There, a Los Angeles ordinance required hotel operators to maintain guest records and to make them available "to any officer of the Los Angeles Police Department for inspection" on demand.  *Id.* at 412.  The Court held that "absent consent, exigent circumstances, or the like," the Fourth Amendment requires that the subject of an administrative search be afforded "an opportunity to obtain precompliance review before a neutral decisionmaker."  *Id.* at 420.  The constitutional defect was not merely that the City required hotels to keep records; it was that the ordinance authorized immediate inspection of nonpublic records, subject to the unilateral discretion of police officers, without any mechanism for neutral review before penalties attached. *See id.* at 421–23.

At the same time, *Patel* reaffirmed the longstanding principle that different considerations apply in "closely regulated" industries, where participants have a reduced expectation of privacy in records related to regulated activity.  *See id.* at 424.  That principle, developed in cases such as *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978), *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 75–77 (1970), and *United States v. Biswell*, 406 U.S. 311, 316 (1972), reflects the settled understanding that pervasive regulation diminishes the privacy interests that would otherwise attach to commercial records and permits their provision without individualized warrants or subpoenas.

In *New York v. Burger*, 482 U.S. 691 (1987), the Court articulated a three-part test for warrantless administrative inspections in closely regulated industries: (1) there must be "a substantial government interest" informing the regulatory scheme; (2) the warrantless inspections must be "necessary to further [that] regulatory scheme"; and (3) the inspection program, "in terms of the certainty and regularity of its application," must provide "a constitutionally adequate substitute for a warrant."  *Id.* at 702–03.  The Court emphasized that warrantless inspections are

24

reasonable where these conditions are met because the regulatory scheme itself provides notice and limits sufficient to substitute for a warrant. *See id.* at 703.

The Second Circuit recently confirmed that there is no tension between *Patel* and *Burger*. In *Hudson Shore Associates Ltd. Partnership v. New York*, 139 F.4th 99, 108–09 (2d Cir. 2025), the court held that administrative inspections are not "per se unreasonable" where regulated parties have either (1) "adequate opportunity to obtain precompliance review" or (2) are so "closely regulated" that its participants have "no reasonable expectation of privacy." The court further emphasized that the "underlying command of the Fourth Amendment is always that searches be reasonable," and that "what is reasonable depends on the context within which a search takes place." *Id.* (quoting *Gudema v. Nassau Cnty.*, 163 F.3d 717, 722 (2d Cir. 1998)). *Hudson Shore* thus makes clear that *Patel*'s pre-compliance requirement and *Burger*'s closely regulated industry exception are independent paths to Fourth Amendment reasonableness in the administrative context.

The TLC's Rules are reasonable under either path. *First,* the Rules govern participants in a pervasively regulated industry who are required, as a condition of licensure, to generate and maintain trip-level operational records. In this context, Plaintiffs have a diminished expectation of privacy in such records, and the reporting requirement falls squarely within the closely regulated industry exception articulated in *Burger*. *Second,* the Rules do not authorize discretionary, on-demand police inspections of the sort invalidated in *Patel*. They impose a uniform, prospective reporting obligation – subject to pre-compliance review – that defines in advance what information must be reported, how it must be transmitted, and when it must be submitted.

**2.      The FHV Industry Is a Closely Regulated Industry With a Diminished Expectation of Privacy**

When an industry is "pervasively regulated," a regulated party's expectation of privacy is correspondingly diminished. *See Burger*, 482 U.S. at 702. Because New York City's FHV industry is "pervasively regulated," the Court concludes that Plaintiffs, as licensed FHV bases operating within the TLC's rules, have a reduced expectation of privacy in records generated as part of their dispatch activities. *Accord Greater New York Taxi Ass'n v. New York City Taxi & Limousine Comm'n*, 988 N.Y.S.2d 5, 10 (2014), *aff'd*, 36 N.E.3d 632 (2015) ("Far-reaching control has been delegated to [the TLC] charged with implementing a pervasive regulatory program.") (citation omitted)).

New York City's FHV industry is no ordinary commercial enterprise. It is a closely regulated, license-dependent system, in which entry and continued participation are conditioned on compliance with a detailed regulatory scheme that has long been in place. The TLC regulates nearly every aspect of the FHV industry through detailed rules codified in Title 35 of the Rules of the City of New York. Those rules "establish the procedures, rules and regulations for obtaining and maintaining a For-Hire Base License" and "provide penalties for violations" of those requirements. 35 R.C.N.Y. § 59B-01(a)–(b). They likewise impose "requirements for obtaining and maintaining a For-Hire Vehicle License." 35 R.C.N.Y. § 59A-01(a).

Entry into the FHV industry is tightly controlled, and eligibility is continuously evaluated. Applicants must demonstrate that they are "Fit to Hold a License," provide detailed ownership and organizational disclosures, and identify all relevant business entities and principals. *See* 35 R.C.N.Y. § 59A-04(m), (o); § 59B-04(g), (i). They must also designate agents for service, provide current contact information, and demonstrate compliance with registration and operating-authority requirements under state law. *Id.*, § 59A-04(d), (n), (p)–(q).

26

The TLC further subjects licensees to background screening and financial accountability requirements.  Base owners and controlling persons must be fingerprinted for "criminal history records," and that history must be reviewed in determining eligibility.  35 R.C.N.Y. § 59B-04(c). Base owners must also post and maintain a bond guaranteeing that the Licensee "will dispatch only vehicles that are currently licensed" and "will pay all civil penalties owed," and the Commission may draw upon that bond to satisfy unpaid violations.  *Id.*, § 59B-04(e).  In addition, applicants and licensees must remain current on "any outstanding fines or fees owed" not only to the TLC but also to other city and state enforcement bodies as a condition of licensure.  *Id.*, § 59B-04(f); § 59A-04(k).

The rules then regulate bases at a granular level.  A base is the "Commission-licensed business for dispatching For-Hire Vehicles" and the "physical location from which For-Hire Vehicles are dispatched."  35 R.C.N.Y. § 59B-03(g).  Vehicles must be "affiliated with an appropriate For-Hire Base," may affiliate with only one base at a time, and may not operate independently of that affiliation.  35 R.C.N.Y. § 59A-04(h)–(i).  FHV drivers, themselves, are subject to a "Base Agreement," which establishes the "terms or conditions a Driver or Vehicle owner must accept or agree to in order to receive a dispatch," including "any costs or fees" and "any schedules or formulas used to calculate" compensation. 35 R.C.N.Y. § 59B-03(b).  The TLC thus regulates not only dispatch itself, but the financial and contractual terms governing participation in a base's business.

A base must dispatch vehicles "on a pre-arranged basis" and must comply with rules governing ownership structure, payment models, and the relationship between bases, drivers, and vehicles, including requirements that "More than ninety percent (90%) of its business" be conducted on a non-cash basis.  *See id.*, § 59A-03(c); § 59B-03(d), (n).  Moreover, operation

within the industry is subject to continuous inspection and compliance obligations.  Vehicles "must pass inspection" as a condition of initial licensure and renewal, are subject to repeated inspection attempts within defined timeframes, and must comply with "any other applicable laws, rules and requirements."  35 R.C.N.Y. § 59A-04(e)–(f).  Vehicles may not operate if they fail inspection or if licensure conditions are not satisfied.  *Id.*, § 59A-04(f)(4).

Finally, the TLC enforces this regime through defined penalties.  "Unlicensed Activity" includes providing or "advertising the provision" of for-hire transportation services without a valid license, including where a license is "suspended, revoked, or expired."  35 R.C.N.Y. §§ 59A-02(a)(1); 59B-02(a)(1).  Such conduct "can subject the violator to the seizure and possible forfeiture of the vehicle involved."  *Id.*, §§ 59A-02(a)(2); 59B-02(a)(2).  Violations are further subject to "specific penalties," including monetary fines, penalty points, and required appearances before the Taxi and Limousine Tribunal, and unpaid fines result in automatic license suspension until compliance is achieved.  *Id.*, §§ 59A-02(b)–(c); 59B-02(b)–(c).

The TLC thus regulates entry, ownership, dispatch operations, driver relationships, vehicle conditions, financial accountability, and ongoing compliance, leaving virtually no aspect of the FHV business unregulated.  These are precisely the conditions under which the Supreme Court has recognized diminished expectations of privacy.  *See Burger*, 482 U.S. at 700–03.

New York courts addressing materially similar TLC data-collection requirements have reached the same conclusion.  For example, in *Carniol v. New York City Taxi & Limousine Commission*, 975 N.Y.S.2d 842 (Sup. Ct. 2013), *aff'd*, 2 N.Y.S.3d 337 (2015), the court upheld the 2004 version of the Rules, particularly the TLC's use of GPS-enabled Taxi Technology Systems, which record and transmit trip-level data – including pickup and drop-off locations, trip times, and distances – to the Commission.  The court concluded that a taxi driver had no reasonable

expectation of privacy in the trip information gathered by TLC. *Carniol*, 975 N.Y.S.2d at 850. That reasoning applies with equal force here with respect to "bases."

Plaintiffs argue that the "closely regulated industry" doctrine is limited to a narrow set of "intrinsically dangerous" industries such as liquor, firearms, mining, and junkyards. But that argument misreads the case law. The Supreme Court has never imposed a categorical "intrinsic danger" requirement; rather, the inquiry is functional, focusing on the comprehensiveness and longevity of the regulatory scheme and the extent to which it substitutes for a warrant. *See Burger*, 482 U.S. at 702–03. The Supreme Court's observation in *Patel* that it "has identified only four industries" that are closely regulated "is neither here nor there," as it reflects the Court's discretionary docket rather than any substantive limitation on the doctrine. 576 U.S. at 435 (Scalia, J., dissenting). Lower courts, like this one, "do not have the luxury of picking the cases they hear" and have identified many more businesses as closely regulated, including pharmacies, massage parlors, commercial fishing operations, day-care facilities, nursing homes, jewelers, barbershops, and even rabbit dealers. *Id.* at 435–36 (collecting cases).

The FHV industry implicates significant public safety concerns at least of the same order. FHV passengers entrust their physical safety to drivers they do not know, riding in vehicles they do not control, often traveling alone and at all hours, and frequently in circumstances where assistance is not readily available if something goes wrong. As detailed in the "Statement of Basis and Purpose of Rule," the "TLC needs to be able to identify the driver in each trip of one of its licensed vehicles, particularly if a vehicle is involved in a crash or if there is a service complaint against the driver." *Notice of Promulgation of Rules*, 141 N.Y. City Rec. 229 (Dec. 1, 2014). Therefore, the TLC's regulations help protect members of the public "who file complaints that a driver violated the law, such as by overcharging, driving recklessly." *Id.* The Court is satisfied

that the FHV industry presents risks to the public that justify comprehensive oversight, which reinforces the diminished expectation of privacy in records generated as a part of regulated dispatch activities.

Plaintiffs chose to enter this heavily regulated market.  In doing so, they subject themselves to longstanding regulatory requirements designed to promote passenger safety, ensure accountability, and mitigate the risks inherent in for-hire transportation.    Under these circumstances, Plaintiffs cannot reasonably claim the same expectation of privacy in records generated as part of their regulated operations.

Second Circuit cases underscore the point.  In *Statharos v. New York City Taxi & Limousine Commission*, 198 F.3d 317, 324 (2d Cir. 1999), Judge Calabresi explained that "the taxi industry is pervasively regulated by the [TLC]," and held that medallion owners who choose to "enter the heavily regulated taxi industry" have a reduced confidentiality interest in information related to their regulated activities.  Likewise, in *Buliga v. New York City Taxi Limousine Commission*, 2007 WL 4547738, at *2 (S.D.N.Y. Dec. 21, 2007), *aff'd*, 324 F. App'x 82 (2d Cir. 2009), my colleague Judge Cote similarly stated that, "Adults who choose to participate in a heavily regulated industry, such as the taxicab industry, have a diminished expectation of privacy, particularly in information related to the goals of the industry regulation."  And in *El-Nahal v. Yassky*, 993 F. Supp. 2d 460, 468 (S.D.N.Y. 2014), *aff'd*, 835 F.3d 248 (2d Cir. 2016), another judge of this court held that the plaintiff had a "low privacy interest in the data collected" through the TLC taxi-data system, because the data related directly to his work as a taxi driver and pre-existing regulations already required him to keep track of that information.

Plaintiffs respond that taxicabs and FHVs are "meaningfully different," citing equal-protection decisions such as *Progressive Credit Union v. City of New York*, 889 F.3d 40 (2d Cir.

30

2018), and *Illinois Transportation Trade Association v. City of Chicago*, 839 F.3d 594 (7th Cir. 2016). That argument misses the mark. Both cases arose in the equal-protection context and addressed whether regulatory distinctions between taxis and FHVs were rational – not whether FHVs are subject to pervasive regulation for Fourth Amendment purposes. *See Progressive Credit Union*, 889 F.3d at 45–49; *Illinois Transportation Trade Ass'n*, 839 F.3d at 598–600. These decisions do not suggest that FHVs operate outside a comprehensive regulatory regime; on the contrary, both decisions proceed from the premise that FHVs are subject to extensive municipal regulation, just as taxicabs are.

That is perfectly sensible. Whether a passenger rides in a yellow taxi or a black car, the City has an interest in making sure that the vehicle and its driver are operating in a safe and responsible manner. From the perspective of protecting the passenger, there is no discernable difference between yellow cabs and black cars. The City's interest in passenger safety, like the passenger's own interest, does not depend on the type of vehicle.

### 3. The Location Reporting Rules Are Reasonable and Satisfy the Requirements Governing Warrantless Administrative Searches Under *New York v. Burger*

Plaintiffs argue that a business possesses a Fourth Amendment interest in its own customer-related records. The City resists that proposition by invoking "third-party doctrine" cases, especially *United States v. Miller*, 425 U.S. 435 (1976), and *Smith v. Maryland*, 442 U.S. 735 (1979). These cases held that individuals generally lack a reasonable expectation of privacy in bank records or dialed telephone numbers because the information at issue is "voluntarily conveyed" to third parties and "exposed" to them in the ordinary course of business. *See Miller*, 425 U.S. at 442; *Smith*, 442 U.S. at 744. More recent decisions have applied the same third-party doctrine to certain forms of location data generated in commercial contexts. *See, e.g., United States v. Brown*, 627 F. Supp. 3d 206, 221–25 (E.D.N.Y. 2022) (holding that defendants lacked a

31

reasonable expectation of privacy in rental-car GPS data because it was "voluntarily conveyed" to the rental company and constituted the company's business records).

But *Miller*, *Smith*, and *Brown* address the customer's interest, not that of the business. The third-party doctrine does not foreclose a company's Fourth Amendment interest in its own records. On this point, Plaintiffs are correct to invoke *Patel* and *Airbnb*. Their premise – that a business may assert a privacy interest in its customer-related records – is sound. But Plaintiffs' reliance on those cases ultimately fails, because the facts about the regulation of this industry are materially different.

As Judge Engelmayer explained in *Airbnb*, a customer-facing business can have its own privacy interest in records concerning its customers, because those records are part of the business's property, competitive position, and customer relationships. He quotes the *en banc* Ninth Circuit observation that the business records at issue in *Patel* were the hotel's "private property," in which it had both a possessory and ownership interest, and therefore a right to exclude others from "prying into the contents of its records." *Airbnb*, 373 F. Supp. 3d at 484, (quoting *Patel v. City of Los Angeles*, 738 F.3d 1058, 1061 (9th Cir. 2013) (en banc)).

The Court agrees that Plaintiffs have a cognizable interest in the confidentiality of their trip data. That is sufficient to conclude that the challenged rules implicate the Fourth Amendment. The only question is whether the TLC's intrusion is reasonable.

The Court concludes that the Location Reporting Rules are reasonable administrative measures. That conclusion follows from the defined limits of the rules, the regulatory context in which the data is generated, and the substantial government interests they serve.

Those limits are borne out in the record. The TLC collects trip data through a controlled reporting system and restricts access to authorized personnel. The record establishes that "owners

of For-Hire Bases . . . are required to transmit to TLC trip records" including "the date, the time, and the location of the passenger pickup and drop-off" on a monthly basis.  Dkt. No. 35, Agarwal Decl., ¶ 2.  Those records must be submitted in "comma-separated value (or 'csv') format" either through "a secured File Transfer Protocol ('FTP') client" or the "TLC Upload Portal."  *Id.*, ¶ 3.  Access to that system is itself controlled, as a base owner must log in using his license credentials, zip code, and "the last five digits of the For-Hire Base's Social Security or Employer Identification Number."  *Id.*  Once submitted, the data "is stored in an encrypted database," cannot be downloaded by the base, and is viewable only by "authorized personnel at TLC, who must access such data to perform their duties."  *Id.*, ¶ 4.

Plaintiffs' asserted injury arises not from the act of reporting data to the TLC itself, but from the alleged downstream consequences of that reporting for Wheely's business model.  Plaintiffs contend that Wheely differentiates itself as a privacy-protective service, and that compelled reporting – particularly if the reported data were later disclosed or reidentified – would undermine that model by deterring privacy-sensitive customers and eroding its competitive position.

In particular, Plaintiffs argue that, once trip-level data is collected by the TLC, it becomes subject to disclosure under New York's Freedom of Information Law ("FOIL"), N.Y. Pub. Off. Law § 84 *et seq.*, and that such disclosure could enable the reidentification of individual riders and reconstruction of their movements.  On Plaintiffs' theory, that downstream risk – rather than the reporting obligation itself – constitutes the injury to Wheely, because it would diminish the value of its privacy-focused service and impair its ability to compete on that basis.

Plaintiffs' argument, however, overstates both the scope of FOIL and the nature of the data actually subject to disclosure.  FOIL does not mandate disclosure of all agency records.  The statute

expressly permits agencies to withhold information where disclosure "would constitute an unwarranted invasion of personal privacy." N.Y. Pub. Off. Law § 87(2)(b). Consistent with that limitation, the record establishes that the TLC does not disclose precise location data in response to FOIL requests. Publicly available datasets include only fields such as the dispatching base identifier, pickup and drop-off timestamps, and LocationIDs corresponding to predefined geographic zones, rather than exact addresses or coordinates. *See* Dkt. No. 34-6, Zilkha Decl., Ex. 6, FHV Open Data Production, (showing tabular data limited to fields such as "dispatching_base_num," "pickup_datetime," "dropOff_datetime," "PUlocationID," and "DOlocationID"). These LocationIDs map to broad TLC-defined taxi zones, not to specific street-level points, and thus do not reveal the precise origin or destination of any trip. The TLC's FOIL officer confirms that, when responding to requests for data reported under 35 R.C.N.Y. § 59B-19(a), the agency "never provide[s] the actual address, intersection, or coordinates that the Base sends to TLC." Dkt. No. 36, Declaration of Latifah Williams ("Williams Decl."), ¶ 3.

These limitations confirm that the Rules do not vest enforcement officials with discretion to demand records on an *ad hoc* basis, as was the case in *Patel*; instead, they establish a uniform, prospective reporting obligation imposed as a condition of participating in a regulated market, with defined limits on both access and downstream disclosure. *See id.* In this regulatory setting, and given the diminished expectation of privacy applicable to business records generated as part of licensed dispatch operations, the TLC's reporting requirement is reasonable under the Fourth Amendment.

Plaintiffs' reliance on *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467 (S.D.N.Y. 2019) does not alter this conclusion. That case turned on the absence of a "comparable history of close regulation" in the home-sharing industry. *Airbnb*, 373 F. Supp. 3d at 485. Here, by contrast,

34

the record reflects decades of continuous regulatory oversight of both taxi and FHV dispatch activity, *see* Section I(B), including mandatory recordkeeping and inspection obligations. That longstanding regulatory framework places this case squarely within the "closely regulated" industry doctrine articulated in *New York v. Burger*, 482 U.S. 691 (1987).

As discussed, *see* Section III(B)(2), the TLC has – and continues to exercise – pervasive oversight over entry into, participation in, and operation of the FHV industry. The Court therefore considers whether the reporting rules satisfy *Burger*'s three-part test for constitutionally reasonable administrative inspection regimes in "closely regulated" industries. They do.

*First,* the City plainly has a substantial government interest in regulating for-hire transportation, including passenger safety, driver accountability, and consumer protection. *See Burger*, 482 U.S. at 702. This interest reflects concrete risks inherent in the industry, including unsafe driving, traffic accidents, and driver fatigue. The rulemaking record confirms that trip-level data is essential to those interests. As the Commission explained, the "TLC needs to be able to identify the driver in each trip of one of its licensed vehicles, particularly if a vehicle is involved in a crash or if there is a service complaint against the driver." *Notice of Promulgation of Rules*, 141 N.Y. City Rec. 229 (Dec. 1, 2014). Without such data, "TLC does not have a way to fairly enforce its rules against drivers across service types," creating "a wide accountability gap." *Id.*

More recent rulemaking reinforces the same point. The TLC adopted additional reporting requirements in 2017 specifically to combat fatigued driving, recognizing that long hours lead to "slowed reaction times" and "increas[e] the danger of driver errors and the risk of crashing." *Notice of Promulgation of Rules*, 144 N.Y. City Rec. 29 (Feb. 13, 2017). The Commission found that drivers operating for extended periods may exhibit impairment comparable to intoxication, underscoring the direct connection between trip-level data and public safety enforcement. *Id.*

(reporting that "being awake for 18 hours results in impairment equal to driving while under the influence of alcohol (DUI), and that being awake for 24 hours results in impairment equal to 1.25 times the threshold for driving while intoxicated (DWI).").

*Second,* standardized reporting is necessary to further that regulatory scheme. The need for centralized, reliable trip data is especially acute in a high-volume, app-based dispatch system involving tens of thousands of drivers operating across multiple bases. The Commission found that, absent centralized reporting, "there is no way for TLC to identify the offending driver" in key enforcement contexts, including traffic violations and consumer complaints about safety. *Notice of Promulgation of Rules*, 141 N.Y. City Rec. 229 (Dec. 1, 2014). The same is true for enforcing limits on driver hours. Without complete trip records, the agency cannot determine whether drivers are exceeding daily or weekly limits designed to prevent fatigue-related crashes. Requiring individualized, trip-by-trip subpoenas would defeat the very purpose of enabling effective oversight of the safety risks across the FHV industry. Uniform reporting, by contrast, ensures that the agency can "identify the driver who committed the offense" and enforce its rules effectively. *Id.*

*Third,* the reporting rules provide a constitutionally adequate substitute for a warrant because they fix in advance what must be reported, by whom, and when, thereby limiting official discretion and providing notice to regulated entities. *See Burger*, 482 U.S. at 702–03. The rules require bases to submit standardized trip records at regular intervals – records they are already obligated to maintain – thereby "automat[ing] existing requirements" through a uniform reporting mechanism rather than discretionary inspection. *Notice of Promulgation of Rules*, 141 N.Y. City Rec. 229 (Dec. 1, 2014). They also operate pursuant to detailed, publicly promulgated rules that define the scope of required reporting and the purposes for which the data may be used, further

36

constraining discretion and ensuring predictable, regular application.  In this way, the scheme bears none of the hallmarks of the *ad hoc*, officer-driven inspection regime invalidated in *Patel*.

The longstanding nature of the reporting requirement further confirms its reasonableness. The TLC has required FHV bases to report trip-level data – including pickup time and location – since at least 2015, and expanded those requirements in 2017 to include drop-off time and location to enforce driver fatigue limits.  *See id.*  Comparable trip-record reporting requirements have applied to taxicabs since at least 1997.

In the years since 2015, the reporting system has operated as a routine feature of for-hire transportation in New York City.  Major industry participants – including large-scale platforms like Uber and Lyft – have complied with these requirements as a condition of licensure.  As far as the Court is aware (and Plaintiffs have not indicated otherwise), the current Rules have not been subject to a constitutional challenge before this action.  This settled practice reinforces both the diminished expectation of privacy among regulated entities and the "certainty and regularity" that *Burger* identifies as a substitute for a warrant.

Accordingly, the TLC's reporting regime falls squarely within the class of prospective administrative schemes that satisfy *Burger*.  Applying settled Fourth Amendment principles governing administrative searches in "closely regulated" industries, the Court concludes that the TLC's Location Reporting Rules are a reasonable administrative measure and do not violate the Fourth Amendment.

Plaintiffs also invoke Article I, § 12 of the New York Constitution, but do not cite a single case applying it to invalidate an administrative measure of this kind.  Instead, they rely solely on the general proposition that New York's constitution can, in some circumstances, afford greater protection than its federal counterpart.  *See* Dkt. No. 10 at 22–23 (citing *People v. Scott*, 79 N.Y.2d

474 (1992)).  This is insufficient.  Plaintiffs offer no developed argument explaining why Article I, § 12 should be construed to provide broader protection in this context.  Courts do not construct state constitutional arguments for litigants, particularly where controlling New York precedent directly addresses the issue presented.

The New York Court of Appeals approach to administrative searches "parallel[s] in many respects the U.S. Supreme Court's test" under the Fourth Amendment.  *Owner Operator Independent Drivers Association, Inc. v. New York State Department of Transportation*, 40 N.Y.3d 55, 63 n.2 (2023) (comparing *People v. Quackenbush*, 88 N.Y.2d 534, 541 (1996), with *New York v. Burger*, 482 U.S. 691, 699 (1987)).  Although certain provisions of the New York Constitution may, in some circumstances, provide greater protection than does the United States Constitution, New York courts applying Art. I, § 12 have largely harmonized their analysis with the federal administrative-search standards.  Plaintiffs identify no authority – and the Court is aware of none – suggesting that a different result should obtain under New York law.

In *Quackenbush*, the New York Court of Appeals has held that warrantless administrative searches are permissible where (1) the activity is subject to a "long tradition of pervasive government regulation," and (2) the regulatory scheme provides sufficient constraints to ensure the "certainty and regularity of . . . application" necessary to furnish a "constitutionally adequate substitute for a warrant."  88 N.Y.2d at 541–42.

The New York Court of Appeals' decision in *Owner Operator Independent Drivers Association, Inc. v. New York State Department of Transportation*, 40 N.Y.3d 55 (2023), is on all fours.  There, the court upheld a regulatory scheme requiring commercial drivers to record and produce electronic logging data ("ELD"), holding that the resulting inspections fell within the administrative search exception and did not violate Article I, § 12.  40 N.Y.3d at 62–64 (concluding

38

that "commercial truck drivers have a diminished expectation of privacy in the location of their vehicles because of their participation in a pervasively regulated industry."). The court emphasized that both the Fourth Amendment and Article I, § 12 protect against "unreasonable government intrusions into [legitimate] expectations of privacy," *id.* at 62 (quoting *Quackenbush*, 88 N.Y.2d at 541), but that participants in a closely regulated industry have a "diminished expectation of privacy in the conduct of that business," *id.* at 64 (quoting *Quackenbush*, 88 N.Y.2d at 541); *see also Murtaugh v. New York State Dep't of Env't Conservation,* 841 N.Y.S.2d 189, 192 (2007) ("Those engaged in business in industries subject to a complex and pervasive pattern of regular and close supervision and inspection have a substantially diminished expectation of privacy in such business affairs.").

That same reasoning applies straightforwardly here. First, as discussed above, the FHV industry is pervasively regulated, and licensees therefore have a "diminished expectation of privacy" in records generated as part of their regulated dispatch operations. *Owner Operator*, 40 N.Y.3d at 64. Second, the rules impose a uniform, prospective reporting obligation that fixes in advance what must be reported, by whom, and when, thereby ensuring the "certainty and regularity" required to substitute for a warrant. *See Quackenbush*, 88 N.Y.2d at 542.

New York law adds a further requirement that the scheme be genuinely administrative and not a pretext "designed simply to give the police an expedient means of enforcing penal sanctions." *Owner Operator*, 40 N.Y.3d at 64 (quoting *People v. Keta*, 79 N.Y.2d 474, 498 (1992)). Nothing in the record suggests that the TLC's reporting rules operate as such a pretext. Rather, they are directed to core administrative functions, including driver identification, complaint investigation, and regulatory enforcement.

Accordingly, the TLC's Rules satisfy New York's administrative-search standards and does not violate Article I, § 12 of the New York Constitution.

### 4. The Availability of Article 78 Proceedings Provides Adequate Pre-Compliance Review

Even if the "closely regulated" industry exception recognized in *New York v. Burger* did not apply – and thus the Fourth Amendment requires an opportunity for pre-compliance review under *City of Los Angeles v. Patel* – that requirement would be satisfied here. The relevant question under *Patel* is whether regulated parties have access to a neutral decisionmaker before penalties are imposed. In *Patel*, the Supreme Court held that, "absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." 576 U.S. at 420. The constitutional defect there was the ordinance's requirement that hotel operators make their registries available to the police "on demand," backed by immediate penalties, without "any opportunity whatsoever" for neutral review. *Id.* at 420–21. That is not this case.

New York law provides a well-established mechanism for pre-compliance review through Article 78 of the New York Civil Practice Law and Rules. Article 78 permits a regulated party to challenge agency action before penalties attach and authorizes courts to determine whether the agency action "was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion." N.Y. C.P.L.R. § 7803(3). A claim that the TLC's regulatory demand violates the Fourth Amendment is, by its nature, a claim that the agency has acted unlawfully or in excess of its authority, and thus falls squarely within the scope of Article 78 review. *See Whitfield v. City of New York*, 96 F.4th 504, 532 (2d Cir. 2024) (citing *Meisner v. Hamilton, Fulton, Montgomery Bd. of Coop. Educ. Servs.*, 175 A.D.3d 1653 (3d Dep't 2019).

40

Article 78 review is not limited to as-applied challenges. "When a plaintiff brings an Article 78 proceeding for review of an administrative action and seeks to include a facial constitutional challenge, the state court can convert the proceeding to a hybrid Article 78/declaratory judgment proceeding in which it can adjudicate facial constitutional challenges." *216 E. 29th St. Tr. v. City of New York*, 2025 WL 3264312, at *3 (2d Cir. Nov. 24, 2025). New York courts "regularly do so." *Id.* (citing *Pilarz v. Helfer*, 148 A.D.3d 1714, 1715–16 (4th Dep't 2017); *MHC Greenwood Village NY, LLC v. County of Suffolk*, 58 A.D.3d 735, 738–39 (2d Dep't 2009)).

What is more, "Article 78 has been used for decades to challenge the reasonableness of regulatory searches under the Fourth Amendment." *Hudson Shore Associates Ltd. Partnership v. New York*, 139 F.4th 99, 110 (2d Cir. 2025). In *Hudson Shore*, the Second Circuit confirmed that Article 78 provides "adequate pre-compliance review" for purposes of a facial Fourth Amendment challenge, describing it as an "expedited summary procedure" that affords access to a neutral decisionmaker before penalties are imposed. 139 F.4th at 109.

In sum, pre-compliance review requires only an opportunity to obtain review before a neutral decisionmaker prior to the imposition of penalties. *See Patel*, 576 U.S. at 420–21. Article 78 provides precisely that opportunity: access to the New York Supreme Court, *see* N.Y. C.P.L.R. § 7804(b), and the ability to obtain injunctive or other equitable relief before enforcement consequences attach, *see* N.Y. C.P.L.R. § 7806. Accordingly, even assuming – contrary to the Court's conclusion above – that the "closely regulated" industry exception does not apply, and that *Patel*'s pre-compliance-review requirement governs in full, the availability of judicial review under Article 78 provides another independent basis for why the challenged rules do not violate the Fourth Amendment.

41

The availability of Article 78 review does not, however, mean that Plaintiffs were required to proceed in state court, or that this Court should abstain from adjudicating their federal constitutional claims. Plaintiffs bring a facial challenge under the Fourth Amendment, over which this Court has undoubted jurisdiction. *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 821 (1976) (stating that federal courts have a "virtually unflagging obligation" to exercise jurisdiction over federal constitutional claims); *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 82 (2013) (stating that *Younger* abstention is "the exception, not the rule").

The mere availability of a state-law remedy such as an Article 78 proceeding does not deprive a plaintiff of access to a federal forum, because "exhaustion of state administrative remedies is not a prerequisite to an action under § 1983." *See Patsy v. Board of Regents of the State of Florida*, 457 U.S. 496, 500–01, 506–507 (1982) (surveying the legislative debates of Congress in 1871 and noting that "many legislators interpreted [§ 1983] to provide dual or concurrent forums in the state and federal system, enabling the plaintiff to choose the forum in which to seek relief"); *see also Steffel v. Thompson*, 415 U.S. 452, 472–73 (1974) ("When federal claims are premised on § 1983 . . . we have not required exhaustion of state judicial or administrative remedies"). And "abstention is not required for interpretation of parallel state constitutional provisions." *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 237 n.4 (1984).

Nor is abstention appropriate under *Younger v. Harris*, 401 U.S. 37 (1971), or its progeny. *Younger* applies only in "exceptional" circumstances involving ongoing state proceedings of a particular kind. *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013). No such proceeding is pending here. To decline jurisdiction in these circumstances would place Plaintiffs in precisely the predicament the Supreme Court identified in *Steffel v. Thompson*, 415 U.S. 452 (1974): "between the Scylla of intentionally flouting state law and the Charybdis of forgoing what

42

[they] believe[] to be constitutionally protected activity." *Id.* at 462.  That dilemma is no less real in the context of a municipal regulation, where Plaintiffs must either comply with the challenged law or risk enforcement in order to obtain judicial review.

The relevance of Article 78 lies in the Fourth Amendment analysis itself.  Under *City of Los Angeles v. Patel*, the question is whether regulated parties have access to a neutral decisionmaker before penalties attach.  *See Patel*, 576 U.S. at 420–21.  Article 78 supplies that opportunity by providing an "expedited summary procedure" through which a regulated entity may challenge agency action – including on constitutional grounds – prior to the imposition of enforcement consequences.  *Hudson Shore*, 139 F.4th at 109–10.  It therefore bears on the reasonableness of the regulatory scheme under the Fourth Amendment, not on the Court's authority to decide this case.

> **5.  Plaintiffs' and *Amici*'s Remaining Aggregation Argument Does Not Establish a Fourth Amendment Violation**

Plaintiffs' separate Fourth Amendment theory rests, not on the nature of any individual reported data point, but on the possibility that aggregated trip-level data could reveal broader patterns of movement.  They ground that concern in both expert opinion and academic literature. *See* Dkt. Nos. 12-6, 13, 43.

Professor Neil Richards opines that location data is "sensitive data" and that privacy concerns are not eliminated merely because such data is "anonymized," because such datasets might be reidentified.  Dkt. No. 13, Richards Decl., ¶ 6.  He states that the TLC's rules require pickup and drop-off information in the form of "an exact address," "the corresponding latitude/longitude," or "the intersection or airport."  *Id.*, ¶ 7.  Plaintiffs' concern, more precisely stated, is not that any single reported data point reveals a passenger's identity, but that such information, when combined with data from other sources outside the TLC's control, could allow

a determined third party sleuth to infer the identity of a rider and reconstruct aspects of that individual's movements.

Plaintiffs rely on scholarship concluding that mobility traces are unique; one oft-cited study found that, in a large dataset, four spatio-temporal points were sufficient to uniquely identify 95% of individuals.  *See* Yves-Alexandre de Montjoye et al., *Unique in the Crowd: The Privacy Bounds of Human Mobility*, 3 Sci. Rep. 1376 (2013).  Plaintiffs further point to the 2014 release of New York City taxi-trip data, which commentators later argued could be reverse engineered to reveal driver identities and movements – though not, apparently, passenger identities.  Dkt. No. 13, Richards Decl., ¶ 30.  But those observations, while interesting, do not resolve the Fourth Amendment question presented here.

Plaintiffs' aggregation theory rests principally on *Carpenter v. United States*, 585 U.S. 296 (2018).  That reliance is misplaced.

*First,* the Supreme Court was explicit that its decision in *Carpenter* was "a narrow one." It emphasized that it did "not express a view on matters not before us," including "real-time CSLI or 'tower dumps,'" and did not "call into question conventional surveillance techniques and tools, such as security cameras," or "business records that might incidentally reveal location information." *Id.* at 316–18.

*Second, Carpenter* did not involve ordinary business or transactional records.  It involved historical cell-site location information ("CSLI") generated by a personal cell phone that, in the Supreme Court's words, is almost a "feature of human anatomy," and that "tracks nearly exactly the movements of its owner." *Carpenter*, 585 U.S. at 311–12 (quoting *Riley*, 573 U.S at 385). Because the CSLI was aggregated from "every day, every moment, [and] over several years," the

44

Government had, without benefit of a warrant, obtained "a comprehensive chronicle of the user's past movements" and enabled "near perfect surveillance." *Id.* at 300, 313, 315.

The TLC's reporting rules are materially different. They do not authorize acquisition of location information from a personal device that "faithfully follows its owner" wherever he goes. *See Carpenter*, 585 U.S. at 312. Instead, they require licensed FHV bases to report discrete, transaction-specific trip records generated in the ordinary course of arranging and dispatching rides. Although those records reflect the movements of a vehicle during a particular trip, the Rules do not authorize the City to track any identifiable passenger across time or space, because the TLC does not collect passenger-identifying information.

Plaintiffs' aggregation theory depends on treating these discrete records as if they functioned as part of a broader surveillance system capable of reconstructing individual movement over time. But cases that do involve such systems arise in a fundamentally different context – one involving government-directed investigative surveillance, not prospective regulatory reporting. For example, in *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (4th Cir. 2021) (en banc), the Fourth Circuit held that the city of Baltimore's warrantless aerial surveillance program constituted a search because it enabled law enforcement to reconstruct "the whole of individuals' movements" across the city over time. *Id.* at 345. That program relied on aircraft equipped with state-of-the-art "Hawkeye Wide Area Imaging System[s]," which captured a series of images at a rate of "32 square miles per image pers second" and flew "at least 40 hours a week." *Id.* at 334. The system generated a continuous, citywide dataset that allowed law enforcement to track the movements of individuals and vehicles by stitching together those images in connection with criminal investigations. *Id.* at 342.

45

The TLC's Rules do nothing of the sort. They do not authorize the government to monitor public movement, deploy advanced surveillance technology, or reconstruct the path of identifiable individuals through time and space. They require only the submission of discrete, transaction-specific business records generated in the ordinary course of regulated dispatch activity. *Beautiful Struggle*, like *Carpenter*, therefore does not control here.

Although bases submit detailed trip information to the TLC, the publicly available FHV dataset uses pickup and drop-off *LocationIDs*, not exact addresses or coordinates, and those identifiers correspond to defined geographic zones. Dkt. No. 34-6, Declaration of Genan Zilkha ("Zilkha Decl."), Ex. 6, FHV Open Data Production. The TLC's FOIL officer further attests that, when responding to FOIL requests for data reported under 35 R.C.N.Y. § 59B-19(a), she "never provide[s] the actual address, intersection, or coordinates that the Base sends to TLC." Dkt. No. 36, Williams Decl., ¶ 3. In addition, uploaded trip data is stored in an encrypted database and is accessible only to authorized TLC personnel who require access to perform their duties. Dkt. No. 35, Agarwal Decl., ¶ 4.

While these features do not eliminate every possibility that someone who gains access to TLC trip data could, by combining it with information from other, non-TLC sources, try to ascertain who the passenger was on a particular trip, they materially distinguish this regulatory requirement from the kind of continuous tracking at issue in *Beautiful Struggle* and *Carpenter*.

The Court declines to invalidate a regulatory reporting requirement based on speculative aggregation or the possibility that a "diligent" observer might piece together lawfully collected information with unspecified data that is available from third (non-TLC) parties in order to identify an individual. That is especially so where the challenged Rule does not itself authorize or require the kind of "comprehensive" or "continuous" location tracking that concerned the Supreme Court

in *Carpenter*, which involved seven days of 24-hour monitoring yielding thousands of location data points. *Accord United States v. Tuggle*, 4 F.4th 505, 524 (7th Cir. 2021) (declining to treat surveillance through pole cameras as a search where it captured only a "sliver" of the defendant's life and did not reveal the "whole of his physical movements").

Moreover, to the extent the reported data reflects the location and movement of vehicles on public roads, the Supreme Court has long held that a person traveling in an automobile on public thoroughfares ordinarily has no reasonable expectation of privacy in his movements from one place to another. *See United States v. Knotts*, 460 U.S. 276, 281 (1983); *accord Morton v. Nassau County Police Department*, 2007 WL 4264569, at \*3 (E.D.N.Y. Nov. 27, 2007) (collecting cases). That principle further undermines Plaintiffs' attempt to equate pickup-and-drop-off information recorded in the ordinary course of a commercial ride (and disclosed publicly only at the level of generalized LocationID zones) with the comprehensive, personal device-based tracking at issue in *Carpenter*.

*Amici* Surveillance Technology Oversight Project and The Legal Aid Society advance substantially the same theory, labeling it as a broader "mosaic" theory, arguing that TLC data, when combined with other sources of information available to law enforcement, contributes to a wider system of urban surveillance. *See, e.g.*, Dkt. No. 32, at 14–20 (stating that "Geolocation data that enters through the TLC" invariably "migrates upward and outward through interagency arrangements whose outer boundaries no one has troubled to map"). That contention does not alter the analysis. The Fourth Amendment inquiry focuses on the government's conduct – not on the hypothetical aggregation of data across agencies by a diligent sleuth. Nor does the possibility that lawfully collected regulatory data might later be accessed or combined with other information, whether by government actors or third parties, transform an otherwise permissible reporting

47

requirement into a constitutional violation.  To the extent such concerns bear on the intrusiveness of the TLC's rules, they are mitigated here by the limits on disclosure and access, as previously discussed.

This case is, in any event, a poor candidate for application of the so-called mosaic theory. The Supreme Court has never adopted that theory as a freestanding basis for Fourth Amendment liability.  *See Jones*, 565 U.S. at 404–13.  And lower courts have declined to treat aggregation alone as dispositive.  *See United States v. Tuggle*, 4 F.4th 505, 523–26 (7th Cir. 2021) (rejecting mosaic-based challenge while acknowledging academic literature concerning aggregated surveillance); *United States v. Green*, 149 F.4th 733, 743–45 (D.C. Cir. 2025) (same).  More fundamentally, the data here is generated only when a user affirmatively engages a regulated transportation service.  It goes without saying that, on any given day, far fewer Americans use TLC's for-hire transportation services than hold onto their own automatic location-monitoring cell phones.  *See Carpenter*, 585 U.S. at 312 (noting that cell-sites "continually log" the location of nearly "400 million devices in the United States").  Unlike cell-site location information, which "tracks nearly exactly the movements of its owner" on a "near perfect surveillance" basis, *id.* at 312–13, the data at issue here reflects intermittent, user-initiated trips and thus lacks the "depth, breadth, and comprehensive reach."  *Id.* at 314.  By any comparison, the TLC data consists of episodic records of individual rides, far from a "comprehensive chronicle of the user's past movements" or the "whole of [a person's] physical movements."  *See id.* at 313, 315.

### 6. Conclusion

The TLC's Location Reporting Rules require standardized, prospective reporting of business records by licensed entities in a closely regulated industry.  They do not authorize continuous tracking, discretionary inspection, or access to personal-device data of the kind at issue

in *Carpenter*. Evaluated in their regulatory context, they are reasonable. The challenged Location Reporting Rules do not violate the Fourth Amendment.

### C. The Stored Communications Act Does Not Preempt the TLC's Reporting Rules

Plaintiffs contend that the TLC's reporting rules are preempted by the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701 *et seq*. That argument fails. The SCA does not regulate the conduct at issue, and Plaintiffs cannot satisfy the demanding standard for conflict preemption.

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. But "the purpose of Congress is the ultimate touchstone," and courts start "with the assumption that the historic police powers of the States are not to be superseded by . . . Federal Act unless that is the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (internal quotation marks omitted). Accordingly, preemption is a "demanding defense," and the party asserting it bears the burden of establishing a clear conflict with federal law. *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 101 (2d Cir. 2013).

Because the SCA contains no express preemption clause, and does not occupy the entire field of data privacy, Plaintiffs' argument sounds in conflict preemption, which takes the form of either (1) impossibility preemption – where compliance with both federal and state regulations is a "physical impossibility" – or (2) obstacle preemption – where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 31 (1996) (citation modified). The former asks whether dual compliance is possible; the latter asks whether the state law undermines federal objectives. Plaintiffs establish neither.

49

The SCA is a targeted statute, not a general data-privacy code.  Congress enacted it "to protect against the unauthorized interception of electronic communications" and to address gaps in existing law governing "electronic mail" and "computer-to-computer communications," while "protecting the Government's legitimate law enforcement needs."  S. Rep. No. 99-541, at 1, 3, 5 (1986).  Consistent with that purpose, the statute regulates two discrete categories of conduct: (1) unauthorized access to stored communications, 18 U.S.C. § 2701; and (2) disclosure by providers of certain protected information, *id.*, §§ 2702–2703.  These protections are limited to defined categories of information.  Section 2702(a)(1) prohibits a provider of an electronic communication service ("ECS") from "knowingly divulg[ing] to any person or entity the *contents* of a communication." (emphasis added).  The term "contents" is defined as "information concerning the substance, purport, or meaning of that communication." *Id.*, § 2510(8).

The SCA cannot preempt the TLC's reporting rules where the rules do not themselves regulate the "contents" of communications.  *See New York State Telecomms. Ass'n, Inc. v. James*, 101 F.4th 135, 147–48 (2d Cir. 2024).  The TLC rules require bases to report trip-level business records, including "the date, the time, and the location of the passenger pickup and drop-off."  35 R.C.N.Y. § 59B-19(a)(1)(i).  These data points reflect the occurrence of a commercial transaction, not the substance or meaning of any communication.  The legislative history confirms that Congress deliberately distinguished "contents" from mere transaction information, explaining that the statute "excludes from the definition of the term 'contents,' the identity of the parties or the existence of the communication."  S. Rep. No. 99-541, at 13.  The SCA therefore does not regulate the information the TLC Rules require to be disclosed.

Nor does the SCA's regulation of non-content records alter that conclusion.  Section 2702(a)(3) of the SCA prohibits disclosure of:

50

a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) covered by paragraph (1) or (2) to any governmental entity.

*Id.*, § 2702(a)(3). But that prohibition is qualified. A provider "may divulge" such information "*with the lawful consent of the customer or subscriber.*" *Id.*, § 2702(c)(2) (emphasis added). That consent is present here.

Wheely's own corporate privacy policy states that it collects and processes, among other things: "Transaction Data — details about payments . . . such as location data, pickup and drop-off address, dates, times, distances travelled . . . calls or texts and other related transaction details." Dkt. No. 12-2, Wheely's Privacy Policy, at 2. It further provides that user data is processed "to comply with our record retention legal obligations, regulatory and audit obligations," including obligations "to disclose personal data to a third party such as a court or regulatory authority." *Id.* at 4. By expressly notifying users that their data may be disclosed to governmental authorities where required by law, Plaintiffs obtain "lawful consent" within the meaning of § 2702(c)(2). Because TLC's reporting requirements are consistent with the SCA's statutory framework rather than in conflict with it, there is no basis for preemption.

Plaintiffs' reliance on § 2703 fares no better. That provision governs the circumstances under which the government may compel a provider to disclose covered communications or records, typically through warrants, court orders, or subpoenas in the context of criminal or investigative proceedings. *See* 18 U.S.C. § 2703(a)–(c). It does not address, much less prohibit, prospective regulatory reporting obligations imposed as a condition of operating in a regulated industry. The distinction between investigative compulsion and regulatory reporting is fundamental: the SCA regulates the former, while the TLC Rules operates in the latter domain.

The decisions from the District of Columbia that Plaintiffs invoke confirm, rather than undermine, that distinction. In *In re United States for an Order Pursuant to 18 U.S.C. § 2705(b)*,

51

289 F. Supp. 3d 201 (D.D.C. 2018), and *In re United States for an Order Pursuant to 28 U.S.C. § 1651(a)*, 2017 WL 3278929 (D.D.C. July 7, 2017), courts addressed nondisclosure orders issued in connection with grand jury subpoenas and other investigative demands.  Those cases interpret § 2705(b), which authorizes courts to delay notice of "a warrant, subpoena, or court order."  18 U.S.C. § 2705(b).  They do not purport to restrict routine regulatory reporting, and nothing in their reasoning extends beyond the investigative context.

In sum, Plaintiffs identify no provision of the SCA with which the TLC Rules conflict. The Rules do not require disclosure of "contents" within the meaning of § 2702(a); they require disclosure of non-content transactional records that the statute either does not regulate or expressly permits to be disclosed with user consent under § 2702(c)(2).  Nor do the Rules compel disclosures in circumvention of § 2703, which governs only compelled production in investigative settings. Because the SCA does not prohibit the disclosures required by the TLC Rules, compliance with both federal and local law is entirely possible and straightforward.  Plaintiffs fail to establish either impossibility preemption or obstacle preemption.  *See Barnett Bank*, 517 U.S. at 31.

## D.  The Location Reporting Rules Do Not Violate the First Amendment

Finally, Plaintiffs contend that the Location Reporting Rules impermissibly compel speech in violation of the First Amendment because they (1) require the disclosure of trip-level data to the TLC and (2) force Plaintiffs to communicate certain data practices to their users.  Neither theory establishes a First Amendment violation.

### 1.    The Reporting Requirement Regulates Conduct, Not Speech

The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech."  U.S. Const. amend. I.  It is implicated only

where the government regulates expression. The threshold question, therefore, is what, if anything, the challenged Rules require Plaintiffs to say.

Plaintiffs' First Amendment theory rests on the contention that, notwithstanding the text of § 59B-19, the regulatory scheme forces Wheely to communicate with its users to obtain their "affirmative express consent" to the disclosure of trip data to the TLC, and that the act of soliciting such consent constitutes compelled speech. In their view, the Rules require Wheely to tell customers that their trip data will be disclosed to the TLC and to condition use of the service on the customer's agreement to that disclosure. This theory is based on a fundamental misreading of the Rules.

The challenged regulation –35 R.C.N.Y. § 59B-19 – requires that a base "must make sure" that specified trip records, including "the date, the time, and the location of the Passenger pickup and drop-off," are "collected and transmitted to the Commission on a monthly basis." 35 R.C.N.Y. § 59B-19(a)(1)(i). That obligation is mandatory and contains no reference to passenger consent or to any communication with users.

Plaintiffs' theory of compelled speech thus depends on provisions outside the challenged rule itself. Plaintiffs rely on 35 R.C.N.Y. § 59B-21(g), which requires a base to "file with the Commission a current detailed information security and use of personal information policy." 35 R.C.N.Y. § 59B-21(g). It mandates that such policy include, at a minimum, "a statement that, except to the extent necessary to provide credit, debit, and prepaid card services and services for any application that provides for electronic payment, personal information will only be collected and used with such passenger's affirmative express consent and that such personal information will not be used, shared, or disclosed, except for lawful purposes," § 59B-21(g)(2), and "a statement of the Base's policies regarding the use of passenger geolocation information, which

53

must include, at a minimum, a prohibition on the use, monitoring, or disclosure of trip information, including the date, time, pick-up location, drop-off location, and real-time vehicle location and any retained vehicle location records, without such passenger's affirmative express consent," § 59B-21(g)(5).

But § 59B-21(g) does not alter the reporting obligation imposed by § 59B-19. Section 59B-19 requires disclosure of trip data to the TLC as a matter of law. Section 59B-21(g), by contrast, governs how a base structures its policies regarding the use and disclosure of passenger information in the ordinary course of its business, and (of great significance) with respect to *non-TLC* third parties. By its terms, § 59B-21(g) permits disclosures made "for lawful purposes," and disclosures required by § 59B-19 falls within that category. Accordingly, nothing in § 59B-21(g) requires Plaintiffs to obtain passenger consent before disclosing trip data to the TLC pursuant to § 59B-19. Nor does § 59B-19 require Plaintiffs to communicate that such consent is necessary. Were a passenger to refuse consent, it would not alter a base's obligation to report.

To the extent Plaintiffs choose to structure their services to obtain user consent for such disclosure – such as through a "check-the-box" prompt – that choice is not dictated by § 59B-19. It is a purely a product of Plaintiffs' own choices.

What § 59B-21(g) *does* require is that Plaintiffs adopt and maintain a written policy describing their data maintenance and disclosure practices. That conduct requirement implicates speech, but only in a limited sense. It requires Plaintiffs to provide factual disclosures about how they collect, use, and share passenger information. It does not compel Plaintiffs to adopt any ideological position or to endorse any government message.

Assuming that compliance with § 59B-21(g) results in communications with users, that would not alter the analysis. The Supreme Court has made clear that laws regulating conduct do

54

not become speech regulations merely because compliance "requires some speech." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006).  In *Rumsfeld*, Congress conditioned federal funding on law schools' providing military recruiters access to campuses and students "in a manner that is at least equal in quality and scope to the access . . . provided to any other employer."  547 U.S. at 52–54, 59.  The law schools argued that the statute compelled speech because compliance required them to assist recruiters – for example, by sending e-mails and posting notices.  The Supreme Court rejected that claim, explaining that, "As a general matter, the Solomon Amendment regulates conduct, not speech.  It affects what law schools must do – afford equal access to military recruiters – not what they may or may not say."  *Id.* at 60.  Although compliance could involve speech, such as scheduling e-mails, that speech was "plainly incidental" to the regulation of *conduct*.  *Id.* at 61–62.  Nor did the statute violate the First Amendment by requiring schools to host military recruiters, because that requirement did not "sufficiently interfere with any message of the school," and schools remained free to express their opposition to the military's policies.  *Id.* at 64–65.

The same is true here.  To the extent Plaintiffs communicate with users regarding data practices – whether through privacy policies or other manners of obtaining consent – those communications arise from a broader regulatory scheme governing economic activity.  They do not reflect a compelled endorsement of any governmental message, and Plaintiffs remain free to express their disagreement with the Rules.  Any speech associated with compliance is therefore "plainly incidental" to the regulation of conduct.  *Id.* at 62.

Section 59B-21(g) regulates what Plaintiffs must do, not what they may say.  Section 59B-21(g) do not prevent Plaintiffs from expressing disagreement with the City's Reporting Rules.  Plaintiffs remain free to publicly advocate their position that the Rules raise privacy concerns, to

criticize the scope of data collection or disclosure, and to urge legislative or regulatory change. Wheely's own privacy policy proves as much.

Plaintiffs' privacy policy states, "Wheely is committed to opposing government and third-party requests for rider data to the extent reasonably permitted under applicable laws."  Dkt. No. 12-2, at 6.  It further explains that "pursuant to a New York City regulation, 35 R.C.N.Y. § 59B-19, Wheely currently is legally required to turn over to the New York City Taxi and Limousine Commission ('TLC') the date, time and locations of your trips," even though "Wheely disagrees with these requirements."  *Id.*  Nothing in the Rules has prohibited Plaintiffs from issuing public statements, updating their privacy policies to reflect their views, or engaging with users, regulators, or the press regarding the perceived risks of the TLC's rules.  What the First Amendment does not permit, however, is for Plaintiffs to invoke a speech right as a basis to avoid compliance with an otherwise valid economic regulation that governs non-expressive conduct.  *See Rumsfeld*, 547 U.S. at 62.

This conclusion is reinforced by the Ninth Circuit's recent decision in *Uber Techs., Inc. v. City of Seattle*, 168 F.4th 1202 (9th Cir. 2026).  There, Seattle enacted an ordinance regulating gig economy "network companies" that operate app-based platforms connecting temporary workers and customers.  *Id.* at 1208–09.  The law prohibited "unwarranted deactivations" of worker accounts and, as relevant here, required companies to (1) "inform" workers "in writing" of their deactivation policies and (2) ensure that those policies were "reasonably related" to "safe and efficient operations."  *Id.* at 1209–10 (quoting Seattle Ordinance 126878, § 8.40.050.A.1–2).  The ordinance applied only to internal communications with workers and did not require companies to communicate any message to the public.  *Id.* at 1210.

Uber argued – much like Plaintiffs here – that these requirements compelled speech by forcing companies to articulate and communicate particular policies.  The Ninth Circuit rejected that claim.  It held that "the Ordinance regulates conduct, not speech," because it targets "nonexpressive conduct."  *Id.* at 1211.  The court emphasized that the relevant inquiry is whether the regulated conduct has a "significant expressive element," and concluded that a "business agreement between two parties" and the operation of a platform-based service do not.  *Id.* at 1211– 12 (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986)).

Critically, the court rejected the argument that a requirement to communicate policies transforms such a law into speech regulation.  Even though the ordinance "necessarily 'compel[s] and dictate[s] the content of a written communication,'" that fact "does not transform a law regulating nonexpressive activity into one that infringes speech."  *Id.* at 1213–14 (citation omitted).  Rather, "Compelled changes in conduct—which might incidentally compel changes in speech— are not reviewed as content-based speech restrictions."  *Id.*

That reasoning applies with full force here.  Like the ordinance in *Uber*, the Rules regulate the operation of a platform-based service – specifically, how bases collect, maintain, and disclose data and how they structure their relationships with their users vis-à-vis third parties.  The requirement that bases state in their privacy policy that they must obtain user consent is no more a compelled speech mandate than the requirement in *Uber* that companies provide written deactivation policies.  In both cases, the communication flows from a broader regulatory scheme governing *economic conduct*.  The First Amendment does not prohibit such regulations.

### 2.       Even if the Rules Implicate Speech, They Regulate Only Commercial, Factual Disclosures and Are Lawful

In *Uber*, the court further held that, even if the ordinance were understood to regulate speech, it would regulate only commercial speech.  *Id.* at 1215.  The communications at

issue – statements to workers about the terms and conditions of their engagement – were "directly related to employment" and thus commercial in nature. *Id.* (citing *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 760 (1976)). The court distinguished cases involving compelled speech on "highly controversial issues of public concern," emphasizing that the ordinance instead required only internal, transactional communications tied to a regulated economic relationship. *Id.* at 1215–16.

So too here. Any speech required by § 59B-21(g) – namely, the adoption and maintenance of a policy describing Plaintiffs' data collection, maintenance, and disclosure practices – concerns the terms under which Plaintiffs provide their services. It is commercial in nature and does not involve expression on matters of public concern.

The Supreme Court has held that requirements to disclose "purely factual and uncontroversial information" in connection with commercial activity are permissible as long as they are reasonably related to legitimate governmental interests. *See Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985). That standard is satisfied here.

To the extent the Rules require Plaintiffs to describe their data practices, the disclosure concerns "purely factual," non-ideological information about the terms on which Plaintiffs provide a commercial service. It does not "force [Plaintiffs] to take sides in a heated political controversy," *Uber*, 168 F.4th at 1216 (quoting *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 848 (9th Cir. 2019)); nor does it require Plaintiffs to express any opinion about privacy, regulation, or the wisdom of the City's policy choices. And the City's interests in passenger safety, driver accountability, and effective enforcement of transportation laws are substantial. *Accord Carniol v. New York City Taxi & Limousine Comm'n*, 975 N.Y.S.2d 842, 849–50 (Sup. Ct. 2013), *aff'd*, 126 A.D.3d 409, 2 N.Y.S.3d 337 (2015) (finding that the TLC's "interest in insuring the safety of

58

both driver and passenger and in generating information to improve service to passengers is both legitimate and substantial"). Requiring bases to maintain policies governing the collection, use, and disclosure of passenger information is reasonably related to those interests.

In sum, the Location Reporting Rules regulate conduct and, to the limited extent they require speech, they mandate only factual, commercial disclosures about Plaintiffs' own data practices. Any communicative effects are incidental to a broader regulatory scheme governing non-expressive economic activity. Plaintiffs' First Amendment "compelled speech" claim fails as a matter of law.

Because "free speech claims under Article 1, Section 8 of the New York State Constitution are subject to the same analysis as free speech claims under the First Amendment," Plaintiffs' parallel claim under New York law fails as well. *See Buchanan v. City of New York*, 556 F. Supp. 3d 346, 365 (S.D.N.Y. 2021).

## Conclusion

Wheely is perfectly free to treat New York City as it has treated Moscow, not to operate here, and to leave the field to the many FHV services that are content to comply with the TLC's perfectly reasonable rules. Or it can open for business and report as required by law. What it cannot do is persuade this Court that any of its arguments for why the TLC Rules are unconstitutional, or otherwise unlawful, has the slightest merit.

Plaintiffs have failed to establish that the Taxi and Limousine Commission's Location Reporting Rules, 35 R.C.N.Y. § 59B-19, violate the Fourth Amendment, the First Amendment, Article I, §§ 8 and 12 of the New York Constitution, or are preempted by the Stored Communications Act, 18 U.S.C. §§ 2701–2712.

For this reason, the Court concludes that Plaintiffs are not entitled to injunctive relief. *Perez v. Hoblock*, 248 F. Supp. 2d 189, 201 (S.D.N.Y. 2002), *aff'd*, 368 F.3d 166 (2d Cir. 2004).

Accordingly, Plaintiffs' motion for preliminary and permanent declaratory and injunctive relief is DENIED.

Because the Court has consolidated Plaintiffs' request for preliminary relief with a determination on the merits pursuant to Rule 65(a)(2), this ruling disposes of all causes of action asserted in Plaintiffs' complaint. The complaint is DISMISSED WITH PREJUDICE, and judgment shall be entered in favor of Defendant the City of New York on all claims.

There being no reason for it, the hearing scheduled for April 20, 2026 is cancelled.

The Clerk of Court is respectfully directed to terminate the motion at Docket Number 9, to enter judgment in favor of Defendant dismissing the case, and to close the file.

This constitutes the Decision and Order of the Court. It is a written decision.

Dated: April 10, 2026

_____

U.S.D.J.